**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| GRAMERCY DISTRESSED OPPORTUNITY FUND, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 4:24-cv-02981 |
| | ) | |
| PDV HOLDING, INC., | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| PETRÓLEOS DE VENEZUELA, S.A. | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |
| | ) | |

**AMENDED COMPLAINT**

Plaintiff Gramercy Distressed Opportunity Fund, LLC ("**Plaintiff**" or "**Gramercy**"), by and through its undersigned counsel, for its Amended Complaint against Defendant PDV Holding, Inc. ("**PDVH**") and Intervenor-Defendant Petróleos de Venezuela, S.A. ("**PDVSA**"), alleges as follows:

**NATURE OF THE ACTION**

1.       This is an action to pierce the corporate veil and hold PDVH liable to Plaintiff for two judgments issued by the United States District Court for the District of Columbia ("**D.D.C.**") recognizing and enforcing final arbitration awards issued under the auspices of the International Centre for Settlement of Investment Disputes ("**ICSID**") against the Bolivarian Republic of Venezuela ("**Venezuela**" or "**the Republic**").  Plaintiff's two judgments have been registered in this District pursuant to 28 U.S.C. § 1963 (*Tenaris S.A. et al. v. Bolivarian Republic of Venezuela*,

Case No. 4:24-mc-1678 (S.D. Tex.); *Talta-Trading E Marketing Sociedade Unipessoal LDA et al. v. Bolivarian Republic of Venezuela*, Case No. 4:24-mc-1679 (S.D. Tex.)) and have the same effect as a judgment of a district court of this District and may be enforced in like manner.

2.      PDVH is the alter ego and wholly-owned subsidiary of PDVSA, a Venezuelan entity wholly owned by Venezuela and an instrumentality of Venezuela.  PDVH in turn holds 100% of the shares in Citgo Holding, Inc. ("**Citgo Holding**"), which in turn owns 100% of Citgo Petroleum Corporation ("**Citgo**"), each of which has its principal place of business in Houston, Texas.

3.      At all relevant times, PDVH has been an alter ego of PDVSA and Venezuela. Among other factors, Venezuela and PDVSA exercised significant and extensive economic control over PDVH, using PDVH's property as their own and commingling PDVSA's and PDVH's funds for the benefit of Venezuela while disregarding ordinary-course commercial obligations, including amounts owed to creditors.  This was accomplished by siphoning PDVH's funds to PDVSA. PDVSA caused PDVH to transfer billions of dollars of Citgo dividends to PDVSA, which PDVSA promptly transferred to its alter ego Venezuela, leaving PDVSA and PDVH undercapitalized, unable to pay debts as they came due, and unable to make dividend payments in the ordinary course of business.

4.      For example, at the direction of PDVSA, the profits of PDVH have been used for the benefit of the sovereign functions of the Venezuelan government and not for commercial purposes; and in the fall of 2016, PDVH pledged 100% of its equity in Citgo Holding in two transactions, for the benefit of PDVSA and without receiving consideration.  PDVSA ignored PDVH's ordinary corporate formalities; exercised close political control over PDVH, managing PDVH and having a hand in its daily affairs; and issued policies or directives that caused PDVH

to act directly on PDVSA's behalf, so that PDVSA and Venezuela were the real beneficiaries of PDVH's conduct.  Moreover, PDVH's officers and directors were not acting in the best interest of all residual beneficiaries, including creditors, in part because PDVH's directors overlapped with PDVSA's board of directors and took direction from Venezuela and PDVSA.

5.      PDVSA has declared to the United States District Court for the Southern District of New York that "PDVSA's only U.S. asset is PDV Holding."

6.      At all relevant times, PDVSA has been an alter ego of Venezuela.  The Third Circuit repeatedly held, and the Supreme Court repeatedly declined to review the holding, that PDVSA is an alter ego of Venezuela regardless of the time period in which the inquiry is made. Furthermore, as explained below, Venezuela and PDVSA expressly stipulated that the Third Circuit's alter ego holding extended to enforcing the Gramercy judgments *that are at issue in this case*.  These conclusions from the Third Circuit—particularly in light of the stipulation—have a preclusive effect on the alter ego issues and claims in this matter under the doctrines of collateral estoppel and/or res judicata because the precise question of PDVSA's status as an alter ego of Venezuela has been actually litigated and decided before in cases where the determination was critical to the final decision, and those determinations resulted in final judgments, including one between the same parties in this case.

7.      In any event, the facts independently establish that PDVSA is an alter ego of Venezuela.  Among other factors, and as explained below, Venezuela is involved in the day-to-day operations of PDVSA, and PDVSA advertises itself as an entity whose purpose is to directly benefit the Republic.  Venezuela has exercised extensive control over PDVSA for decades and has expressed publicly that it considers PDVSA to be an instrument of the Republic.  Venezuela has used the corporate façade of PDVSA to siphon billions of dollars to Venezuela.  These funds have

been used for the benefit of the sovereign functions of the Venezuelan government while leaving PDVSA and its subsidiaries undercapitalized.  Under both the Maduro government and the U.S.-recognized National Assembly, PDVSA has been treated as an extension of the Venezuelan government, as evidenced by the government's involvement in the daily affairs and management of PDVSA, appointment of members to PDVSA's board of directors, and use of PDVSA property (including airplanes) for government activities.

8.      Plaintiff seeks a declaration that PDVH is the alter ego of PDVSA and Venezuela. Because PDVSA is the alter ego of Venezuela, as the Third Circuit has already held, Plaintiff seeks a declaration that PDVH is liable for the judgments entered against Venezuela.  Alternatively, if the Court does not find that the Third Circuit's holding has preclusive effect, Plaintiff seeks an additional declaration that PDVSA is the alter ego of Venezuela, and that PDVSA is liable for the judgments entered against Venezuela.  Declaring PDVH to be an alter ego of the judgment-debtor and/or PDVSA would prevent an inequitable result that would otherwise occur if Venezuela and PDVSA were permitted to hide behind the corporate forms they have abused.

## THE PARTIES

9.      Plaintiff is a limited liability company incorporated under the laws of Delaware. Plaintiff's principal place of business is in Connecticut.  Plaintiff is a wholly-owned subsidiary of Gramercy Special Situations Opportunity I LP.  Some of the limited partners in Gramercy Special Situations Opportunity I LP are citizens of Texas.

10.      Defendant PDVH is a Delaware corporation with its principal place of business located at 1293 Eldridge Parkway, Houston, TX 77077.  PDVH is a wholly-owned subsidiary of PDVSA and is indirectly wholly owned by Venezuela.

11.      Intervenor-Defendant PDVSA is a corporation organized under the laws of Venezuela and is owned directly by Venezuela, which is a foreign state.  PDVSA is an alter ego

of Venezuela.  *See OI Eur. Grp. B.V. v. Bolivarian Republic of Venez.*, 73 F.4th 157, 172 (3d Cir.

2023) ("[I]t is clear PDVSA is Venezuela's alter ego."); *Crystallex Int'l Corp. v. Bolivarian*

*Republic of Venez.*, 932 F.3d 126, 152 (3d Cir. 2019) ("[I]f the relationship between Venezuela

and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing

that can.").

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1330(a),

28 U.S.C. § 1331, and 28 U.S.C. § 1367(a).

13.    PDVSA is a foreign corporation owned directly by the Republic, and therefore

PDVSA is an "agency or instrumentality" of a foreign state.  28 U.S.C. § 1603(b).

14.    Plaintiff's claims against PDVSA arise from ICSID arbitration awards that were

confirmed by the United States District Court for the District of Columbia under 22 U.S.C. § 1650a

and Article 54 of the ICSID Convention.  Pursuant to 28 U.S.C. §§ 1605(a)(1) and (6), Venezuela

unconditionally waived its sovereign immunity when it submitted to the ICSID arbitration, and the

arbitral award immunity exception applies.  The waivers, consents, agreements, and designations

of a sovereign entity may be imputed to its alter egos, including waivers of sovereign immunity.

Venezuela's waiver is imputed to its alter ego PDVSA pursuant to 28 U.S.C. §§ 1605(a)(1) and

(6).

15.    Furthermore, PDVSA has waived any sovereign immunity pursuant to 28 U.S.C.

§ 1605(a)(1) by intervening in this action, and pursuant to 28 U.S.C. § 1605(a)(2) because this

action is based upon commercial activities that have a jurisdictional nexus with the United States,

including commercial activities carried on in the United States by PDVSA, acts performed in the

United States in connection with commercial activities carried on by PDVSA and Venezuela

outside of the United States, and/or acts performed outside the territory of the United States in

connection with commercial activities of Venezuela and PDVSA that cause a direct effect in the United States.

16.     Accordingly, this Court has subject matter jurisdiction over PDVSA pursuant to 28 U.S.C. § 1330(a).

17.     Plaintiff's claim against PDVH is so related to its claims against PDVSA, which is within the Court's original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution.  The preclusive effect of the Third Circuit's decision about whether PDVSA is an alter ego of Venezuela such that judgments against Venezuela can be enforced against PDVH as PDVSA's alter ego is a federal question.  Accordingly, the Court has jurisdiction over PDVH pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

18.     Personal jurisdiction over PDVH is proper because PDVH's principal place of business is in Texas, where its headquarters are located.  The Court has personal jurisdiction over PDVSA because PDVSA has intervened and made general appearances in this case.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred in this judicial district, and pursuant to 28 U.S.C. § 1391(d), because PDVH's principal place of business is within this judicial district.

## FACTUAL ALLEGATIONS

### I.     Gramercy's Judgments Against Venezuela

#### A.     *Gramercy Holds Unsatisfied Judgments Against Venezuela Based on Two Final ICSID Arbitration Awards*

20.     Tenaris S.A. ("**Tenaris**"), the leader in pipe manufacturing and related services for the world's energy industry, and its subsidiary Talta-Trading e Marketing Sociedade Unipessoal Lda. ("**Talta**") held interests in three Venezuelan companies operating across Venezuela's steel industry:  Matesi Materiales Siderurgicos S.A. ("**Matesi**"), Tubos de Acero de

Venezuela S.A. ("**Tavsa**"), and Complejo Siderurgica de Guayana C.A. ("**Comsigua**").  In 2008, 2009 and 2011, the government of Venezuela expropriated without compensation Tenaris and Talta's interests in those companies.

21.     Tenaris and Talta initiated ICSID arbitration proceedings against Venezuela under two international treaties to which Venezuela was a party:  the Agreement between the Belgo-Luxembourg Economic Union and the Government of the Republic of Venezuela on The Reciprocal Promotion and Protection of Investments, and the Agreement between Portugal and Venezuela for the Promotion and the Protection of the Investments (collectively, the "**Treaties**"). In the arbitrations, Tenaris and Talta claimed that the expropriation of their investments violated the Treaties and required Venezuela to compensate Tenaris and Talta.

22.     Tenaris and Talta initiated the first arbitration concerning government measures related to Matesi on September 30, 2011, and the second arbitration concerning government measures related to Tavsa and Comsigua on July 20, 2012.  Tenaris and Talta prevailed before both tribunals.  On January 29, 2016, one tribunal ordered Venezuela to pay Tenaris and Talta $87,300,000 for the expropriation of Matesi, plus attorneys' fees and costs.  On December 12, 2016, the second tribunal ordered Venezuela to pay $112,345,530 to Tenaris for the expropriation of Tavsa and $24,672,357 to Talta for the expropriation of Comsigua.  These three awards from the two tribunals are collectively the "**Awards**."  Both tribunals awarded Tenaris and Talta pre- and post-award interest.

23.     Venezuela subsequently applied to annul the Awards under the ICSID rules, but the applications were rejected, and the Awards therefore became final in 2018.

24.     Tenaris and Talta sought recognition and enforcement of the Awards as judgments in parallel proceedings in the D.D.C., pursuant to 22 U.S.C. § 1650(a) and Article 54 of the ICSID

Convention (which requires ICSID Member States, including the United States, to recognize and enforce ICSID awards as final judgments of the Member States' courts).

25.     Venezuela appeared in the D.D.C. proceedings.  Venezuela agreed with Tenaris and Talta that the D.D.C. had jurisdiction pursuant to 28 U.S.C. § 1330(a) and the Foreign Sovereign Immunity Act's arbitration exception, 28 U.S.C. § 1605(a)(6), and did not oppose Tenaris and Talta's claims for recognition of the Awards.  Venezuela opposed only the interest calculations and requested that enforcement of the judgment be stayed.

26.     The United States District Court for the District of Columbia issued two judgments in favor of Tenaris and Talta and against Venezuela (the "**Judgments**").  The first judgment, issued on July 17, 2020, required Venezuela to pay $256,375,009.12, plus post-judgment interest pursuant to 28 U.S.C. § 1961.  *Tenaris S.A. et al. v. Bolivarian Republic of Venezuela*, No. 18-cv-1371-CRC, Dkt. No. 29 (D.D.C. July 17, 2020).  The second judgment, issued on August 24, 2021 and subsequently altered on November 5, 2021, required Venezuela to pay $280,667,040.00, plus post-judgment interest pursuant to 28 U.S.C. § 1961.  *Tenaris S.A. et al. v. Bolivarian Republic of Venezuela*, No. 18-cv-01373-CJN, Dkt. No. 32 (D.D.C. Aug. 24, 2021); Dkt. No. 34 (D.D.C. Nov. 5, 2021).

### B.     *Gramercy Acquired Tenaris's and Talta's Rights, Title, and Interests in the Awards and the Judgments*

27.     On January 25, 2023, Gramercy, Tenaris, and Talta entered into a certain Awards Purchase Agreement ("**the APA**"), whereby Gramercy agreed to acquire all of Tenaris's and Talta's rights, title, and interests in the Awards and the Judgments.  The United States Department of the Treasury Office of Foreign Asset Controls authorized the transaction and, on August 1, 2023, issued a specific license allowing Gramercy's acquisition of the Awards and Judgments.

28.     Upon the fulfillment of certain conditions (which, for the avoidance of doubt, included the issuance of the OFAC license and subsequent payment of an aggregate purchase price in excess of $500,000, paid in cash on the closing date), the APA transaction closed on September 7, 2023, and Gramercy became the sole holder of title and right to the Awards and the Judgments, succeeding Tenaris and Talta in all their rights therein.

### C.     *Gramercy Obtained a Writ of Attachment in the District of Delaware*

29.     Crystallex International Corporation ("**Crystallex**") confirmed an arbitral award against Venezuela in the D.D.C. and obtained a $1.2 billion judgment, then subsequently registered its judgment pursuant to 28 U.S.C. § 1963 in the United States District Court for the District of Delaware ("**Delaware District Court**") in *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, l:l7-mc-00151-LPS ("*Crystallex*").  Crystallex then moved to attach the PDVH shares held by PDVSA (the "**PDVH Shares**") on the ground that PDVSA was Venezuela's alter ego.  The Delaware District Court found that PDVSA was Venezuela's alter ego and granted Crystallex's motion for a writ of attachment in *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 426 (D. Del. 2018).  The U.S. Court of Appeals for the Third Circuit affirmed the order in *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019).  The Supreme Court declined to grant *certiorari*.  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 140 S. Ct. 2762 (2020).

30.     Other creditors with claims against both PDVSA and Venezuela subsequently filed motions for writs of attachment against the PDVH Shares in Delaware.  In light of the change in U.S. recognition of Venezuela's political leadership in 2019, the question of whether PDVSA was Venezuela's alter ego returned to the Third Circuit.  Once again, the Delaware District Court found that PDVSA was Venezuela's alter ego; once again, the Third Circuit affirmed; and once again, the Supreme Court declined to grant *certiorari*.  *OI Eur. Grp. B.V. v. Bolivarian Republic*

*of Venez.*, 663 F. Supp. 3d 406 (D. Del. 2023) ("**_OIEG I_**"), *aff'd*, 73 F.4th 157 (3d Cir. 2023) ("**_OIEG II_**"), *cert. denied*, 144 S. Ct. 549 (2024).

31.     The Delaware District Court set forth a process for selling the PDVH Shares to satisfy the writs of attachment (the "**Sale Process**"[1]).  The court required any creditor of PDVSA or Venezuela seeking to attach their judgments to the PDVH Shares to file an Attached Judgment Statement in *Crystallex* by August 14, 2023.  On August 14, 2023, Tenaris and Talta filed their Attached Judgment Statements.

32.     On August 17, 2023, Tenaris and Talta submitted certified copies of the Judgments to the Clerk of the Delaware District Court in *Gramercy Distressed Opportunity Fund LLC v. Bolivarian Republic of Venezuela*, Case No. 1:23-mc-378-LPS (D. Del.) (formerly *Tenaris S.A. et al. v. Bolivarian Republic of Venezuela*) and *Gramercy Distressed Opportunity Fund LLC v. Bolivarian Republic of Venezuela*, Case No. 1:23-mc-379-LPS (D. Del.) (formerly *Tenaris S.A. at al. v. Bolivarian Republic of Venezuela*) (the "**Delaware Actions**"), requesting registration of the Judgments pursuant to 28 U.S.C. § 1963.  The same day, Tenaris and Talta filed motions in the Delaware Actions for writs of attachment *fieri facias* against the PDVH Shares.

33.     On September 21, 2023, after the closing of the APA transaction, the Delaware District Court entered an order substituting Gramercy for the original plaintiffs, Tenaris and Talta, in the Delaware Actions.

34.     On October 11, 2023 in Case No. 1:23-mc-378-LPS (D.I. 18) and October 13, 2023 in Case No. 1:23-mc-379-LPS (D.I. 17), Venezuela, PDVSA, and Gramercy filed identical stipulations.  The stipulations recited that the Third Circuit's decision in *OIEG II* "affirmed . . . that PDVSA and its assets are not immune in the actions decided by *OIEG I* under the Foreign

---

[1] Capitalized terms not otherwise defined that relate to the Sale Process are defined in the *Crystallex* Sale Procedure Order (*Crystallex* Dkt. 481).

Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. (the "FSIA") and the doctrine of *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*") and (2) declined to reach whether the attachment of PDVSA's assets is permitted."

35.     The parties then stipulated that, although Venezuela opposed Gramercy's attachment motion, and PDVSA, as intervenor, joined Venezuela's opposition, and moved to dismiss the Delaware Actions in their entirety as to PDVSA, "when it rules on the Attachment Motion and the Motion to Dismiss, the Court shall enter an order determining, based on the Third Circuit's decision in *OIEG II*, that PDVSA is not immune under the FSIA from the attachment sought in this action, and the Court shall further enter an order denying the Motion to Dismiss, to the extent it asserts FSIA immunity or lack of jurisdiction, in light of *OIEG II*."  Gramercy expressly preserved its arguments in opposition to any appeal by Venezuela or PDVSA "from the determination that PDVSA is not immune under the FSIA from the attachment sought in this action," as well as "its right to assert that PDVSA is not immune under the FSIA from the attachment sought in this action."  Venezuela and PDVSA also expressly preserved certain rights.

36.     Relying in part on these stipulations, on November 1, 2023, the Delaware District Court issued an order granting Gramercy a conditional writ of attachment *fieri facias* against the PDVH Shares on the basis that PDVSA is Venezuela's alter ego.  *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, No. MC 19-79-LPS, 2023 WL 7182179 (D. Del. Nov. 1, 2023), *dismissed sub nom. Contrarian Cap. Mgmt. LLC v. Bolivarian Republic of Venezuela*, No. 23-3144, 2024 WL 2830502 (3d Cir. Mar. 4, 2024).  Specifically, the Delaware District Court found "that federal common law, as outlined in *Bancec*, rather than Delaware law, governs whether PDVSA is the alter ego of Venezuela, for purposes of determining whether, in this litigation, PDVSA's property . . . may be attached to satisfy the Seven Creditors' judgments against Venezuela," and that

"application of *Bancec* here leads to the conclusion that PDVSA is, indeed, the alter ego of Venezuela – a finding the Third Circuit has twice affirmed." *Id.* at *11.

37.     The Third Circuit dismissed Venezuela's, PDVSA's and PDVH's appeal against that order in March 2024.

38.     On January 8, 2024, the Delaware District Court designated Gramercy and all other creditors who had obtained a conditional or unconditional writ of attachment against the PDVH Shares as creditors entitled to the proceeds of the Sale Process ("**Additional Judgment Creditors**").

39.     On March 8, 2024, the Clerk of the Delaware District Court issued the Additional Judgment Creditors' writs of attachment.  On April 5, 2024, the U.S. Marshals Service served the writs of attachment on Robert B. Pincus, the Special Master for the Delaware District Court, who is the current custodian of the PDVH share certificate, and on PDVH.

40.     On April 3, 2024, the Delaware District Court issued a "Final Priority Order" establishing the order in which Crystallex and the Additional Judgment Creditors will receive any proceeds of the Sale Process.  The priority order was determined based on the date an Additional Judgment Creditor moved for a writ of attachment that was eventually granted.  Gramercy's position in the priority order is 16 out of 18 creditors.  The total amount of the attached judgments is approximately $21.3 billion, not including all accruing interest, of which approximately $20.2 billion is owed to the 15 creditors ahead of Gramercy in priority.

## II.    Alter Ego Liability

41.     Plaintiff is not the first creditor to have brought alter ego claims against entities in the chain from Citgo, to Citgo Holding, to PDVH, to PDVSA, to Venezuela, requesting that a court reverse-pierce the veil from a parent down to its subsidiary.  Nor is Plaintiff the first or only creditor of Venezuela to have requested a declaratory judgment in Texas that PDVSA is an alter

ego of Venezuela, and that PDVH is an alter ego of PDVSA and Venezuela. *See Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela et al.*, No. 18-cv-1458 (S.D. Tex.); *Siemens Energy, Inc. v. PDV Holding, Inc.*, No. 24-BC11B-0010 (Harris County, Tex. Oct. 4, 2024). The Third Circuit has repeatedly reverse-pierced the veil between Venezuela and PDVSA—decisions on which the Delaware District Court relied when granting Gramercy's motions for writs of attachment against the PDVH Shares—and the Supreme Court has repeatedly declined to review this determination. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126, 152 (3d Cir. 2019) ("[I]f the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can."), *cert. denied*, 140 S. Ct. 2762 (2020); *OIEG II*, 73 F.4th at 176 ("For the second time in five years, we conclude that PDVSA is the alter ego of Venezuela."), *cert. denied*, 144 S. Ct. 549 (2024); *Tidewater Inv.*, 2023 WL 7182179.

42.     Prior to 2019, Venezuela operated PDVSA, PDVH, Citgo Holding, and Citgo as a single economic unit, commingling the funds and disregarding the corporate form, including when the President of Venezuela directly appointed the President of Citgo, rather than the boards of each parent appointing the boards of each subsidiary. The subsidiaries, including PDVSA and PDVH, could not and did not pay their commercial debts when they came due, but the dividends generated from Citgo's assets were funneled directly up to Venezuela without being used to pay commercial debts. PDVH was used as a conduit through which PDVSA funneled revenue generated by Citgo to itself, and to its alter ego Venezuela.

43.     After 2019, the U.S.-recognized National Assembly continued to operate PDVSA, PDVH, Citgo Holding, and Citgo as a single economic unit with respect to assets outside of Venezuela. PDVH was used as a conduit through which the PDVSA Ad Hoc Board funneled revenue generated by Citgo to itself, and to its alter ego Venezuela. Furthermore, the National

Assembly's 2019 Statute Governing the Transition to Democracy prohibits PDVH from making dividend payments to PDVSA while Maduro continues to illegitimately hold the presidency. As such, dividends are blocked, and cannot be paid to creditors.

44.     PDVSA, PDVH, Citgo Holding, and Citgo are in the same corporate group, and are subject to the same, group-wide system of corporate governance and control. The same system of command and control which unites Venezuela and PDVSA as alter egos similarly unites PDVSA and PDVH as alter egos. Venezuela treats PDVSA as an arm of the state, and so too do Venezuela and PDVSA treat PDVH as an arm of the Venezuelan state—conduct that occurred prior to 2019 and that continues to this day.

45.     This conduct, which results in the operation of PDVH as a sham company, without a separate identity, is wrongful and an injustice.

III.    **Venezuela's Control of PDVSA, PDVH, and Citgo**

    A.      *Economic and Political Environment*

46.     On January 1, 1976, Venezuela created PDVSA as part of the nationalization of Venezuela's oil resources. Between 1986 and 1990, PDVSA acquired 100% ownership of Citgo.

47.     Beginning in approximately 2007, Hugo Chávez, the then-President of Venezuela, began a wave of nationalizations, including of large oil and mining projects, among many other expropriations. Joint ventures with foreign oil companies were converted into partnerships in which PDVSA held a minimum 60% stake, and in 2009, Chávez nationalized hundreds of assets from service providers, further straining PDVSA's capacity to manage its operations. Many of the entities whose assets had been nationalized, including Tenaris and Talta, initiated arbitration proceedings seeking compensation for the value of their expropriated property.

48.     Chávez used PDVSA as a "piggy bank" for Venezuela, imposing heavy taxes to finance increased public spending. For example, a few years into his first term, the royalty rate

for all oil operators was nearly doubled by the 2001 reform of the Hydrocarbons Law.

49.     In addition, Chávez required PDVSA to directly fund social spending beyond its fiscal obligations. Between 2004 and 2016, PDVSA allocated approximately $144 billion, or 12% of its gross revenues, to the government for "Social Development Contributions."  Much of this funding went to the opaque National Development Fund, but, on information and belief, due to corruption many of the planned social development projects were not completed.

50.     From 2006 to 2016, both Venezuelan public external debt and PDVSA's debt grew significantly.  The increased debt service compounded PDVSA's financial troubles, limiting its ability to invest in oil production, as investment funds were diverted to non-oil sectors, including electricity infrastructure, in response to Venezuela's mounting energy crisis.

51.     In 2012, Chávez was reelected for a third six-year term.  The Venezuelan public sector ran a deficit of 15.1% of GDP in 2012 due to a substantial increase in spending (particularly on imports), partially engineered to ensure Chávez's reelection.  By the fourth quarter of 2012, the Venezuelan economy was running a sizable current account deficit of over $2 billion (over 2% of quarterly GDP).

52.     Chávez died shortly after the start of his term, and Nicolás Maduro was elected in a snap election held in April of 2013 to complete Chávez's term in office.  In June 2013, the United States recognized Maduro as the President of Venezuela.

53.     In 2014, the price of oil collapsed; between June 2014 and January 2016, the price of a Venezuelan barrel of oil fell from over $100 to under $25.  PDVSA's revenues plummeted from over $120 billion in 2014 to under $50 billion in 2016.  PDVSA struggled to pay suppliers and joint venture partners; the oil sector's short-term liabilities rose from almost $750 million in 2006 to nearly $14 billion in 2015.  In other words, PDVSA could not pay its commercial debts

when they came due.

54.     In the December 2015 elections for Venezuela's National Assembly, the opposition coalition won over two thirds of the seats.  Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Summary Judgment, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. at al.*, Case No. 1:19-cv-10023 (S.D.N.Y.), Dkt. No. 166 ¶ 72 ("**PDVH Statement of Facts**").

55.     Between 2007 and 2016, each of Moody's, Fitch, and S&P downgraded PDVSA's credit rating.  PDVH Statement of Facts ¶ 54.

56.     Venezuela's credit risk rose from approximately 900 basis points in July 2014 to over 3,000 basis points in April 2016.  These spreads, and the fact that no country had a lower credit rating than Venezuela, made it nearly impossible for the Venezuelan government or PDVSA to engage in unsecured financing.

57.     Thus, by the end of 2016, PDVSA and Venezuela faced substantial debts, including, but not limited to, the Tenaris and Talta ICSID awards and various other arbitral awards that had already been issued against Venezuela.

58.     In 2018, presidential elections were held in Venezuela.  Maduro claimed victory, but the National Assembly declared on January 15, 2019 that the election was illegitimate and named Juan Guaidó as the Interim President of Venezuela.

59.     The United States recognized Guaidó as the Interim President of Venezuela on January 23, 2019.

60.     On February 13, 2019, the National Assembly approved the Guaidó administration's appointments to the PDVSA Ad Hoc Board, which in turn appointed the directors of PDVH.  PDVH Statement of Facts ¶ 309.  In 2020, PDVSA and PDVH advised the United

States District Court for the Southern District of New York that PDVSA's "board members [are] appointed by the Venezuelan government."  PDVH Statement of Facts ¶ 9.

61.     The Second Circuit noted in 2022 that control of PDVSA is divided:  "The Maduro-appointed Board remained in control of all operations and assets in Venezuela.  At the same time, … the Guaidó-appointed Ad Hoc Board was recognized in the United States as the governing body."  *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 463 (2d Cir. 2022).

62.     PDVH has been registered with the United States Department of Justice as a foreign agent for the PDVSA Ad Hoc Board since its creation.  In regular filings provided to the Department of Justice pursuant to the Foreign Agents Registration Act of 1938 ("**FARA**"), PDVH explained that it "interacted with U.S. Government officials to advocate for a resolution to various creditor claims against the Government of Venezuela and/or its subsidiaries in which PDVH is either a party or in which the value of PDVH and its subsidiaries is implicated by the claim.  PDVH's preparation for those meetings on occasion involved discussion with Venezuelan government officials within the Government of Juan Gerardo Guaidó."  Department of Justice guidelines on "The Scope of Agency Under FARA" note that there must be "some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request," such that "it is 'fair to draw the conclusion that an individual is not acting independently, is not simply stating his or her own views, but is acting as an agent or alter ego of the foreign principal.'"  Accordingly, PDVH's registration is a reflection of the reality that PDVH is controlled by PDVSA and Venezuela.

63.     In its September 2022 FARA filing, PDVH noted that Carlos Jordá, "[a]cting on behalf of PDVH, … ha[d] participated in meetings with representatives of the U.S. Government . . . to discuss the importance and means of protecting the assets of PDVH and its

subsidiaries, or the value of said assets, from claims brought by creditors of the Maduro regime."

64.     Since January 2023, the United States has recognized the 2015 National Assembly as the legitimate governmental authority for the Bolivarian Republic of Venezuela.  The National Assembly currently supervises the Committee for the Administration and Protection of the Assets ("CAPA"), which was created by the 2023 transition statute and which in turn controls the PDVSA Ad Hoc Board.

65.     In its March 2023 FARA filing, PDVH reported that it had "participated in meetings with representatives of the U.S. Government and prepared materials for those meetings, in an effort to protect PDVH's assets from seizure or diminution in value by creditors of the Maduro regime."  PDVH also reported its "understand[ing] that under the DOJ's interpretation of FARA, PDVSA's indirect ownership of PDVH may, in itself, render PDVH an agent of the PDVSA Ad Hoc Board."

66.     As recently as March 28, 2024, PDVH reported in its FARA filing that "PDVH has worked to advocate for a resolution to various creditor claims against the Government of Venezuela and/or its subsidiaries in which PDVH is either a party or in which the value of PDVH and its subsidiaries is implicated by the claim."  The lobbying firm which represents the "Ad Hoc Board of Petróleos de Venezuela, S.A. through PDV Holding, Inc.," and is paid an $80,000/month retainer by the "Ad Hoc Board of Petróleos de Venezuela, S.A. through PDV Holding, Inc.," reported on its own FARA forms as recently as June 2024 that it assisted the PDVSA Ad Hoc Board "through PDV Holding, Inc." with its "efforts to engage with and advocate before the federal government on issues relating to challenges brought by creditors of the illegitimate Maduro regime that threaten PDVH's continued ownership of its subsidiaries and the durability of PDVH's relationship with its shareholder, in order to secure protections for PDVH and its subsidiaries."  If

PDVH were operating as an independent entity, it would not spend time and effort on resolving the debts of PDVSA since PDVH is purportedly not liable for those debts. Yet, at the domination and control of PDVSA and Venezuela, PDVH seeks to resolve these issues for its dominant shareholders. Furthermore, the payment of $80,000 per month by PDVH to PDVSA's lobbying firm is an example of PDVH's funds being siphoned to PDVSA and Venezuela, and of the use of PDVH as a mere conduit for PDVSA and Venezuela.

67.     Subsidiaries of PDVH have also had their funds siphoned to PDVSA and Venezuela. For example, in 2020 PDV USA, Inc. ("**PDV USA**"), a wholly-owned subsidiary of PDVH, filed a complaint for breach of contract in the United States District Court for the Southern District of New York alleging that "PDV USA was instructed by the parent company (PDVSA) of its parent company (PDV Holding, Inc.) to enter into [a consulting agreement] for the purported purpose of improving PDVSA's 'long-term reputation and standing' in the United States." *PDV USA, Inc. v. Interamerican Consulting Inc.*, No. 20-cv-3699 (S.D.N.Y.), Dkt. No. 1 ¶¶ 1, 9. In its Second Amended Complaint, PDV USA explained, "PDV USA had (and has) no independent employees or independent business operations. It existed solely to provide shareholder support services in the United States to PDVSA. In fact, at the time, most of the executives of PDV USA held simultaneous positions at PDVSA, and lived and worked at PDVSA in Caracas." *Id.* at Dkt. No. 104 ¶ 11. PDV USA alleged it paid $15 million "because it was instructed to do so by PDVSA," even though it "had no visibility into what, if any services [the defendant] was providing to PDVSA," and "received nothing . . . in exchange." *Id.* ¶¶ 7, 60.

68.     PDV USA further alleged, "Beginning on or around May 2017, employees within Citgo (who were in charge of managing PDV USA) began pushing to have the [consulting] Agreement assigned to PDVSA. These employees . . . felt highly uncomfortable with maintaining

the Agreement—forced on PDV USA by PDVSA—on PDV USA's books." *Id.* ¶ 68.  PDV USA

further alleged that, in May 2017, "Citgo's Compliance Committee was informed about the

Agreement, and Citgo's Controller (a member of the Compliance Committee) ordered that

payments to Interamerican cease. Around the same time, senior management at Citgo, PDV USA,

and PDVSA also determined that the Agreement should be assigned to PDVSA." *Id.* ¶ 69.

69.     PDV USA's Second Amended Complaint continued at ¶ 78:

> It defies credulity to assert that PDVSA, which at the time was
> controlled entirely by the Maduro Regime, directed its U.S.
> subsidiary to hire Interamerican so that Interamerican could advise
> Citgo, PDVSA's primary U.S. operating entity, on how to disengage
> from PDVSA and the Maduro regime. This claim is even more
> incredible in light of the fact that (a) PDVSA provided the $50
> million earmarked for Interamerican, (b) PDV USA's authorized
> representative under the Agreement, as well as the signatory on
> behalf of PDV USA, were both PDVSA employees with PDVSA
> email addresses, (c) PDV USA's sole corporate purpose was to
> provide shareholder services to PDVSA, and (d) the intended
> participants at the . . . meeting were PDVSA employees and
> members of the Venezuelan government and the meeting was going
> to have nothing to do with Citgo.

70.     In short, PDV USA repeatedly informed the United State District Court for the

Southern District of New York that PDVSA ignored corporate formalities to operate PDV USA, a

wholly-owned subsidiary of PDVH, as a sham entity, "forc[ing]" PDV USA (through executives

who were concurrent directors of PDVSA) to make decisions that were against PDV USA's

interests.

71.     In PDV USA's April 30, 2021 FARA filing, where it retroactively registered as an

agent of PDVSA from 2015 through January 2019, PDV USA listed various forms of financial

support it provided in relation to, or connection with, "the Permanent Mission of the Bolivarian

Republic of Venezuela" and "Venezuelan diplomatic representatives," including "rent, utilities,

and furniture expenses for three apartments in New York City . . . [which] facilitated living

arrangements for several Venezuelan citizens including a member of the Venezuelan delegation to the United Nations."  PDV USA also "provided financial support in relation to renovations to the Venezuelan Embassy and the Residence of the Venezuelan Ambassador to the United Nations, along with office supplies for the Venezuelan Embassy."  Furthermore, PDV USA paid over $110,000 for "computer equipment and printers"; over $32,000 for "[i]nstallation of new door for Venezuelan Embassy"; over $89,000 for "[p]er diem for Venezuelan Youth orchestra performers at UN"; and much, much more.  These dozens of payments, worth millions of dollars, are further examples of funds that should have gone to PDVH being siphoned to PDVSA and to Venezuela, and of the use of PDVH as a mere conduit for PDVSA and Venezuela.

72.     The siphoning of funds continued under the U.S.-recognized National Assembly. According to FARA filings, Horacio Francisco Medina Herrera, the Chair of the PDVSA Ad Hoc Board since December 2020, is paid a regular stipend for his services of "[a]ct[ing] as President of the PDVSA Ad Hoc Board and represent[ing] the PDVSA Ad Hoc Board to third parties." Medina's stipend was paid by the "Ad Hoc Board of the Central Bank of Venezuela" on November 20, 2021 ($3,400), December 9, 2021 ($3,400), December 14, 2021 ($3,400), July 9, 2022 ($13,600), August 17, 2022 ($3,400), August 29, 2022 ($3,400), November 3, 2022 ($3,400), November 23, 2022 ($3,400), and December 9, 2022 ($3,400).  This provides an example of over $40,000 in sovereign Venezuelan funds being paid on behalf of PDVSA to a PDVSA officer or director.  Then, according to FARA filings through May 2024, Medina's stipend increased and was paid by PDV Chalmette, LLC:  $40,000 on September 14, 2023 and $5,000 on each of October 2, 2023; November 1, 2023; December 1, 2023; January 1, 2024; February 1, 2024; March 1, 2024; and April 1, 2024.  Upon information and belief, PDV Chalmette, LLC is a wholly-owned subsidiary of PDVH, and these payments made from PDV Chalmette, LLC directly to Medina for

his services of "represent[ing] the PDVSA Ad Hoc Board to third parties" provide an example of at least $75,000 in funds that should have gone to PDVH instead being siphoned to PDVSA, and of the use of PDVH as a mere conduit for PDVSA.

73.     A presidential election was held in Venezuela on July 28, 2024.  On August 1, 2024, U.S. Secretary of State Antony Blinken issued a press release noting that, despite Maduro's declaration of a re-election victory, "it is clear to the United States and, most importantly, to the Venezuelan people that Edmundo González Urrutia won the most votes in Venezuela's July 28 presidential election."

74.     On September 8, 2024, Edmundo González Urrutia sought asylum in Spain.

75.     On September 17, 2024, Venezuela and PDVSA jointly filed a brief in *Crystallex*, Dkt. No. 1273, arguing that a stay should be granted in that case because, "[i]f and when Mr. González assumes the presidency, his government intends to renegotiate Venezuela's debt, through the mechanisms commonly used by sovereign States to restructure their debt, an opportunity that has so far been blocked by Maduro's usurpation of power."  But as the *Crystallex* Special Master pointed out in his September 24, 2024 opposition brief, "the Republic and PDVSA rely on 'the **possibility** that a new Venezuelan government' will come to power in January 2025 and will thereafter '***propose*** a global resolution of Venezuela's debts' that might 'present a window of opportunity' for an alternative resolution of Venezuela's debts. . . . The Republic and PDVSA offer no evidence in connection with their motion to show that any such proposal currently exists or will exist by January 2025, much less that such a proposal would be accepted and approved." *Crystallex* Dkt. No. 1308 (emphasis in original).

76.     Venezuela and PDVSA have been making these same arguments since 2019, and there is no sign that the situation will change, or the dispute between the U.S.-recognized

government and the Maduro-controlled government will be resolved, any time soon.  Regardless of the ongoing political dispute, commercial obligations are owed by Venezuela and its alter egos PDVSA and PDVH to Plaintiff, and Plaintiff has been wronged.

77.     At the time of filing of this Amended Complaint on October 16, 2024, 100% of the shares of Citgo are owned by Citgo Holding; 100% of the shares of Citgo Holding are owned by PDVH; and 100% of the shares of PDVH are owned by PDVSA (as controlled by the PDVSA Ad Hoc Board), which is an agency or instrumentality of Venezuela and is controlled by CAPA, which in turn is controlled by the 2015 National Assembly.

### B.     Dividend Payments

78.     When Chávez served as the President of Venezuela, he ordered Citgo to pay hundreds of millions of dollars in dividends to support the Venezuelan economy, as Dr. Juan Carlos Boué—an academic who conducted a study on PDVSA's internationalization program commissioned by PDV (UK) S.A. at the request of the Venezuelan Minister of Energy and Mines—noted in March 2004.  ("The President gave orders that the affiliates (especially Citgo, by far the largest among them) should make a contribution to ameliorate the fiscal crisis in which the Venezuelan government found itself . . .  As a result of this, Citgo declared 468 MMUSD in dividends for that year," some portion of which reached PDVSA, "a figure which exceeded by 401 MMUSD the total amount of dividends that it had declared throughout the eight years in which PDVSA had been its sole shareholder.").

79.     In a May 25, 2005 speech to the Venezuelan National Assembly, Rafael Dario Ramírez Carreño, the Minister of Energy and Oil and President of PDVSA, explained that PDVSA was "putting an end to th[e] perverse structure" of the "iron 'Corporate Veil' that stood between international business and the control of the Venezuelan State."  He continued, "Our instructions to PDVSA to cooperate, without restriction, with [Venezuela's revenue service] the SENIAT,

marks an attitude diametrically opposed to the attitude of the old PDVSA that allowed its activity to become a black box impenetrable to the control of the Venezuelan State.  We are dismantling this black box, one by one in its parts, to definitively make the management of the new PDVSA transparent."  Mr. Ramírez concluded, "The reality is that PDVSA now belongs to the People, [and] is perfectly aligned with the guidance of the Venezuelan State . . . . PDVSA and its workers are now an integral part of the country."

80.     The following year, in February 2006, Chávez instructed Mr. Ramírez "to allocate towards the financing of [a] Science Mission 941 billion bolivars derived from the dividends of PDVSA's subsidiary in the United States, CITGO, calculated at $500 million."  PDVSA's press release noted Chávez's "emphasi[s] that Citgo and all it has is 100% Venezuelan, when faced with some voices that have designated this company as American."

81.     Citgo's dividends continued to flow through PDVH to PDVSA and Venezuela.  For example, in May 2013, Reuters reported that the "refining subsidiary of state-owned Petróleos de Venezuela (PDVSA) in the United States, Citgo, will pay $461 million in first-quarter dividends to the parent company this month," "a quarterly record."  In comparison, in the prior year, 2012, "all of PDVSA's external affiliates, including Citgo, reported a dividend to the parent company of just $77 million."

82.     In July 2014, Citgo prepared to issue a $650 million note in part to finance $300 million in dividends for PDVSA.  Press coverage from July 17, 2014 noted Citgo would therefore "be indebted to provide resources to its parent company [PDVSA]."

83.     In the years prior to 2015, Citgo had been paying dividends roughly equal to net earnings.  Then, in February 2015, Citgo Holding issued $2.8 billion in debt, at PDVSA's direction, the proceeds of which largely passed through PDVH to PDVSA as a dividend, and then

from PDVSA to Venezuela.  Upon information and belief, this transaction was negotiated and orchestrated by PDVSA employees, not employees of PDVH or Citgo Holding.  All of Citgo Holding's assets were pledged as collateral for the debt incurred to fund the 2015 dividends.

84.     The 2015 transaction to fund the dividends took place in two parts.  First, on or about February 9, 2015 Citgo Holding issued $1.5 billion in high-yield bonds secured by 100% of Citgo's stock, five terminals, and substantially all other assets of Citgo Holding and the guarantors, which guarantors included the holding companies that owned Citgo's refineries.  PDVSA Statement of Facts ¶ 471.  Second, on or about February 12, 2015, Citgo Holding entered into a $1.3 billion loan facility, secured by 100% of Citgo's stock and 100% of the limited liability company interests in Citgo Holding's direct subsidiaries, as well as minority pipeline interests and terminals owned by those subsidiaries, and further guaranteed by Citgo Holding's "direct subsidiaries other than CITGO."  PDVSA Statement of Facts ¶ 472.

85.     Then Citgo Holding transferred the funds to PDVH as a dividend—which Horacio Medina has referred to as a "fictitious" and "non-existent" dividend—despite a net income of under $925 million that year, for a dividend ratio of nearly 3x net earnings.  (By contrast, the dividend payout ratios of Phillips 66, Valero, and Marathon, three comparable large U.S. refiners, averaged 31% of their net earnings in 2015.)  PDVH then declared a dividend and transferred the funds to PDVSA, moving a significant portion of Citgo's value outside the United States—and the reach of creditors based in the United States, including the entities that had already been awarded billions of dollars in arbitration awards.  The 2015 dividends were equivalent to over 6% of Venezuela's 2015 government revenue.

86.     Upon information and belief, the indebtedness incurred by these dividend payments took place without any appropriate assessment of PDVH's financial capacity to fund such

distributions, and without any consideration of the consequences for higher-priority claimants, such as creditors.

87.     The Venezuelan central bank was low on cash due to the 2014 collapse of oil prices. By the end of 2015, the cash reserves had fallen to approximately $16.4 billion, down approximately $5.7 billion from the beginning of 2014.

88.     This transfer of assets out of the U.S. was consistent with Venezuela's declared intent to refuse to pay arbitral awards.  *See* January 2012 speech by Chávez ("[W]e will not recognize any decision" by an arbitral panel.  "They are trying the impossible: to get us to pay them.  We are not going to pay them anything."); July 2014 statements by Venezuelan "energy ministry officials" that PDVSA was considering selling Citgo to "reduce the government´s exposure to foreign litigation," because of "concerns in Caracas" that arbitration awards totaling approximately $10 billion "could be followed by US court litigation resulting in attachments and liens on Citgo assets in the US."

89.     In August 2017, the United States issued an executive order explicitly prohibiting "dividend payments or other distributions of profits to the Government of Venezuela from any entity owned or controlled, directly or indirectly, by the Government of Venezuela," an order which would prevent another such dividend transaction.  Executive Order 13808 of August 24, 2017, § 1(iv).

90.     This executive order followed a July 2017 press release by OFAC announcing sanctions against certain Venezuelan officials and noting allegations that between 2004 and 2014, approximately $11 billion went missing from PDVSA.

91.     On August 1, 2019, after the PDVSA Ad Hoc Board took control, Citgo Holding issued $1.37 billion in 2024 notes secured by 100% of Citgo Holding's interest in Citgo,

guaranteed by other subsidiaries, in a transaction governed by New York law.  PDVH Statement of Facts ¶ 475.  As discussed above, Citgo Holding is 100% owned by PDVH.

92.     In 2019, industry press for the oil and gas industry noted that Citgo's dividends had contributed significantly to PDVSA and Venezuela.  In 2019, Carlos Jordá, the President of Citgo, and Luisa Palacios, President of Citgo's Board of Directors and a member of PDVH's Board of Directors, stated in an interview that Citgo's dividends were used to pay Venezuela's debts.

93.     The U.S.-recognized Venezuelan government—the 2015 National Assembly— issued a Statute Governing the Transition to Democracy on February 5, 2019, which continues to be valid to this date and prohibits PDVH from making dividend payments to PDVSA while Maduro continues to illegitimately hold the presidency.  Article 36 states that any assets recovered by state-owned companies—which includes any stake in subsidiaries such as Citgo Holding and Citgo—cannot be disposed of while Maduro remains in office illegitimately.

94.     In 2022, Maduro stated that "PDVSA owns CITGO and its dividends belong to our country."

### C.     Promissory Notes and the 2020 Bonds

95.     In April 2007, PDVSA issued $3,000,000,000 in aggregate principal amount of notes due in April 2017 (the "**April 2017 Notes**"), and in October 2010 and January 2011, PDVSA issued $6,150,000,000 in aggregate principal amount of notes due in November 2017 (the "**November 2017 Notes**").  The principal on the November 2017 Notes was due in three equal installments of $2,050,000,000 due on November 2, 2015; November 2, 2016; and November 2, 2017.  PDVH Statement of Facts ¶¶ 40–42.

96.     The April 2017 Notes and the November 2017 Notes (collectively the "**2017 Notes**") were denominated in U.S. dollars and governed by New York Law and New York forum-selection clauses, and the November 2017 Notes were deposited in New York, New York.  PDVH

Statement of Facts ¶¶ 46–48, 51.

97.     By the middle of 2016, PDVSA was facing the prospect of many more arbitration awards, including the January 2016 award of $87 million to Tenaris and Talta for the expropriation of Matesi, as well as principal payments of $2 billion in November 2016, $3 billion in April 2017, and $2 billion in November 2017.  Having made billions of dollars in dividend payments the previous year, PDVSA lacked the cash to manage its business in the ordinary course, and funded infrastructure projects through promissory notes.

98.     On September 16, 2016, an Exchange Offer was announced for the 2017 Notes, which had a collective outstanding principal balance of $7.1 billion.  PDVH Statement of Facts ¶ 64.

99.     On October 28, 2016 the Exchange Offer closed, and the 2017 Notes were exchanged for 2020 bonds secured by a pledge of 50.1% of PDVH's equity in Citgo Holding.  The validity of the exchange and pledge is the subject of ongoing litigation that PDVH and PDVSA initiated in the United States District Court for the Southern District of New York in 2019.

100.    A physical stock certificate for the collateral—50.1% of PDVH's equity in Citgo Holding—is held in a vault in New York.  PDVH Statement of Facts ¶ 176.

101.    On November 30, 2016, the remaining 49.9% of PDVH's equity in Citgo Holding was pledged as collateral in exchange for a $1.5 billion loan from Rosneft, an oil company controlled by the Russian government.

102.    Over the span of a month, all of PDVH's assets were pledged for the ultimate benefit of PDVSA and Venezuela.

103.    Yet PDVH did not receive value from either transaction.  The Venezuelan Special Attorney General, José Ignacio Hernández, confirmed in 2019 that "PDV Holding, Inc. had no

plausible financial reasons to establish the pledge in order to guarantee an obligation of its shareholder, unrelated to its line of business," and noted that, "despite the fact that PDV Holding, Inc. signed the guarantee contract [the Pledge], in truth, it was PDVSA who undertook the obligation to establish that guarantee, for the benefit of its own public credit operation – which in no way benefitted PDV Holding, Inc."  PDVH Statement of Facts ¶ 327.

104.    Upon information and belief, these guarantees took place without any appropriate assessment of PDVH's financial capacity to fund them, and without any consideration of the consequences for higher-priority claimants, such as creditors.

### D.    Venezuela's Extensive Control Over PDVSA and PDVH

105.    As discussed above, for decades Venezuela has considered Citgo, PDVH, and PDVSA to be "an instrument of [the Venezuelan] people," after "dismantling" the "perverse structure" of the "iron 'Corporate Veil' that stood between international business and the control of the Venezuelan State" to create the "reality . . . that PDVSA now belongs to the People, [and] is perfectly aligned with the guidance of the Venezuelan State."  Venezuela "emphasized that Citgo and all it has is 100% Venezuelan, when faced with some voices that have designated this company as American."

106.    PDVSA's articles of incorporation provide that PDVSA is a "state-owned company . . . under the form of a corporation, which will carry out and execute the policy issued in matters of hydrocarbons by the National Executive Branch."  Article 1, PDVSA Articles of Incorporation.  PDVSA's "company purpose [is] to plan, coordinate and supervise the actions of the companies it owns . . . in order to achieve an appropriate relationship between the hydrocarbon resources and the national economy, . . . and in general, to perform all those operations, contracts and commercial acts that are necessary or convenient for complying with the aforementioned object."  Title I, Article Two, PDVSA Articles of Incorporation.  Venezuela exerts de jure control

over PDVSA.

107.    Furthermore, a Venezuelan court recognized that, "although [PDVSA] is a company incorporated and organized in the form of a corporation, it is beyond doubt, and this is reaffirmed by the Constitution of the Bolivarian Republic of Venezuela, that it is framed within the general structure of the National Public Administration, . . . because of the unbreakable principle that the Venezuelan State reserves the exclusivity of oil activity[.] . . . [B]y reason of national economic, political and strategic sovereignty, the Venezuelan State will retain all [PDVSA's] actions." *See* Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 464 (Mar. 18, 2002).  Similarly, in 2007, the same court reversed and remanded a case to the lower court with instructions to extend the "privileges" of the Venezuelan state to PDVSA.  *See* Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 281 (Feb. 26, 2007).

108.    PDVSA has explicitly stated that it views its subsidiaries as playing a role in advancing the political objectives of the Venezuelan government.  On the "Subsidiaries" page of its website, PDVSA explicitly refers to the objectives of the Plan de la Patria (the six-year plan for Venezuela, approved by the national legislature) of ensuring the quality of life and availability of human talent committed to Venezuela, and affirms that the workforce of "the businesses and oil and non-oil subsidiaries plays a leading role in achieving the goals set by PDVSA".

109.    PDVSA has represented to the United States Securities and Exchange Commission that it is regulated and supervised by the National Executive of Venezuela.

110.    Furthermore, every contract—national or international—to which PDVSA or any of its subsidiaries (including PDVH, Citgo Holding, and Citgo) or joint companies is a party is subject to prior review, approval, and/or validation by the President of PDVSA.  *See* Venezuelan Official Gazette 41.294, Resolution No. 164 (Dec. 6, 2017) (any lack of such prior review,

approval, and/or validation affects the existence and/or validity of the contract).  Upon information and belief, the President of PDVSA is a Venezuelan government official.  It is not a typical corporate formality for a parent's president to approve all contracts of a subsidiary—rather, it is one way in which PDVSA exerted its domination and control over PDVH.

111.   In April 2018, Maduro issued Decree No. 44, which empowered the Venezuelan Minister of Petroleum to take a variety of actions to control PDVSA and its subsidiaries— including PDVH, Citgo Holding, and Citgo—such as creating, eliminating, or making changes to PDVSA and its affiliates; creating, eliminating, modifying, or centralizing the management and administration of PDVSA and its affiliates; and ordering the amendment of the by-laws of state-owned oil companies.  *See* Venezuelan Official Gazette 440.859, Decree No. 44 (Apr. 12, 2018).

### E.   *Venezuela and PDVSA Exercise Control Over the Boards of Directors of PDVH and Citgo*

112.   For decades, there has been substantial overlap between the Boards of Directors of PDVSA and PDVH.  PDVSA's board members are appointed by decree by the President of Venezuela, and PDVH Directors have listed their address as PDVSA's headquarters in Venezuela.  This overlap can, and has, served as a mechanism for abusing the corporate form.

113.   Venezuelan presidents have directly appointed the president of Citgo—ignoring the boards of PDVSA, PDVH, and Citgo Holding—on multiple occasions.  For example, in April and November 2017, Maduro signed decrees appointing first José Pereira, then Asdrúbal Chávez, as interim presidents of Citgo, and delegating to the Venezuelan Minister of Petroleum the responsibility of swearing them in.  *See* Venezuelan Official Gazette 41.138, p.435.247 (Apr. 26, 2017); 41.284, pp. 438.823-438.824 (Nov. 22, 2017).  Both decrees state that the president is using the authority conferred by Article 236 of the Constitution (to "appoint and remove those public officials whose designation is attributed to him by this Constitution and the Law").  They also cite

the Statute of Public Function's article 20, which classifies as high-level public officials "general directors, directors and other public officials of similar level at the service of the Presidency of the Republic, Executive Vice-presidency and Ministries."

114.    When Maduro announced his appointment of Chávez as the Citgo president on November 22, 2017 (the day after the Venezuelan government arrested the prior president, José Pereira, and five top executives of Citgo, referred to as the "Citgo Six") during a broadcast on state television, he disregarded corporate formalities and said, "I have decided to appoint as president of CITGO, Venezuelan firm in the United States, comrade Asdrubal Chávez… Asdrubal Chávez, from Barinas, is going directly [to serve] as president of CITGO now, to restructure CITGO, to recover CITGO, to strengthen CITGO in the United States, which is a firm that is ours, Venezuelan capital, Venezuelan firm."  It took a full week, until November 29, 2017, for the Citgo board of directors to announce the appointment of Chávez.

115.    The practice of direct appointment of executives and directors of PDVSA's subsidiaries, which reflects a blatant and deliberate disregard of corporate formalities and appropriate corporate governance norms, continued under the National Assembly-controlled government.  On February 13, 2019, the National Assembly instructed the board of PDVH to "carry out all the necessary actions with the purpose of designating the new board of the subsidiaries of PDV Holding, Inc., of CITGO Holding, Inc. and of the Firm CITGO Petroleum corporation, which will be integrated by the following persons," then proceeded to list the officials that would eventually be designated.  Interim President Guaidó announced the decision through a Twitter post where he stated, "From the @AsambleaVE [National Assembly] we designated the new board of CITGO, formed by Luisa Palacios, Ángel Olmeta, Édgar Rincón, Luis Urdaneta, Andrés Padilla and Rick Esser."  On February 15, 2019, two days after the National Assembly

issued its authorization and specifically appointed the board of Citgo, ignoring corporate formalities and distinct identities of each subsidiary, each parent company ratified the mandates of the National Assembly by appointing such individuals by written consent.

116.    The Citgo Six were arrested for signing a contract to refinance loans without the explicit approval of the Venezuelan government.  The "most serious" element of the charge was that "the subsidiary itself [i.e., Citgo] was being offered as collateral, compromising the own patrimony of Venezuela."  Specifically, the Citgo Six were charged with—and sentenced for— violating articles 54 and 72 of the Organic Law Against Corruption ("OLAC") and article 37 read together with article 29, paragraph 9 of the Law Against Organized Crime and the Financing of Terrorism ("LAOFT").  Article 54 of the OLAC states that public officials are obligated to denounce acts of corruption whenever they have had knowledge of these acts because of their work.  Article 29 of the LAOFT says that using a public position to participate in organized crime activities is an aggravating factor.  Thus, the Venezuelan executive and judicial branches both considered Citgo executives to be Venezuelan public officials, who were obligated to seek approval from the Venezuelan government for Citgo's refinancing transactions such that failing to seek that approval constituted a crime, rather than a decision based on the corporate governance norms and fiduciary duties of directors of a Delaware corporation.

**Overlapping Directors**

117.    Upon information and belief, over a period of decades a majority of members of the board of PDVH also served on the board of PDVSA, often concurrently.

118.    Upon information and belief, in the 1990s, Luis Urdaneta was Executive Vice President of PDVSA and a Director of PDVH; Alonso Velasco was a Director of PDVH and a Director of PDVSA; and Theodore Helms was a Director of PDVH and the self-described New York-based financial representative for PDVSA.

119.    Upon information and belief, in the years between 2000 and 2004, Aires Barreto served as a Director of PDVH and a Director of PDVSA; Carlos Jordá, presently the CEO of Citgo, served as a Director of PDVH and held various positions at PDVSA; and Oswaldo Contreras, the CEO of Citgo from 2000 to 2003, also served as a Director of PDVH and held various positions at PDVSA.

120.    In early 2003 Déster Rodríguez served concurrently as a Director of PDVSA, a Director of Citgo, and a member of the board of PDVH; upon information and belief his tenure on the board of PDVSA lasted until late 2008.

121.    Similarly, in early 2005 Eudomario Carruyo served concurrently as a Director of PDVSA, a Director of Citgo, and a member of the board of PDVH; his tenure on the board of PDVSA lasted until late 2008.  According to Delaware tax records, Carruyo served as a Director of PDVH during the tax years 2006–2010.

122.    In early 2005, Alejandro Granado served concurrently as Vice President of PDVSA; President of Citgo; and President of PDVH, PDV USA, PDV Chalmette, PDV America, and PDV Caribe.  Upon information and belief, his tenure on the board of PDVSA lasted until late 2008.

123.    According to Delaware tax records, Ivan Hernandez served as a Director of PDVH for the 2004 tax year.  Upon information and belief, he served concurrently as the Vice President of Refining at PDVSA.

124.    Upon information and belief, Nelson Martinez served concurrently as a Director of PDVH and President of PDVSA in 2005; Luis Marin served as a Director of PDVSA, the head of Citgo, and a Director of PDVH in the 2003–2005 time frame; Feliz Rodriguez served as a Vice President of PDVSA and a Director of PDVH in 2006–2007; and Asdrubal Chávez served as a

Director of PDVH in 2009–2014, and held a variety of positions at PDVSA from 2003–2014.

125.    Upon information and belief, Víctor Aular served as a Director of PDVH, a Director of Citgo, and from 2011–2014 an Internal Director of PDVSA.

126.    Orlando Enrique Chacín served as a Director of PDVH and a Director of Citgo. From 2011–2017 he served as an Internal Director of PDVSA, and from 2015–2017 he was PDVSA's Vice President of Exploration and Production.  In October 2016, Mr. Chacín was one of only three members of the board of PDVH.  PDVH Statement of Facts ¶ 94.  Mr. Chacín is also a registered foreign agent of PDVSA in connection with his work with PDVH.

127.    Jesús Enrique Luongo served as a Director of PDVH and a Director of Citgo.  From 2011–2016 he served as an Internal Director of PDVSA, and from 2015–2017 he was PDVSA's Vice President of Refining, Trade, and Supply.  On October 28, 2016, Mr. Luongo signed the pledge agreement for 50.1% of PDVH's equity in Citgo Holding, as part of the Exchange Offer, on behalf of PDVH.  PDVH Statement of Facts ¶ 103.  On that date, Mr. Luongo was simultaneously the President of PDVH (and one of only three board members) and the PDVSA Vice President of Refining, Trade and Supply.  PDVH Statement of Facts ¶¶ 94, 111.  Mr. Luongo is also a registered foreign agent of PDVSA in connection with his work with PDVH.

128.    Upon information and belief, Anton Rafael Castillo served as a Director of PDVH and, from 2014–2017, an Internal Director of PDVSA.  In October 2016, Mr. Castillo was one of only three members of the board of PDVH, while serving simultaneously as a Director of PDVSA. PDVH Statement of Facts ¶ 94.

129.    According to Delaware tax records, Eulogio Del Pino Díaz served as a Director of PDVH from 2008–2014.  He was President of PDVSA from 2014–2017, and upon information and belief in 2016 he served concurrently as the President of PDVSA, the President of Citgo

Holding, and the Minister of Petroleum of Venezuela.

130.     Also in the 2011–2019 time period, upon information and belief, Asdrubal Chávez held a variety of positions at PDVSA.  He was appointed the President of Citgo directly by Maduro in 2017.  Maduro did not first propose Chávez to the boards of PDVH or Citgo Holding or otherwise follow corporate formalities.  According to Delaware tax records, Chávez served as a Director of PDVH from 2008–2013.

131.     Upon information and belief, when the PDVSA Ad Hoc Board appointed a new board of directors of PDVH, the overlap continued.  For example, Exeario Boscan served as a Director on the PDVSA Ad Hoc Board in 2021, and a Director of PDVH from 2022–2024; and Carlos Jordá, the present CEO of Citgo who served as a Director of PDVH and held various positions at PDVSA in the early 2000s, served as a Director of PDVH from 2023–2024.

132.     PDVH reported in its September 2022 FARA filing that Carlos Jordá had rendered services directly in furtherance of the interests of the PDVSA Ad Hoc Board.

**IV.     PDVSA Is an Alter Ego of Venezuela**

133.     No matter when the analysis is conducted, PDVSA is the alter ego of Venezuela. The Third Circuit has made this determination multiple times—that is, PDVSA under the control of the Maduro-appointed board is an alter ego of Venezuela, and PDVSA under the control of the PDVSA Ad Hoc Board is an alter ego of Venezuela—and the Delaware District Court relied on those determinations, and the stipulation between Venezuela, PDVSA, and Gramercy that the Third Circuit's decision controlled, when granting Gramercy's motions for writs of attachment against the PDVH Shares.  *Crystallex*, 932 F.3d at 152 ("[I]f the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can."); *OIEG II*, 73 F.4th at 176 ("For the second time in five years, we conclude that PDVSA

is the alter ego of Venezuela."); *Tidewater Inv.*, 2023 WL 7182179.  The Supreme Court has repeatedly declined to review the Third Circuit's determination.

134.     Accordingly, PDVSA is, and continues to be, an alter ego of Venezuela under both Maduro and the U.S.-recognized National Assembly—regardless of whether the U.S.-recognized National Assembly in turn recognizes Juan Guaidó as Interim President—a conclusion that has a preclusive effect on the alter ego issues and/or claims in this matter under the doctrines of collateral estoppel and/or res judicata.  Alternatively, if the Court does not find that the prior decision preclusively establishes that PDVSA was, is, and continues to be an alter ego of Venezuela, the facts alleged herein independently establish that PDVSA was, is, and continues to be an alter ego of Venezuela.

### A.     PDVSA Is Extensively Controlled by Venezuela, And Its Corporate Form Is Used to Facilitate Fraud or Injustice

135.     Venezuela caused the incorporation of PDVSA.

136.     Under both Maduro and the U.S.-recognized National Assembly, Venezuela maintained and maintains extensive economic control over PDVSA, treating PDVSA's assets as its own.  For example, upon information and belief, the Maduro government has caused PDVSA to sell oil products at below-market prices for political ends.  Similarly, as Medina acknowledged in an interview, the U.S.-recognized National Assembly used funds from the PDVSA Ad Hoc Board to compensate lawyers representing Venezuela.  Venezuela's economic control of PDVSA remains engrafted in Venezuela's Constitution, resulting in substantial control over PDVSA and the Venezuelan oil industry.

137.     Under both Maduro and the U.S.-recognized National Assembly, PDVSA operated with grossly inadequate capital.

138.   Under both Maduro and the U.S.-recognized National Assembly, Venezuelan statutes, case law, and public governmental statements demonstrate that Venezuela views PDVSA as an arm of the state.   For example, the PDVSA Ad Hoc Board systematically publishes statements in favor of the Venezuelan political opposition on its official social media accounts, including several posts in August and September 2024.

139.   Under both Maduro and the U.S.-recognized National Assembly, PDVSA is wholly owned by the Venezuelan government and is managed by officers and directors who are closely linked to the Venezuelan government.

140.   Under both Maduro and the U.S.-recognized National Assembly, Venezuela profits from PDVSA's operations, as the Republic is the sole shareholder of PDVSA.  As discussed above, PDVSA pays high royalties to Venezuela, and the PDVSA Ad Hoc Board's funds have been used to compensate Venezuela's lawyers.

141.   Under both Maduro and the U.S.-recognized National Assembly, Venezuela uses PDVSA's property as its own and is the real beneficiary of PDVSA's conduct, as evidenced by, among other things, Venezuela's use of PDVSA property (including airplanes) for government activities, and Venezuela's use of PDVSA petroleum to support Venezuelan foreign policy (including with respect to Cuba and China).

142.   PDVSA is concerned with Venezuela's problems and interests, as evidenced by PDVSA's website's declaration that one of its strategic objectives is to "[s]upport the geopolitical positioning of Venezuela internationally," and the PDVSA Ad Hoc Board's website's declaration that its functions include "[t]he promotion of policies that foster the sustainable development of [Venezuela's] oil sector."

143.     Venezuela is regularly involved in the day-to-day operations of PDVSA.  Under both Maduro and the U.S.-recognized National Assembly, Venezuelan government officials manage PDVSA, having a hand in its daily affairs.  For example, the Maduro government has appointed members of PDVSA's Board (including government officials, such as the Minister of Petroleum) and the president of Citgo.  Similarly, the U.S.-recognized National Assembly has exercised its powers under the Transition Statute to appoint the Ad Hoc Board of PDVSA and to appoint directly the board of Citgo.

144.     Furthermore, on June 28, 2023 CAPA wrote a letter to the U.S. Secretary of State, entitled "Resolucion Administrativa CAPA-R-007-1-2023," which set forth a proposal for how "PDV Holding, Inc. ("PDVH") and its indirect subsidiary CITGO Petroleum Corporation ("CITGO," or the "Company") could resolve via settlement, the bulk of the creditor claims currently pending against Petroleos de Venezuela, S.A. ("PDVSA"), and the Bolivarian Republic ofVenezuela (the "Republic")."  Specifically, CAPA proposed "to leverage CITGO's improved financing capacities to settle claims by Crystallex, the PDVSA 2020 bondholders, and the PDVSA creditors who currently hold conditional attachments (ConocoPhillips, Dresser Rand, and Red Tree)," deferring the resolution of other creditors' claims "until after the 2024 Venezuelan elections, after which would come a major debt restructuring process."  There is no reference in the letter to any input by the Citgo board of directors in CAPA's proposal that settlements would continue "as CITGO pays down the debt[s]" of certain PDVSA creditors.  The CAPA letter also noted that "PDVSA and PDVH began settlement discussions with Crystallex in December of [2022]. Since then, the parties have had more than a dozen settlement related calls and meetings, and the PDVSA Ad Hoc Board has advanced two concrete settlement proposals to Crystallex."  In other words, after Citgo, PDVH, and PDVSA's attempts to use Citgo's assets to pay Venezuela's

and PDVSA's debts were unsuccessful, the Venezuelan government made a formal request to "the U.S. Government to give PDVSA and PDVH the time and space necessary to pay the claims of Crystallex, the PDVSA 2020 bondholders," and certain other PDVSA creditors, and to use the OFAC sanctions process to prevent any other creditors from being satisfied "until after a Venezuelan election in 2024"—thus demonstrating Venezuela's control over PDVSA, PDVH, Citgo Holding, and Citgo.

145.    PDVSA is merely a façade for Venezuela's dominance, resulting in an abuse of the corporate form that perpetuates a wrong or injustice.  Adherence to separate identities between Venezuela and PDVSA would entitle Venezuela to disregard PDVSA's separate corporate existence when it suits Venezuela's political purposes to do so, while simultaneously invoking the limited-liability shield afforded by PDVSA's purportedly separate corporate existence as a means of avoiding its legitimate financial obligations.  It would also entitle Venezuela to benefits in United States courts while avoiding its obligations.  Under these circumstances, respecting the corporate form would lead to injustice.

## V.    PDVH Is an Alter Ego of PDVSA

### A.    PDVH Is Extensively Controlled by PDVSA and Venezuela, And Its Corporate Form Is Used to Facilitate Fraud or Injustice

146.    Venezuela operates its alter ego PDVSA, PDVSA's alter ego PDVH, Citgo Holding, and Citgo as a single economic unit, exerting pervasive control over each level to operate PDVH as a sham entity and facilitate fraud or injustice.

147.    Under both Maduro and the U.S.-recognized National Assembly, the Venezuelan government has bypassed the boards of PDVSA, PDVH, and Citgo Holding to directly appoint the President and/or board of directors of Citgo.

148.    Under both Maduro and the U.S.-recognized National Assembly, the profits of PDVH have been used to fund sovereign functions of Venezuela rather than for commercial purposes or to pay legitimate third-party creditors.  PDVH cannot pay its commercial debts when they are due.  Furthermore, according to PDVH's FARA filings, PDVH spent over $100,000 between September 1, 2023 and February 29, 2024 for PDVSA Ad Hoc Board members, CAPA members, and National Assembly members to travel to "meetings to discuss protection of assets subject to creditor claims."

149.    PDVH's separate corporate existence from PDVSA is a legal fiction:  PDVSA and PDVH operate as a single economic unit, and PDVH's profits are siphoned to PDVSA.  PDVH is a sham entity used by PDVSA for the purpose of defrauding creditors by advancing PDVSA's (and in turn, Venezuela's) interests while avoiding its obligations and the obligations of its subsidiaries, and materially assisting PDVSA with avoiding its commercial obligations.

**B.      Under the Bancec Standard, PDVH Is an Alter Ego of PDVSA**

150.    PDVSA and its alter ego Venezuela exert significant and extensive economic control over PDVH beyond the control attendant to equity ownership in the entity.  As discussed above, the PDVSA Board overlaps with, and controls, PDVH's Board; Venezuelan and PDVSA authorities have issued public statements regarding the lack of a corporate veil between Citgo, Citgo Holding, PDVH, PDVSA, and Venezuela; PDVH has issued outsized dividends for the benefit of PDVSA and Venezuela that rendered PDVSA, PDVH and their subsidiaries undercapitalized and unable to satisfy their financial obligations in the ordinary course of business; Venezuelan governmental officials have the authority to review, approve, and veto PDVH's transactions in a manner inconsistent with ordinary principles of corporate governance; and PDVH pledged 100% of its assets with no value received, for the benefit of PDVSA.

151.    PDVSA uses PDVH's property as its own and ignores any commercial purpose for such assets.   As discussed above, and confirmed by public statements from Venezuela and PDVSA, all of PDVH's profits are directed by PDVSA away from PDVH and to PDVSA, not for commercial purposes, but for the political and social uses of PDVSA and the Republic.

152.    PDVSA ignores PDVH's separate status and ordinary corporate formalities and exercises close political control over PDVH, managing PDVH and its subsidiaries and directing and having a hand in their daily affairs—functions that ought properly to be exercised by management of PDVH and of its subsidiary entities, respectively.   PDVSA's alter ego, Venezuela, directly appointed the President of Citgo on multiple occasions, and the Venezuelan National Assembly directly appointed the board of Citgo, demonstrating that the separate status of PDVH and Citgo, as well as ordinary corporate formalities, were ignored.   Upon information and belief, the corporate records and/or corporate formalities relating to corporate records of these entities are incomplete.

153.    PDVSA deprives PDVH of independence through close political control.   As discussed above, for decades there has been extensive overlap between the Boards of Directors of PDVSA and PDVH.   PDVSA has used its influence over PDVH's directors to interfere with PDVH's ordinary business affairs, such as when concurrent directors of PDVSA and PDVH caused PDVH to pledge 50.1% of its assets to secure PDVSA's notes issuance in connection with an exchange, without receiving any value for PDVH in return, in October 2016.   Furthermore, the Venezuelan government's direct appointment of the President and board of Citgo has deprived PDVH of the independence to appoint the board of Citgo Holding, which in turn appoints the board of Citgo.

154.     PDVH's ordinary business decisions, such as its contracts, must be approved by the President of PDVSA, a Venezuelan political actor.  As discussed above, Venezuelan and PDVSA authorities have issued public statements regarding the deliberate lack of a corporate veil between Citgo, Citgo Holding, PDVH, PDVSA, and Venezuela; PDVH has issued outsized dividends for the benefit of PDVSA; and PDVH pledged 100% of its assets, with no value received, for the benefit of PDVSA.  These actions have left PDVH and its subsidiaries undercapitalized and unable to satisfy obligations to creditors, as well as materially assisting PDVSA to avoid its commercial obligations to creditors.

155.     PDVSA also issues policies or directives that cause PDVH to act directly on behalf of PDVSA and the Republic, such that PDVSA and Venezuela are the real beneficiaries of PDVH's conduct.  For example, as discussed above, PDVH is registered with the Department of Justice as a foreign agent acting on behalf of the PDVSA Ad Hoc Board and has acted directly for PDVSA's benefit by, among other things, pledging the majority of its assets for PDVSA's benefit, without any corresponding business justification to PDVH.

156.     Furthermore, adherence to separate corporate status would entitle PDVH, and by extension PDVSA, to benefit in United States courts while avoiding its obligations.  As the Third Circuit has held, "[i]t is . . . clear from the record that PDVSA, and by extension Venezuela, derives significant benefits from the U.S. judicial system. . . . [I]t is probable the U.S. legal system is the backstop that gives substantial assurance to investors who buy PDVSA's debt." *Crystallex*, 932 F.3d at 149.  PDVSA should not be permitted to reap such benefits while simultaneously avoiding its legitimate obligations.

157.     Finally, as discussed above, adherence to separate identities between PDVSA and PDVH would work a fraud or injustice.  Adherence to separate identities between PDVSA and

PDVH would entitle PDVSA, as the agency and instrumentality of a foreign state, and Venezuela, as a foreign state, to the benefits of conducting business in the United States and invoking the protections of its courts while simultaneously abusing the corporate form to cheat creditors and shirk valid debts.

158.    PDVH's separate corporate existence from PDVSA is a legal fiction:  PDVSA and PDVH operate as a single economic unit.  PDVH is a sham entity used by PDVSA for the purpose of defrauding creditors by advancing PDVSA's (and in turn, Venezuela's) interests while avoiding its financial obligations.

### C.    *Under Delaware Law, PDVH Is an Alter Ego of PDVSA*

159.    In the alternative, in the event that this Court does not apply the *Bancec* test, Delaware law would apply.  PDVH—a Delaware corporation—is, and has been at all relevant times, an alter ego of PDVSA under Delaware law.

160.    Delaware courts expressly permit creditors to impose liability on subsidiaries for the liabilities of the parent.

161.    At all relevant times, PDVSA and PDVH operated as one entity.

162.    PDVSA left PDVH and its subsidiaries undercapitalized by causing PDVH to transfer billions of dollars of Citgo dividends to PDVSA, which in turn siphoned funds to Venezuela without any corporate entity in the chain paying creditors, thereby degrading a substantial portion of PDVH's value and commingling its funds with PDVSA's, and depriving PDVH of the financial ability to distribute its own dividend payments or to satisfy its financial obligations.  PDVH knew, should have known, and/or recklessly and/or deliberately disregarded that PDVSA was scheming to avoid commercial obligations to creditors by dominating and controlling the whole corporate enterprise, including PDVH, to send funds to Venezuela without satisfying any commercial debts, and/or to block funds from flowing up to PDVSA and/or

Venezuela to prevent satisfaction of any commercial debts.

163.    Together with the 2016 pledges of all of PDVH's assets (49.9% in October 2016 and 50.1% in November 2016), this dividend scheme was part of a strategic effort on the part of PDVSA and Venezuela to ensure that their creditors could not recover the money they are owed.

164.    PDVSA failed to observe corporate formalities when its President reviewed and approved PDVH's contracts, as set forth in Resolution No. 164, and when Decree No. 44 authorized the Venezuelan Minister of Petroleum to make changes to PDVH and modify or centralize PDVH's management and administration, in disregard of ordinary channels of corporate governance.   Moreover, upon information and belief, some of the corporate records and/or corporate formalities are incomplete.

165.    The 2015 dividend transaction, and the 2016 pledges of 100% of PDVH's assets within a month, further illustrate that PDVH is a façade for PDVSA, as does PDVH's registration with the Department of Justice as a foreign agent of PDVSA.

166.    PDVSA abused the corporate form to perpetrate a wrong or injustice.   PDVH's separate corporate existence from PDVSA is a legal fiction:   PDVSA and PDVH operate as a single economic unit, and PDVH is used as a conduit for its profits to be siphoned to PDVSA without respect for its corporate separateness, or the rights of any creditors.   PDVH is a sham entity used by PDVSA for the purpose of defrauding creditors by advancing PDVSA's (and in turn, Venezuela's) interests while avoiding its obligations.

167.    Piercing the veil from PDVSA to PDVH would not impair the legitimate expectations of any adversely affected shareholders who are not responsible for the conduct that gave rise to the claim.   PDVSA owns 100% of the shares of PDVH, so there are no shareholders who are not responsible for the improper conduct that supports veil-piercing.   Allowing the veil to

be pierced from PDVSA to PDVH would not establish a precedent troubling to shareholders generally.

168.    Innocent third parties will not be harmed if the Court pierces the veil between PDVSA and PDVH.  The third parties with claims against PDVH of whom Plaintiff is aware are ably represented in other courts.

169.    PDVSA has exercised significant and extensive dominion and control over PDVH, as described above.

170.    As a creditor of PDVSA, Plaintiff was harmed by PDVSA's exercise of dominion and control over PDVH.  PDVSA first stripped all of its subsidiaries of value without paying creditors in total disregard to duties it owed to all of the residual beneficiaries when it could not pay its debts in the ordinary course of business.  Then, since 2019, the PDVSA Ad Hoc Board has blocked its subsidiaries from distributing any dividends.  Equity will not countenance such an unjust result, where assets were first stripped and then blocked from distribution in the ordinary course, thereby frustrating creditors.  It is an abuse of the corporate form and U.S. law that benefits the wrongdoers, who benefit from limited liability while simultaneously avoiding legitimate debts.

171.    The public convenience would be served by allowing the veil to be pierced from PDVSA to PDVH because doing so would prevent abuse of the corporate form of Texas-headquartered entities by foreign owners in order to leave creditors unsatisfied.  And the public convenience would also be served by allowing the veil to be pierced from PDVSA to PDVH because doing so would prevent Delaware companies from abusing their corporate form in order to leave creditors unsatisfied.

172.    The wrongful conduct engaged in by PDVSA is extensive and severe.

173.     Plaintiff comes before the Court with clean hands and has engaged in no wrongful conduct sufficient to bar it from obtaining equitable relief.  Plaintiff properly acquired Tenaris's and Talta's rights through the APA and complied with all requirements of the U.S. Department of the Treasury of Foreign Asset Controls to obtain the license to complete the purchase.  Plaintiff now seeks to pierce the veil between PDVSA and PDVH in order to exercise the remedies available to it as a judgment creditor.

174.     No other remedies are practically available to Plaintiff at law or in equity to recover the debt owed to it by Venezuela and PDVSA.  Multiple judges have recognized the extent of PDVSA's and Venezuela's recalcitrance as judgment debtors, and vast resources have been expended by courts and creditors in pursuit of the debts owed by PDVSA and Venezuela.  Upon information and belief, no creditors have recovered anything from PDVSA or Venezuela in years.

### CLAIMS FOR RELIEF

### COUNT I
### Declaratory Relief
### (against PDVSA)

175.     Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

176.     Plaintiff is a creditor of Venezuela.

177.     Venezuela owns 100% of PDVSA.

178.     Pursuant to the doctrines of collateral estoppel and/or res judicata, PDVSA is an alter ego of Venezuela as it pertains to the Plaintiff, and as an alter ego of Venezuela, PDVSA is liable for the sums Venezuela owes Plaintiff.

179.     In the alternative, pursuant to the *Bancec* test, PDVSA is an alter ego of Venezuela, and as an alter ego of Venezuela, PDVSA is liable for the sums Venezuela owes Plaintiff.

a)   At all relevant times, Venezuela and PDVSA operated as one entity.

b) At all relevant times, Venezuela exercised significant and extensive economic control over PDVSA.  PDVSA has expressed publicly that it considers itself to function for the benefit of the Republic.

c) Venezuela has exercised extensive control over PDVSA for decades and has expressed publicly that it considers PDVSA to be an instrument of the Republic. Venezuela has used the corporate façade of PDVSA to siphon billions of dollars to Venezuela, which left PDVSA operating with grossly inadequate capital. These funds have been used for the benefit of the sovereign functions of the Venezuelan government while leaving PDVSA and its subsidiaries undercapitalized.  Under both the Maduro government and the U.S.-recognized National Assembly, PDVSA is treated as an extension of the Venezuelan government, as evidenced by the government's involvement in the daily affairs of managing PDVSA, appointing members to PDVSA's board of directors (some of whom served as Venezuelan government officials) who then acted in the primary and independent interest of Venezuela, and using PDVSA property (including airplanes) for government activities.  PDVSA's corporate existence, which has been dominated and controlled by the Venezuelan government, has become a façade created by the Venezuelan government to avoid its obligations to creditors.

d) At all relevant times, Venezuela used PDVSA's property as its own, and PDVSA's profits went to Venezuela.

e) At all relevant times, Venezuela ignored PDVSA's separate status and ordinary corporate formalities.

f)  At all relevant times, Venezuela deprived PDVSA of independence from close political control.

g)  Based on the domination of PDVSA by Venezuela, it is reasonable to infer that PDVSA had to obtain approval from Venezuela for material business decisions, including its contracts, from Venezuelan political actors.

h)  At all relevant times, Venezuela issued policies or directives that caused PDVSA to act directly on the Republic's behalf.

i)  Adherence to separate identities between Venezuela and PDVSA would perpetuate a fraud or injustice.

180.  An actual case or controversy exists, in that PDVSA disputes that it is an alter ego of Venezuela and that it is liable for Venezuela's debt, whereas Plaintiff contends it is so liable.

181.  An inequitable and unjust result would follow if the corporate separateness of PDVSA were respected with respect to Plaintiff and the debt owed to Plaintiff; no adequate alternative remedy exists; and a declaration of the liability of PDVSA, as the alter ego of Venezuela, is necessary to allow Plaintiff to recover the money it is owed.

182.  Plaintiff seeks a declaration of its right to recover, from PDVSA as an alter ego of Venezuela, Venezuela's debt to Plaintiff and any judgment entered against Venezuela.

183.  Such a judicial declaration is necessary and appropriate at this time and under the circumstances and to resolve the dispute between Plaintiff and Venezuela.

184.  Accordingly, Plaintiff seeks a declaratory judgment pursuant to the Court's authority under 28 U.S.C. § 2201 finding PDVSA, as an alter ego of Venezuela, liable to Plaintiff for the unpaid amount of the debt owed to Plaintiff, along with interest, attorneys' fees, and costs.

## COUNT II
## Declaratory Relief
## (against PDVH)

185. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

186. PDVSA, Venezuela's alter ego, owns 100% of PDVH.

187. Plaintiff is a creditor of PDVSA because PDVSA is an alter ego of Venezuela and Plaintiff is a creditor of Venezuela.

188. Pursuant to the *Bancec* test, PDVH is an alter ego of PDVSA, and as an alter ego of PDVSA, PDVH is liable for the sums PDVSA owes Plaintiff.

    a) At all relevant times, PDVSA exercised significant and extensive economic control over PDVH.

    b) At all relevant times, PDVSA used PDVH's property as its own, and PDVH's profits went to PDVSA.

    c) At all relevant times, PDVSA ignored PDVH's separate status and ordinary corporate formalities.

    d) At all relevant times, PDVSA and PDVH have had common officers or directors.

    e) At all relevant times, PDVSA deprived PDVH of independence from close political control.

    f) Based on the domination of PDVH by PDVSA, it is reasonable to infer that PDVH had to obtain approval from PDVSA for material business decisions, including its contracts, from the President of PDVSA, a Venezuelan political actor.

g) At all relevant times, PDVSA issued policies or directives that caused PDVH to act directly on PDVSA and the Republic's behalf.

h) Adherence to separate identities between PDVSA and PDVH would perpetuate a fraud or injustice.

189. Pursuant to Delaware law, PDVH is an alter ego of PDVSA, and as such, PDVH is liable for the sums PDVSA owes Plaintiff.

a) At all relevant times, PDVSA and PDVH operated as one entity.

b) PDVSA left PDVH, and its subsidiaries, undercapitalized by causing PDVH to transfer billions of dollars of Citgo dividends to PDVSA, which in turn siphoned funds to Venezuela without any corporate entity in the chain paying creditors, thereby degrading a substantial portion of PDVH's value and commingling its funds with PDVSA's, and depriving PDVH of the financial ability to distribute its own dividend payments or to satisfy its financial obligations.  PDVH knew, should have known, and/or recklessly and/or deliberately disregarded that PDVSA was scheming to avoid commercial obligations to creditors by dominating and controlling the whole corporate enterprise, including PDVH, to send funds to Venezuela without satisfying any commercial debts, and/or to block funds from flowing up to PDVSA and/or Venezuela to prevent satisfaction of any commercial debts.  FARA filings show that funds were siphoned to PDVSA, PDVSA's directors, and Venezuela at various times.  PDVSA failed to observe corporate formalities when the President of PDVSA reviewed PDVH's contracts.  PDVH's officers and directors were not acting in the best interest of all residual beneficiaries of their

fiduciary obligations, including creditors, in part because PDVH's directors overlapped with PDVSA's board of directors and took direction from Venezuela, and PDVH's corporate existence is a façade for PDVSA's dominance and control.

c)   At all relevant times, PDVSA abused the corporate form to perpetrate a wrong or injustice.

d)   PDVH is a sham entity used by PDVSA for the purpose of defrauding creditors by advancing PDVSA's (and in turn, Venezuela's) interests while avoiding its obligations.

e)   Piercing the veil from PDVSA to PDVH would not impair the legitimate expectations of any adversely affected shareholders who are not responsible for the conduct that gave rise to the claim.

f)   Allowing the veil to be pierced from PDVSA to PDVH would not establish a precedent troubling to shareholders generally.

g)   At all relevant times, PDVSA exercised extensive dominion and control over PDVH, which harmed Plaintiff as a creditor of PDVSA.

h)   The public convenience would be well served by allowing the veil to be pierced from PDVSA to PDVH.

i)   At all relevant times, the wrongful conduct engaged in by PDVSA was extensive and severe.

j)   Plaintiff comes before the Court with clean hands and has engaged in no wrongful conduct sufficient to bar Plaintiff from obtaining equitable relief.

k)   Innocent third-party creditors of PDVH will not be harmed if the Court pierces the veil between PDVSA and PDVH.

l)   No other remedies are practically available to Plaintiff at law or in equity to recover the debt owed to it by PDVSA.

190.   An actual case or controversy exists, in that PDVH disputes that it is an alter ego of PDVSA and that it is liable for PDVSA's debt, whereas Plaintiff contends it is so liable.

191.   An inequitable and unjust result would follow if the corporate separateness of PDVH were respected with respect to Plaintiff and the debt owed to Plaintiff; no adequate alternative remedy exists; and a declaration of the liability of PDVH, as the alter ego of PDVSA, is necessary to allow Plaintiff to recover the money it is owed.

192.   Plaintiff seeks a declaration of its right to recover from PDVH the debt it is owed by PDVSA and PDVSA's alter ego Venezuela on the ground that PDVH is an alter ego of PDVSA with respect to its debt to Plaintiff and any judgment entered against PDVSA.

193.   Such a judicial declaration is necessary and appropriate at this time and under the circumstances and to resolve the dispute between Plaintiff and PDVH.

194.   Accordingly, Plaintiff seeks a declaratory judgment pursuant to the Court's authority under 28 U.S.C. § 2201 finding PDVH, as an alter ego of PDVSA, which is an alter ego of Venezuela, liable to Plaintiff for the unpaid amount awarded to Plaintiff, along with interest, attorneys' fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in favor of Plaintiff and against Defendants, as follows:

i.      declaring that PDVSA is an alter ego of Venezuela;

ii.     declaring that PDVH is an alter ego of PDVSA;

iii.    awarding Plaintiff damages against Defendant PDVH and Intervenor-Defendant PDVSA jointly and severally in the amount of the judgments against Venezuela acquired by Plaintiff though the APA, together with all accumulated interest thereon;

iv.     expediting relief in light of other creditors seeking to enforce their rights; and

v.      granting such other and further relief as this Court shall deem just and proper.


Dated: October 16, 2024                    Respectfully submitted,

                                           /s/ *Justin Waggoner*
                                           Justin Waggoner
                                           State Bar No. 24003122
                                           SDTX No. 23098
                                           STEPTOE LLP
                                           717 Texas Avenue, Suite 2800
                                           Houston, TX 77002
                                           Tel: (713) 221-2346
                                           Fax: (713) 221-2320
                                           E-mail: jwaggoner@steptoe.com

                                           Michael J. Baratz (*admitted pro hac vice*)
                                           STEPTOE LLP
                                           1330 Connecticut Avenue, NW
                                           Washington, DC 20036
                                           Tel: (202) 429-3000
                                           Fax: (202) 429-3902
                                           E-mail: mbaratz@steptoe.com

                                           *Counsel for Plaintiff*
                                           *Gramercy Distressed Opportunity Fund,*
                                           *LLC*

<u>CERTIFICATE OF SERVICE</u>

I certify that on October 16, 2024, a copy of Plaintiff's Amended Complaint was served on all counsel of record through the Court's e-filing system.

/s/ Justin Waggoner
Justin Waggoner