**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| GRAMERCY DISTRESSED OPPORTUNITY FUND, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. Action No. 4:24-cv-02981 |
| PDV HOLDING, INC., | ) ) | |
| Defendant, | ) ) | |
| PETRÓLEOS DE VENEZUELA, S.A., | ) ) | |
| Intervenor-Defendant. | ) ) | |

---

**SECOND AMENDED COMPLAINT**

Plaintiff Gramercy Distressed Opportunity Fund, LLC ("**Plaintiff**" or "**Gramercy**"), by and through its undersigned counsel, for its Second Amended Complaint against Defendant PDV Holding, Inc. ("**PDVH**") and Intervenor-Defendant Petróleos de Venezuela, S.A. ("**PDVSA**"), alleges as follows:

**NATURE OF THE ACTION**

1.      This is an action to pierce the corporate veil and hold PDVH liable to Plaintiff for two judgments issued by the United States District Court for the District of Columbia ("**D.D.C.**") recognizing and enforcing final arbitration awards issued under the auspices of the International Centre for Settlement of Investment Disputes ("**ICSID**") against the Bolivarian Republic of Venezuela ("**Venezuela**" or the "**Republic**").  Plaintiff's two judgments have been registered in this District pursuant to 28 U.S.C. § 1963 (*Tenaris S.A. et al. v. Bolivarian Republic of Venez.*,

Case No. 4:24-mc-1678 (S.D. Tex.); *Talta-Trading E Marketing Sociedade Unipessoal LDA et al. v. Bolivarian Republic of Venez.*, Case No. 4:24-mc-1679 (S.D. Tex.)) and have the same effect as a judgment of a district court of this District and may be enforced in like manner.

2.      PDVH is the alter ego and wholly-owned subsidiary of PDVSA, itself a wholly-owned instrumentality and alter ego of Venezuela.  PDVH holds 100% of the shares in Citgo Holding, Inc. ("**Citgo Holding**"), which in turn owns 100% of Citgo Petroleum Corporation ("**Citgo**"), each of which has its principal place of business in Houston, Texas.

3.      At all relevant times, PDVSA has been an alter ego of Venezuela.  The District of Delaware and the Third Circuit, even without the benefit of discovery, have repeatedly held that PDVSA is the alter ego of Venezuela, applying the test set forth in *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("**Bancec**"), and the Supreme Court repeatedly declined to review the holding.  Those findings are issue-preclusive as to the alter ego relationship between Venezuela and PDVSA because, through the District of Delaware and the Third Circuit actions, PDVSA was given multiple opportunities to fully and fairly litigate the identical issue of whether it is Venezuela's alter ego, and the alter ego relationship was the crux of each final judgment.

4.      Furthermore, in October 2023 Venezuela, PDVSA, and Gramercy expressly stipulated that the Third Circuit's alter ego holding extended to enforcing the Gramercy judgments *that are at issue in this case*.  As discussed in Paragraphs 39–42, *infra*, the parties stipulated that the District of Delaware "shall enter an order determining, based on the Third Circuit's decision in *OIEG II*, that PDVSA is not immune under the FSIA from the attachment sought in this action."

5.      Relying in part on those stipulations, the District of Delaware entered an order "that federal common law, as outlined in *Bancec*, rather than Delaware law, governs whether

PDVSA is the alter ego of Venezuela, for purposes of determining whether, in this litigation, PDVSA's property . . . may be attached to satisfy . . . judgments against Venezuela," and that "application of *Bancec* here leads to the conclusion that PDVSA is, indeed, the alter ego of Venezuela – a finding the Third Circuit has twice affirmed," then granted Plaintiff a conditional writ of attachment against PDVSA's assets.

6.      In any event, the facts independently establish that PDVSA is an alter ego of Venezuela.  Among other factors, and as explained below, Venezuela has persistently and repeatedly disregarded PDVSA's separate corporate existence including by (1) siphoning billions of dollars to Venezuela, causing PDVSA to (i) allocate hundreds of billions of dollars in social development contributions to the government, (ii) sell its assets and transfer the proceeds directly to Venezuela, (iii) cause PDVSA's U.S. subsidiaries—PDVH in particular—to assume exorbitant debts to fund billions of dollars of dividend distributions that were funneled to Venezuela, and (iv) permit Venezuela's use of PDVSA's property directly, for governmental and political purposes; (2) summarily firing thousands of PDVSA's employees and directors and replacing them with government loyalists, including cabinet members like the Minister of Energy and Oil, who, at various points in time, was also appointed as PDVSA's president; (3) using PDVSA as an arm of the state to administer Venezuela's large oil reserves, but also to advance and finance the government's broader political agenda; (4) subjecting PDVSA and its subsidiaries to strict constraints, including requiring political approval for commercial contracts; (5) using PDVSA's social media channels and other resources as a means of disseminating political messages criticizing the opposing political regime; and (6) directing PDVSA to act against its own commercial interests, including, when politically expedient for Venezuela, by prohibiting PDVSA from receiving regular dividends from its subsidiaries and prohibiting it from satisfying its

creditors without political approval.

7.      At all relevant times, PDVH has been an alter ego of PDVSA.  PDVSA and Venezuela have persistently and repeatedly disregarded PDVH's separate corporate existence to unjustly avoid paying Venezuela's and PDVSA's legitimate creditors, sequestering billions of dollars under PDVH to avoid paying their debts while, at the same time, extracting cash and services from PDVH and its U.S. subsidiaries whenever convenient to fund the Venezuelan government's political objectives.  PDVSA and Venezuela have exercised complete control over PDVH by, among other things: (1) appointing, removing, coercing, and otherwise controlling the leadership of PDVH and its subsidiaries; (2) using PDVH's property as their own, including by siphoning off PDVH's funds through extraordinary dividends that flowed into Venezuelan government coffers; (3) requiring PDVH, against its commercial interests, to assume enormous debts and pledge substantially all of its assets to raise funds for PDVSA and Venezuela; (4) barring PDVH from paying normal dividends so that PDVSA could avoid paying its creditors; (5) causing PDVH and its subsidiaries to selectively pay the expenses of PDVSA and its leadership for sovereign functions; and (6) making PDVH the registered agent of PDVSA to lobby for PDVSA's and Venezuela's interests in the United States, including lobbying in support of a strategy to keep select sanctions in place until PDVSA's and Venezuela's frustrated creditors submit to settlement on PDVSA's and Venezuela's terms.

8.      Venezuela's complete control over PDVSA and PDVH has persisted regardless of government changes in Venezuela, including during the regimes of Hugo Chávez and Nicolás Maduro, the Interim Government of Juan Guaidó and, most recently, the National Assembly elected in 2015 (the "*National Assembly*").  The National Assembly is currently recognized by the United States as the legitimate government of Venezuela.

9.      Although the methods by which Venezuela has exercised its control over PDVSA and PDVH have changed over time, throughout this period, PDVSA and PDVH have consistently relied on access to the United States market and legal system to advance Venezuela's interests. PDVH is a Delaware company that generates billions of dollars annually through its subsidiaries operating in the United States.  PDVSA, although a Venezuelan company, has raised billions of dollars in United States capital markets.  Many of PDVSA's capital raises and material contracts were governed by New York law, and selected New York as an available forum for resolving disputes.  PDVSA has also restructured trade payables into promissory notes, which selected New York as the governing law, and New York courts as the forum.  Having relied on the United States market and legal system for decades to its advantage, and having treated the assets of PDVSA and PDVH as its own throughout that period, Venezuela may not, consistent with the law and applicable principles of international equity as described in *Bancec*, invoke the separate corporate form of PDVSA and PDVH as a basis for denying Plaintiff recovery on its judgment.

10.     Plaintiff seeks a judgment declaring that PDVH is the alter ego of PDVSA and Venezuela.  Because PDVSA is the alter ego of Venezuela, as the Third Circuit has already held, Plaintiff seeks a judgment declaring that PDVH is liable for the judgments entered against Venezuela.  Alternatively, if the Court does not find that the Third Circuit's holding has preclusive effect, Plaintiff seeks an additional judgment declaring that PDVSA is the alter ego of Venezuela, and that PDVSA is liable for the judgments entered against Venezuela.  Declaring PDVH to be an alter ego of the judgment debtor and/or PDVSA would prevent an inequitable result that would otherwise occur if Venezuela and PDVSA were permitted to hide behind the corporate forms they have abused.

## THE PARTIES

11.     Plaintiff is a limited liability company incorporated under the laws of Delaware. Plaintiff's principal place of business is in Connecticut.  Plaintiff is a wholly-owned subsidiary of Gramercy Special Situations Opportunity I LP.

12.     Defendant PDVH is a Delaware corporation with its principal place of business located at 1293 Eldridge Parkway, Houston, TX 77077.  PDVH is a wholly-owned subsidiary of PDVSA and is indirectly wholly owned by Venezuela.

13.     Intervenor-Defendant PDVSA is a corporation organized under the laws of Venezuela and is owned directly by Venezuela, which is a foreign state.  PDVSA is an alter ego of Venezuela.  *See OI Eur. Grp. B.V. v. Bolivarian Republic of Venez.*, 73 F.4th 157, 172 (3d Cir. 2023) ("[I]t is clear PDVSA is Venezuela's alter ego."); *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126, 152 (3d Cir. 2019) ("[I]f the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can.").

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1330(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367(a).

15.     PDVSA is a foreign corporation owned directly by the Republic, and therefore PDVSA is an "agency or instrumentality" of a foreign state.  28 U.S.C. § 1603(b).

16.     Plaintiff's claims against PDVSA arise from ICSID arbitration awards that were confirmed by the D.D.C. under 22 U.S.C. § 1650a and Article 54 of the ICSID Convention. Pursuant to 28 U.S.C. §§ 1605(a)(1) and (6), Venezuela unconditionally waived its sovereign immunity from execution and enforcement of the arbitral awards when it consented to ICSID arbitration.  The waivers, consents, agreements, and designations of a sovereign entity may be

imputed to its alter egos, including waivers of sovereign immunity. Venezuela's waiver is imputed to its alter ego PDVSA pursuant to 28 U.S.C. §§ 1605(a)(1) and (6).

17.     Furthermore, PDVSA has waived any sovereign immunity pursuant to 28 U.S.C. § 1605(a)(1) by intervening in this action, and pursuant to 28 U.S.C. § 1605(a)(2) because this action is based upon commercial activities that have a jurisdictional nexus with the United States, including commercial activities carried on in the United States by PDVSA, acts performed in the United States in connection with commercial activities carried on by PDVSA and Venezuela outside of the United States, and/or acts performed outside the territory of the United States in connection with commercial activities of Venezuela and PDVSA that cause a direct effect in the United States. These acts and commercial activities are described in greater detail *infra*, including for example in Paragraphs 85–94, 97–128, and 141–188.

18.     Accordingly, this Court has subject matter jurisdiction over Plaintiff's claim against PDVSA pursuant to 28 U.S.C. § 1330(a).

19.     Plaintiff's claim against PDVH is so related to its claim against PDVSA, which is within the Court's original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution. The preclusive effect of the Third Circuit's decision about whether PDVSA is an alter ego of Venezuela such that judgments against Venezuela can be enforced against PDVH as PDVSA's alter ego is a federal question. Accordingly, the Court has jurisdiction over PDVH pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

20.     Personal jurisdiction over PDVH is also proper because PDVH's principal place of business is in Texas, where its headquarters are located. The Court has personal jurisdiction over PDVSA because PDVSA has intervened and made a general appearance in this case.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred in this judicial district, and pursuant to 28 U.S.C. § 1391(d), because PDVH's principal place of business is within this judicial district.

## FACTUAL ALLEGATIONS

### I.     Gramercy's Judgments Against Venezuela

#### A.    *Gramercy Holds Unsatisfied Judgments Against Venezuela Based on Two Final ICSID Arbitration Awards*

22.     Tenaris S.A. ("**Tenaris**"), the leader in pipe manufacturing and related services for the world's energy industry, and its subsidiary Talta-Trading e Marketing Sociedade Unipessoal Lda. ("**Talta**") held interests in three Venezuelan companies operating across Venezuela's steel industry:  Matesi Materiales Siderurgicos S.A. ("**Matesi**"), Tubos de Acero de Venezuela S.A. ("**Tavsa**"), and Complejo Siderurgica de Guayana C.A. ("**Comsigua**").  Between 2008 and 2011, the government of Venezuela expropriated without compensation Tenaris and Talta's interests in those companies.  During that same time period, as discussed in Paragraph 71, *infra*, the Venezuelan government under then-President Hugo Chávez was nationalizing hundreds of assets, including large oil, mining, and industrial projects.

23.     Specifically, on April 30, 2008, Chávez issued Decree No. 6058, whereby the iron industry in the Guayana region was reserved to the State of Venezuela.  On May 21, 2009, Chávez announced the nationalization of Tavsa and Comsigua.  Chávez's announcement was followed, on May 25, 2009, by the establishment of two Takeover Commissions in charge of taking over control of Tavsa and Comsigua and overseeing their transition into state-owned companies.  On July 14, 2009, soon after the Takeover Commissions were set up, Chávez issued Decree No. 6796, completing nationalization pursuant to Decree No. 6058.

8

24.     On May 15, 2010, Chávez announced that Matesi was to be expropriated.  The formal expropriation order was made pursuant to the Law for Expropriation in the Public or Social Interest of May 2002.  On October 7, 2010, the Venezuelan National Assembly declared that Matesi's assets were of "social purpose and public interest."  That declaration was followed on June 14, 2011, by Decree No. 8,280.  Pursuant to the terms of this decree, an order was made for the "forced acquisition" of "all of the movable and immovable assets and improvements presumptively owned or in possession of Matesi," which were required "for the execution of the "BRIQUETERA DE VENEZUELA C.A." ["BriqVen"] project."

25.     After Venezuela failed to provide compensation for the expropriations, Tenaris and Talta initiated ICSID arbitration proceedings against Venezuela under two international treaties to which Venezuela was a party:  (i) the Agreement between the Belgo-Luxembourg Economic Union and the Government of the Republic of Venezuela on the Reciprocal Promotion and Protection of Investments and (ii) the Agreement between Portugal and Venezuela for the Promotion and the Protection of the Investments (collectively, the "**Treaties**").  In the arbitrations, Tenaris and Talta claimed that the expropriation of their investments violated the Treaties and required Venezuela to compensate Tenaris and Talta.

26.     Tenaris and Talta initiated the first arbitration concerning government measures related to Matesi on September 30, 2011, and the second arbitration concerning government measures related to Tavsa and Comsigua on July 20, 2012.  Tenaris and Talta prevailed before both tribunals.  On January 29, 2016, the first tribunal ordered Venezuela to pay Tenaris and Talta $87,300,000 for the expropriation of Matesi, plus attorneys' fees and costs.  On December 12, 2016, the second tribunal ordered Venezuela to pay $112,345,530 to Tenaris for the expropriation of Tavsa and $24,672,357 to Talta for the expropriation of Comsigua.  These three awards from

the two tribunals are referenced herein collectively as the "**Awards**."  Both tribunals awarded Tenaris and Talta pre- and post-award interest.

27.    Venezuela subsequently applied to annul the Awards under the ICSID rules, but the applications were rejected, and the January 29, 2016 award therefore became final on August 8, 2018 while the December 12, 2016 award became final on December 28, 2018.

28.    On June 8, 2018, Tenaris and Talta sought recognition and enforcement of the Awards as judgments in parallel proceedings in the D.D.C., pursuant to 22 U.S.C. § 1650(a) and Article 54 of the ICSID Convention (which requires each state which is party to ICSID, including the United States, to recognize and enforce ICSID awards as if the awards were final judgments of one of its own courts).

29.    Venezuela appeared in the D.D.C. proceedings on January 24, 2020.  Venezuela agreed with Tenaris and Talta that the D.D.C. had jurisdiction pursuant to 28 U.S.C. § 1330(a) and the Foreign Sovereign Immunity Act's arbitration exception, 28 U.S.C. § 1605(a)(6), and did not oppose Tenaris and Talta's claims for recognition of the Awards.  Venezuela opposed only the interest calculations and requested that enforcement of the judgment be stayed.

30.    The D.D.C. issued two judgments in favor of Tenaris and Talta and against Venezuela (the "**Judgments**").  The first judgment, issued on July 17, 2020, required Venezuela to pay $256,375,009.12, plus post-judgment interest pursuant to 28 U.S.C. § 1961.  *Tenaris S.A. et al. v. Bolivarian Republic of Venez.*, No. 18-cv-1371-CRC, Dkt. No. 29 (D.D.C. July 17, 2020). The second judgment, issued on August 24, 2021, and subsequently altered on November 5, 2021, required Venezuela to pay $280,667,040.00, plus post-judgment interest pursuant to 28 U.S.C. § 1961.  *Tenaris S.A. et al. v. Bolivarian Republic of Venez.*, No. 18-cv-01373-CJN, Dkt. No. 32 (D.D.C. Aug. 24, 2021); Dkt. No. 34 (D.D.C. Nov. 5, 2021).

**B.      Gramercy Acquired Tenaris's and Talta's Rights, Title, and Interests in the Awards and the Judgments**

31.      On January 25, 2023, Gramercy, Tenaris, and Talta entered into a certain Awards Purchase Agreement (the "**APA**"), whereby Gramercy agreed to acquire all of Tenaris's and Talta's rights, title, and interests in the Awards and the Judgments.  The United States Department of the Treasury Office of Foreign Assets Control ("**OFAC**") authorized the transaction and, on August 1, 2023, issued a specific license allowing Gramercy's acquisition of the Awards and Judgments.

32.      Upon the fulfillment of certain conditions (which, for the avoidance of doubt, included the issuance of the OFAC license and Gramercy's subsequent payment of an aggregate purchase price in excess of $500,000, paid in cash on the closing date), the APA transaction closed on September 7, 2023, and Gramercy became the sole holder of title and right to the Awards and the Judgments, succeeding Tenaris and Talta in all their rights therein.

**C.      Gramercy Obtained a Writ of Attachment in the District of Delaware**

33.      Crystallex International Corporation ("**Crystallex**") confirmed an arbitral award against Venezuela in the D.D.C. and obtained a $1.2 billion judgment, then subsequently registered its judgment pursuant to 28 U.S.C. § 1963 in the United States District Court for the District of Delaware ("**Delaware District Court**") in *Crystallex International Corporation v. Bolivarian Republic of Venez.*, l:l7-mc-00151-LPS ("***Crystallex***").

34.      Crystallex then moved to attach the PDVH shares held by PDVSA ("**PDVH Shares**") on the ground that PDVSA was Venezuela's alter ego.  The Delaware District Court found that PDVSA was Venezuela's alter ego and granted Crystallex's motion for a writ of attachment in *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 333 F. Supp. 3d 380, 426 (D. Del. 2018).  The U.S. Court of Appeals for the Third Circuit affirmed the order in *Crystallex*

*Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126 (3d Cir. 2019). The Supreme Court declined to grant *certiorari*. *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 140 S. Ct. 2762 (2020).

35.     Other creditors with claims against both PDVSA and Venezuela subsequently filed motions for writs of attachment against the PDVH Shares in Delaware. In light of the change in U.S. recognition of Venezuela's political leadership in 2019, the question of whether PDVSA was Venezuela's alter ego returned to the Third Circuit. Once again, the Delaware District Court found that PDVSA was Venezuela's alter ego; once again, the Third Circuit affirmed; and once again, the Supreme Court declined to grant *certiorari*. *OI Eur. Grp. B.V. v. Bolivarian Republic of Venez.*, 663 F. Supp. 3d 406 (D. Del. 2023) ("**_OIEG I_**"), *aff'd*, 73 F.4th 157 (3d Cir. 2023) ("**_OIEG II_**"), *cert. denied*, 144 S. Ct. 549 (2024).

36.     The Third Circuit rejected PDVSA's argument that changes implemented by the National Assembly-led government undermined an earlier determination that PDVSA was an alter ego of Venezuela. *OIEG II*, 73 F.4th at 168. Although PDVSA argued that "drastic changes arrived in 2019," the court concluded that "the facts reveal Venezuela's significant economic control of PDVSA through both rival governments" and, based on the "totality of Venezuela's control over PDVSA, it is clear PDVSA is Venezuela's alter ego." *Id.* at 172.

37.     The Delaware District Court set forth a process for selling the PDVH Shares to satisfy the writs of attachment (the "**_Sale Process_**"[1]). The court required any creditor of PDVSA or Venezuela seeking to attach their judgments to the PDVH Shares to file an Attached Judgment Statement in *Crystallex* by August 14, 2023. On August 14, 2023, Tenaris and Talta filed their Attached Judgment Statements.

---

[1] Capitalized terms not otherwise defined that relate to the Sale Process are defined in the *Crystallex* Sale Procedure Order (*Crystallex* Dkt. 481).

38.     On August 17, 2023, Tenaris and Talta submitted certified copies of the Judgments to the Clerk of the Delaware District Court in *Gramercy Distressed Opportunity Fund LLC v. Bolivarian Republic of Venez.*, Case No. 1:23-mc-378-LPS (D. Del.) (formerly *Tenaris S.A. et al. v. Bolivarian Republic of Venez.*) and *Gramercy Distressed Opportunity Fund LLC v. Bolivarian Republic of Venez.*, Case No. 1:23-mc-379-LPS (D. Del.) (formerly *Tenaris S.A. et al. v. Bolivarian Republic of Venez.*) (the "**Delaware Actions**"), requesting registration of the Judgments pursuant to 28 U.S.C. § 1963.  The same day, Tenaris and Talta filed motions in the Delaware Actions for writs of attachment *fieri facias* against the PDVH Shares.

39.     On September 21, 2023, after the closing of the APA transaction and pursuant to a stipulation between Tenaris, Talta, Gramercy, and Venezuela, the Delaware District Court entered an order substituting Gramercy for the original plaintiffs, Tenaris and Talta, in the Delaware Actions.

40.     On October 11, 2023, in Case No. 1:23-mc-378-LPS (D.I. 18) and October 13, 2023 in Case No. 1:23-mc-379-LPS (D.I. 17), Venezuela, PDVSA, and Gramercy filed identical stipulations.  The stipulations recited that the Third Circuit's decision in *OIEG II* (i) "affirmed . . . that PDVSA and its assets are not immune in the actions decided by *OIEG I* under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. (the 'FSIA') and the doctrine of *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ('*Bancec*')" and (ii) "declined to reach whether the attachment of PDVSA's assets is permitted."

41.     The stipulations noted that Venezuela opposed Gramercy's attachment motion, and PDVSA, as intervenor, joined Venezuela's opposition and moved to dismiss the Delaware Actions in their entirety as to PDVSA. The parties nevertheless stipulated that:

> [W]hen it rules on the Attachment Motion and the Motion to
> Dismiss, the Court shall enter an order determining, based on the
> Third Circuit's decision in *OIEG II*, that PDVSA is not immune
> under the FSIA from the attachment sought in this action, and the
> Court shall further enter an order denying the Motion to Dismiss, to
> the extent it asserts FSIA immunity or lack of jurisdiction, in light
> of *OIEG II*.

42.     In the same stipulations, Gramercy expressly preserved its arguments in opposition to any appeal by Venezuela or PDVSA "from the determination that PDVSA is not immune under the FSIA from the attachment sought in this action," as well as "its right to assert that PDVSA is not immune under the FSIA from the attachment sought in this action."  Venezuela and PDVSA also expressly preserved certain rights.

43.     Relying in part on these stipulations, on November 1, 2023, the Delaware District Court issued an order granting Gramercy a conditional writ of attachment *fieri facias* against the PDVH Shares on the basis that PDVSA is Venezuela's alter ego.  *Tidewater Inv. SRL v. Bolivarian Republic of Venez.*, No. MC 19-79-LPS, 2023 WL 7182179 (D. Del. Nov. 1, 2023), *dismissed sub nom. Contrarian Cap. Mgmt. LLC v. Bolivarian Republic of Venez.*, No. 23-3144, 2024 WL 2830502 (3d Cir. Mar. 4, 2024).  Specifically, the Delaware District Court found "that federal common law, as outlined in *Bancec*, rather than Delaware law, governs whether PDVSA is the alter ego of Venezuela, for purposes of determining whether, in this litigation, PDVSA's property . . . may be attached to satisfy . . . judgments against Venezuela," and that "application of *Bancec* here leads to the conclusion that PDVSA is, indeed, the alter ego of Venezuela – a finding the Third Circuit has twice affirmed."  The court held that Federal Rule of Civil Procedure 69(a) does not "require that the Court apply the **substantive** law of the forum state."  Further, "[h]aving concluded that federal common law, rather than Delaware law, should be applied to the alter ego analysis, the Court need not reach the issues of whether the Delaware alter ego principles require proof of fraud or similar injustice and whether the judgment creditors here have proved fraud or

14

similar injustice."

44.     The Third Circuit dismissed Venezuela's, PDVSA's and PDVH's appeal against that order in March 2024.

45.     On January 8, 2024, the Delaware District Court designated Gramercy and all other creditors who had obtained a conditional or unconditional writ of attachment against the PDVH Shares as creditors entitled to the proceeds of the Sale Process (the "**Additional Judgment Creditors**").

46.     In an order dated July 27, 2023, the Delaware District Court set the priority order for the proceeds from the Sale Process.  Specifically, the Delaware District Court determined that, in the event the proceeds from a future sale of PDVSA's shares in PDVH were insufficient to satisfy all attached judgments, attached judgment creditors would be paid, in full, according to the order in which they filed a successful petition for a writ of attachment.  Based on estimates of the sale proceeds, under this "first-in-time, first-in-line" approach, Crystallex would be paid before other creditors, and creditors at the end of the line (like Gramercy) would receive nothing at all.

47.     On February 15, 2024, the Delaware District Court denied a motion by Gramercy and two other judgment creditors for an order requiring creditors who obtained writs of attachment in 2023 to be paid in equal priority from the sale proceeds, stating (with emphasis added) that:

> It bears emphasis that nothing the Court is doing eliminates or even reduces the value of the moving creditors' claims.  If they fail to collect on their judgments as part of the ongoing sale process, ***they will remain free to pursue other collection efforts***.

48.     On March 8, 2024, the Clerk of the Delaware District Court issued the Additional Judgment Creditors' writs of attachment.  On April 5, 2024, the U.S. Marshals Service served the writs of attachment on Robert B. Pincus, the Special Master for the *Crystallex* case, who is the current custodian of the share certificate for the PDVH Shares, and on PDVH.

49.    On April 3, 2024, the Delaware District Court issued a "Final Priority Order" establishing the order in which Crystallex and the Additional Judgment Creditors will receive any proceeds of the Sale Process.  The priority order was determined based on the date an Additional Judgment Creditor moved for a writ of attachment that was eventually granted.  Gramercy's position in the priority order is 16th (out of 18 places).  The total amount of the attached judgments is approximately $21.3 billion, not including all accruing interest, of which approximately $20.2 billion is owed to creditors in the 15 places ahead of Gramercy in priority.

50.    On September 27, 2024, the *Crystallex* Special Master filed a notice recommending a transaction proposed by Amber Energy Inc. ("**Amber**") for the purchase of the PDVH Shares.  After extended briefing related to the Initial Notice and the proposed transaction with Amber, on December 31, 2024, the Delaware District Court directed the Special Master to solicit additional bids for the PDVH Shares.  The December 2024 Order also set forth revised procedures and a timeline for the sale of the PDVH Shares, including directions for the Special Master to recommend a stalking horse bid or base bid.

51.    Earlier in September 2024, before recommending the Amber bid, the *Crystallex* Special Master moved in the Delaware District Court for an injunction against Plaintiff's alter ego claims against PDVH.  Following several rounds of briefing and oral argument, the Delaware District Court denied the injunction in a December 30, 2024 order.  The order highlights that the *Crystallex* sale process and this action are independent from each other, and that there is no basis to prevent Plaintiff from seeking to enforce its judgment directly against PDVH under an alter ego theory.  The Delaware District Court noted, among other things, that, because the *Crystallex* action related solely to the sale of PDVSA's shares in PDVH, and not the assets of PDVH itself, "in no way would prevailing in the Alter Ego Actions … allow [Plaintiff] to obtain through the 'back

door' a higher-priority claim to the PDVH Shares than [it] obtained through the 'front door' of this Court's Sale Process."

52.     On March 21, 2025, the *Crystallex* Special Master recommended a stalking horse bid made by Red Tree Investments, LLC ("**Red Tree**") for the purchase of the PDVH Shares.  The Special Master also received three other proposed stalking horse bids.  Red Tree's bid is not conditional on the outcome of any actions against PDVH alleging that PDVH is an alter ego of PDVSA.  Red Tree's bid, if approved by the Delaware District Court, OFAC, and on appeal, would satisfy the judgments of the first seven creditors in the *Crystallex* priority order, including Red Tree, all of whom had obtained judgments and moved for writs of attachment in *Crystallex* by February 8, 2022.

53.     This would leave unpaid over $18 billion in debts owed to creditors who met the deadline to participate in the sale process, including Plaintiff's Judgments.  Even the highest proposed stalking horse bid would result in no satisfaction of Plaintiff's Judgments (and billions of dollars still owed to creditors more senior than Plaintiff in that priority order).  In recent months, two Attached Judgment Creditors—one more senior than Plaintiff, and one more junior than Plaintiff—have withdrawn from the *Crystallex* Sale Process.

## II.     Alter Ego Liability

54.     Pursuing alter ego liability against PDVH is Plaintiff's sole remaining avenue for recovering on its Judgments in the United States.  Plaintiff and its predecessors have been litigating against Venezuela for over thirteen years, hold final arbitral awards against Venezuela issued in 2016, and have held the Judgments enforcing such awards since 2020 and 2021.  Yet Venezuela has paid nothing.  Plaintiff and its predecessors obtained a writ of attachment against PDVSA's PDVH shares and were designated an Attached Judgment Creditor in *Crystallex*, but PDVSA has also refused to pay.  And, as explained above, Plaintiff stands no chance of recovery in the

*Crystallex* sale process.

55.    The ongoing *Crystallex* sale process does not bar Plaintiff's recovery against PDVH.  As the Delaware District Court has confirmed, creditors "remain free to pursue other collection efforts."

56.    Unsurprisingly, given Venezuela's and PDVSA's predilection for not paying their debts, Plaintiff is not the first creditor to have brought alter ego claims against entities in the chain from Citgo to Citgo Holding to PDVH to PDVSA to Venezuela, requesting that a court reverse-pierce the veil from a parent down to its subsidiary.  Nor is Plaintiff the first or only creditor of Venezuela to have requested a declaratory judgment in Texas that PDVSA is an alter ego of Venezuela, and that PDVH is an alter ego of PDVSA and Venezuela.  *See Rusoro Mining Ltd. v. Bolivarian Republic of Venez. et al.*, No. 18-cv-1458 (S.D. Tex.); *Siemens Energy, Inc. v. PDV Holding, Inc.*, No. 24-BC11B-0010 (Harris County, Tex. Oct. 4, 2024).  The Third Circuit has repeatedly reverse-pierced the veil between Venezuela and PDVSA—decisions on which the Delaware District Court relied when granting Gramercy's motions for writs of attachment against the PDVH Shares—and the Supreme Court has repeatedly declined to review this determination. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126, 152 (3d Cir. 2019) ("[I]f the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can."), *cert. denied*, 140 S. Ct. 2762 (2020); *OIEG II*, 73 F.4th at 176 ("For the second time in five years, we conclude that PDVSA is the alter ego of Venezuela."), *cert. denied*, 144 S. Ct. 549 (2024); *Tidewater Inv.*, 2023 WL 7182179.

57.    Venezuela's and PDVSA's domination of PDVH started under Chávez and Maduro, whose governments siphoned billions from PDVH to support political priorities, and continued under the National Assembly, which avoided paying creditors to protect what it viewed

as Venezuela's financial patrimony.  PDVSA repeatedly used its control over PDVH to bolster Venezuela's finances, pay PDVSA's expenses, and pledge PDVH's assets with no benefit to PDVH—while avoiding paying its debts, including the Judgments.  Under the National Assembly, PDVSA and Venezuela continued to access PDVH's assets for their own use, and mandated through legislation a policy of "asset protection" which consisted of (1) not paying judgments owed to foreign creditors; (2) depriving the Maduro regime of access to the wealth generated by PDVH; (3) lobbying the U.S. government to maintain sanctions on PDVH and PDVSA that would prevent enforcement against their assets; and (4) generating and conserving wealth under the corporate shield of PDVH to be used to fund political priorities of the National Assembly following the end of the Maduro regime in Venezuela.  Pursuant to this policy, the National Assembly prohibited PDVH's declaration of dividends.  At the same time, PDVSA was permitted to cause PDVH's subsidiaries to continue paying expenses of its board and certain National Assembly expenses directly, obtaining special exceptions from the U.S. sanctions regime whenever necessary.  Also pursuant to the "asset protection" strategy, the National Assembly instructed PDVSA, PDVH, and its subsidiaries to adopt formal corporate governance policies that would give the appearance of independent decision making in order to manufacture a record for contesting future judgment enforcement actions asserting an alter ego theory.  These formalities did not reduce in any practical manner the degree of Venezuela's control over PDVSA and PDVH. *Bancec* supports veil-piercing when sovereigns extensively control instrumentalities in this manner.

58.      PDVSA, PDVH, Citgo Holding, and Citgo are in the same corporate group and are subject to the same, group-wide system of corporate governance and control.  The same system of command and control which unites Venezuela and PDVSA as alter egos similarly unites

PDVSA and PDVH as alter egos. Venezuela treats PDVSA as an arm of the state, and so too do Venezuela and PDVSA treat PDVH as an arm of the Venezuelan state—conduct that occurred prior to 2019 and that continues to this day.

59.     This conduct results in the misuse of PDVH's corporate form to shield Venezuela and PDVSA from their creditors, including Plaintiff, thereby advancing the political goals of the government (including, currently, the National Assembly seeking a regime change in Venezuela). And while their creditors receive nothing, Venezuela and PDVSA freely tap into the vast resources they keep accumulating under PDVH for their own benefit. That is wrongful and an injustice.

## III.    Venezuela's Control of PDVSA, PDVH, and Citgo

### A.    Economic and Political Environment

60.     Venezuela has the world's largest oil reserves, and the oil industry is an important sector of Venezuela's economy, accounting for a large share of Venezuela's public fiscal revenues (29% on average from 2010 through 2015), and a large share of Venezuela's exports (96% in 2014). Reliance on oil revenues made Venezuela vulnerable to fluctuations in global oil market conditions.

61.     On January 1, 1976, Venezuela created PDVSA as part of the nationalization of Venezuela's oil resources. Article 303 of the Venezuelan Constitution provides for Venezuela's ownership of PDVSA "[f]or reasons of economic and political sovereignty and national strategy." Between 1986 and 1990, PDVSA, through PDVH and Citgo Holding, acquired 100% ownership of Citgo. At the time of filing of this Second Amended Complaint on April 15, 2025, 100% of the shares of Citgo are owned by Citgo Holding; 100% of the shares of Citgo Holding are owned by PDVH; and 100% of the shares of PDVH are owned by PDVSA. PDVSA is currently controlled by the PDVSA Ad Hoc Board ("***PDVSA Ad Hoc Board***"), which is an agency or instrumentality of Venezuela and is controlled by the National Assembly. Since January 2023, the National

Assembly has exercised that control through the Council for the Administration and Protection of Assets ("**CAPA**").

62.     In the early 1990s, Venezuela and PDVSA encouraged private initiatives and investment in the oil industry and entered into operating and association agreements with private entities, including international companies like ExxonMobil, ConocoPhillips, Shell, and Chevron.

### B.     The Chávez Regime's Political Control of PDVSA, PDVH, and Citgo

63.     Hugo Chávez was elected president of Venezuela in 1998.  During his 1998 campaign, Chávez expressed criticism that Venezuela's oil industry had continued to function as an autonomous commercial operation rather than serving national development goals.  After he assumed office, Chávez's government pursued a new constitutional framework for the oil industry that reinforced public ownership of oil resources—a "Bolivarian Revolution."

64.     Chávez used PDVSA as a "piggy bank" for Venezuela, imposing heavy taxes to finance increased public spending.  For example, a few years into his first term, the royalty rate for all oil operators was nearly doubled by the 2001 reform of the Hydrocarbons Law.

65.     In 2002, Chávez appointed government loyalists to the PDVSA board; this sparked protests from PDVSA workers, after which Chávez publicly fired approximately 20,000 PDVSA employees and seven high-ranking PDVSA managers, contributing to a political crisis, including a brief ouster of Chávez during a coup and a two-month oil strike.

66.     In addition, Chávez required PDVSA to directly fund social spending beyond its fiscal obligations. Between 2003 and 2016, PDVSA allocated approximately $137 billion, or 11% of its gross revenues, to the government for a line item that it labeled "Social Development Contributions" in its financial statements.  Much of this funding went to the opaque National Development Fund.  On information and belief, a large proportion of the amounts contributed by

PDVSA for social development contributions was embezzled by corrupt politicians and individuals linked to the Venezuelan government.

67.     In 2005, Chávez sought to maximize the capture of oil revenues by modifying the Venezuelan Central Bank Law to divert oil incomes from the national budget to extrabudgetary funds.

68.     Chávez also exploited Venezuela's control over Citgo to pursue the Venezuelan government's foreign policy objectives in the United States.  For example, in 2005, following discussions with members of the United States Congress, Chávez promoted a program through which Citgo would sell subsidized refined oil products to poor communities and organizations in the United States.

69.     In August 2006, Venezuela announced it would sell Citgo's 41.25% share participation in the Texas-based Lyondell-Citgo refinery to its partner Lyondell Chemical Co. for just over $1.3 billion.

70.     In 2006, certain joint operating agreements executed with private entities were converted into joint ventures, in which Corporación Venezolana del Petróleo, S.A. held between 60% and 80% of the equity.

71.     Beginning in approximately 2007, Chávez began a wave of nationalizations, including of large oil and mining projects, among many other expropriations.  In 2009, Chávez nationalized extensive assets from service providers, including 76 oil service companies, further straining PDVSA's capacity to manage its operations.  Many of the entities whose assets had been nationalized, including Tenaris and Talta, initiated arbitration proceedings seeking compensation for the value of their expropriated property.

72.     From 2006 to 2016, both Venezuelan public external debt and PDVSA's debt grew significantly.  The increased debt service compounded PDVSA's financial troubles, limiting its ability to invest in oil production, as investment funds were diverted to non-oil sectors, including electricity infrastructure, in response to Venezuela's mounting energy crisis.

73.     In 2012, Chávez was reelected for a third six-year term.  The Venezuelan public sector ran a deficit of 15.1% of GDP in 2012 due to a substantial increase in spending (particularly on imports), partially engineered to ensure Chávez's reelection.  By the fourth quarter of 2012, the Venezuelan economy was running a sizable current account deficit of over $2 billion (over 2% of quarterly GDP).

## C.     The Maduro Government Expands Venezuela's Control over PDVSA and Its U.S. Subsidiaries

74.     Chávez died shortly after the start of his third term, and Nicolás Maduro was elected in a snap election held in April of 2013 to complete Chávez's term in office.  In June 2013, the United States recognized Maduro as the President of Venezuela.

75.     In 2014, the price of oil collapsed; between June 2014 and January 2016, the price of a Venezuelan barrel of oil fell from over $100 to under $25.  PDVSA's revenues plummeted from over $120 billion in 2014 to under $50 billion in 2016.  PDVSA struggled to pay suppliers and joint venture partners; the oil sector's short-term liabilities rose from approximately $750 million in 2006 to nearly $14 billion in 2015.  In other words, PDVSA could not pay its commercial debts when they came due.

76.     In the December 2015 elections for Venezuela's National Assembly, the opposition coalition won over two thirds of the seats.

77.     Between 2007 and 2016, each of Moody's, Fitch, and S&P downgraded PDVSA's credit rating.

78.     Venezuela's credit risk rose from approximately 900 basis points in July 2014 to over 3,000 basis points in April 2016.  These spreads, and the fact that no country had a lower credit rating than Venezuela, made it nearly impossible for the Venezuelan government or PDVSA to engage in unsecured financing.  From 2012 to 2016, Venezuela's consolidated public sector ran an average fiscal deficit of 12.9% of GDP.  Thus, by the end of 2016, PDVSA and Venezuela faced substantial debts, including, but not limited to, the Tenaris and Talta ICSID awards and various other arbitral awards that had already been issued against Venezuela.  Chávez declared in January 2012 that Venezuela "will not recognize any decision" rendered against it by international arbitration tribunals, and that Venezuela's award creditors "are trying the impossible: to get us to pay them."  He concluded: "We are not going to pay them anything."

79.     The decline in Venezuela's external asset holdings, combined with PDVSA's significant arrears, ultimately led Venezuela to default on its external debt in 2017.  To cover the fiscal deficit, the government of Venezuela implemented inflationary policies and expanded Venezuela's monetary base at an annual rate of 98.9% during the same period.  Venezuela's annual inflation rate increased from 20% in 2012 to 274% in 2016, and its economic growth decelerated from +5.6% in 2012 to -17.0% in 2016.

80.     Before Maduro's election in 2013, Venezuela's public finances had become severely strained.  The hyperinflation and the economic crisis forced the Maduro government to devalue the official exchange rate to reduce local currency liabilities in foreign currency terms.  Venezuela's multi-tier foreign exchange rate system has restrictions on foreign currency, and large differences between official and parallel exchange rates.  Despite the ongoing poor economic background, PDVSA's liabilities measured in U.S. dollars declined between 2014 and 2015.  This was a direct consequence of the government's decision to monetize its fiscal deficits by increasing

the rate of money creation and generating high levels of inflation. PDVSA adjusted the exchange rate used in its financial statements between 2014 and 2015, reflecting a devaluation of 69.7%. The increase in the exchange rate caused the value of local currency debt expressed in foreign currency to drop; however, the reduction of liability on paper did not mean that any creditors were paid.

>
> **D.    The Interim Government of Juan Guaidó and the National Assembly Continued Pervasive Control Over PDVSA and Its U.S. Subsidiaries**

81.    In 2018, presidential elections were held in Venezuela. Maduro claimed victory, but the National Assembly declared, on January 15, 2019, that the election was illegitimate and named Juan Guaidó as the Interim President of Venezuela.

82.    The United States recognized Guaidó as the Interim President of Venezuela on January 23, 2019.

83.    On February 13, 2019, the National Assembly approved the Guaidó administration's appointments to the PDVSA Ad Hoc Board, which in turn appointed the directors of PDVH. In 2020, PDVSA and PDVH advised the United States District Court for the Southern District of New York that PDVSA's "board members [are] appointed by the Venezuelan government."

84.    The Second Circuit noted in 2022 that control of PDVSA is divided: "The Maduro-appointed Board remained in control of all operations and assets in Venezuela. At the same time, … the Guaidó-appointed PDVSA Ad Hoc Board was recognized in the United States as the governing body." *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 463 (2d Cir. 2022). Nevertheless, the Maduro regime continues to claim an entitlement to PDVSA and Citgo, stating as recently as November 30, 2022, that "PDVSA owns CITGO and its dividends belong to our country."

### E.    Venezuela and PDVSA Control PDVH's Subsidiaries

85.    PDVH has a number of other wholly-owned direct subsidiaries in addition to Citgo Holding.  PDVH's wholly-owned direct subsidiaries CITGO Aruba Holding, LLC ("**Citgo Aruba**"), LDC Supply International, LLC ("**LDC**"), PDV Chalmette LLC ("**PDV Chalmette**" or "**PDVC**"), and PDV USA, Inc. ("**PDV USA**") are relevant to some of the ways in which Venezuela and PDVSA have exerted control over PDVH, including extracting value from PDVH and its subsidiaries for the benefit of Venezuela and PDVSA.

86.    Citgo Aruba is a Delaware-based holding company formed in February 2016 to hold the following entities: CITGO Aruba Refining N.V. ("**CAR**"), CITGO Aruba Terminal, N.V. ("**CAT**"), CITGO Aruba Marine Operations N.V. ("**CAMO**"), CITGO Aruba Supply N.V. ("**CAS**") (collectively, the "**Aruba Entities**").  Citgo Aruba and the Aruba Entities were created with the intention to refurbish a refinery in Aruba, operate and maintain the refinery pursuant to a lease agreement with the government of Aruba, and ultimately supply refined Venezuelan crude oil to the government of Aruba.  PDVH guaranteed the Aruba Entities' payment obligations on the refurbishment project, which was never completed.  All of the entities other than Citgo Aruba and CAR have since wound down their operations.

87.    LDC, a Delaware limited liability company, was created to procure for PDVSA and its subsidiaries products including diluents, crude oil, condensate, feedstock, industrial products, and refined products, which were bought from third parties and then sold to PDVSA. LDC also provided services to PDVSA that included, but were not limited to, identifying and negotiating with third-party suppliers and making partial or total payments on the transactions.

88.    PDV Chalmette is a Delaware limited liability company created to form a joint venture among itself, Exxon Mobil Oil Corporation ("**ExxonMobil**"), and Mobil Pipe Line Company, each of which held an equity interest in Chalmette Refining, LLC ("**Chalmette**

**Refining**"), which owned a refinery located in Chalmette, Louisiana. Chalmette Refining purchased crude oil and other products from affiliates of both ExxonMobil and PDVSA, including PDVSA Petróleo, S.A. ("**Petróleo**" or "**PPSA**"), which is wholly-owned by PDVSA, and PetroMonagas S.A.

89.     PDV USA is a Delaware corporation created to hold commercial and residential leases and subleases on properties in New York City, and well as provide shareholder support services for PDVSA, including but not limited to financing operations and paying for legal expenses on behalf of PDVSA.

90.     Throughout the last three decades, Venezuela has extracted value from PDVSA and its U.S. subsidiaries—to the detriment of PDVSA's creditors and/or in disregard of PDVH and its subsidiaries' distinct corporate forms—in at least four ways: (i) cash dividends (including, in addition to regular dividends, large one-time payments and extraordinary financing to fund them); (ii) "non-cash dividends"; (iii) crude oil offsets; and (iv) netting related parties' receivables and payables.

91.     At PDVSA's instructions, PDVH's subsidiaries, including Citgo, paid for a number of items on behalf of PDVSA, many of which were directed at supporting sovereign functions. These payments included, from time to time, financial support for Venezuela's U.S. Embassy and United Nations Mission, paying for planes that were used by government officials, and renting real estate in New York to be used by Venezuelan diplomats and other officials. These items were then accounted for as "non-cash dividends" on PDVH's books, as if an actual dividend had been distributed up through the corporate chain. But such payments were never actually distributed in cash to PDVSA or Venezuela; instead, PDVSA caused the expenditures to be made directly on its own and/or Venezuela's behalf, using funds that were outside of the reach of

PDVSA's creditors.

92.    PDVSA entered into a variety of agreements—itself, through its affiliates, and/or with or among its direct and indirect subsidiaries—by which PDVSA would receive services from its U.S.-based subsidiaries without ever paying for them directly.  For example, under PDVSA's Crude Supply Agreement with Citgo, Citgo purchased crude oil from PDVSA's subsidiary, Petróleo.  Rather than pay PDVSA or Petróleo in cash for the crude, Citgo would be directed to "procure" from third parties items and equipment on behalf of PDVSA pursuant to a Procurement Services Agreement with PDVSA, pay the third party for the services or equipment, and then offset the costs of the procurement or services from the amount owed on the purchased oil.  Neither the Crude Supply Agreement nor the Procurement Services Agreement contained specific price terms for PPSA's crude oil sales and Citgo's service fees, respectively.  This was PDVSA and Citgo's ordinary course of business, rather than PDVSA paying the third-party provider directly or having Citgo pay PDVSA or Petróleo for the crude it had purchased.  Crude offsets enabled PDVSA to obtain goods and services to its creditors' detriment.

93.    Venezuela and PDVSA used offsets and "netting" against inter-affiliate balances to reach the funds of their U.S.-based subsidiaries when it served their interests.  For example, relying on the outstanding balance PDV Chalmette owed to Petróleo, Venezuela and PDVSA funded their legal expenses and lobbying campaigns by instructing PDV Chalmette to pay those costs itself and reduce its accounts payable owed to Petróleo.

94.    The Chávez and Maduro regimes were brazen and unabashed in their domination of PDVH and its subsidiaries.  For example, Venezuela's alter ego PDVSA was quoted in a December 23, 2016, article stating that Citgo is under PDVSA's "full ownership and control."

### F.    *Dividend Payments*

#### i.    Historical Dividends

95.    When Chávez served as the President of Venezuela, he ordered Citgo to pay hundreds of millions of dollars in dividends to support the Venezuelan economy, as Dr. Juan Carlos Boué—an academic who conducted a study on PDVSA's internationalization program commissioned by PDV (UK) S.A. at the request of the Venezuelan Minister of Energy and Mines—noted in March 2004.  He wrote:

> The President gave orders that the affiliates (especially Citgo, by far the largest among them) should make a contribution to ameliorate the fiscal crisis in which the Venezuelan government found itself . . . .  As a result of this, Citgo declared 468 MMUSD in dividends for that year," some portion of which reached PDVSA, "a figure which exceeded by 401 MMUSD the total amount of dividends that it had declared throughout the eight years in which PDVSA had been its sole shareholder.

96.    In a May 25, 2005 speech to the Venezuelan National Assembly, Rafael Dario Ramírez Carreño, the then-Minister of Energy and Oil of Venezuela and President of PDVSA, explained that PDVSA was "putting an end to th[e] perverse structure" of the "iron 'Corporate Veil' that stood between international business and the control of the Venezuelan State."  He continued: "Our instructions to PDVSA to cooperate, without restriction, with [Venezuela's internal revenue service] the SENIAT, marks an attitude diametrically opposed to the attitude of the old PDVSA that allowed its activity to become a black box impenetrable to the control of the Venezuelan State.  We are dismantling this black box, one by one in its parts, to definitively make the management of the new PDVSA transparent."  Mr. Ramírez concluded: "The reality is that PDVSA now belongs to the People, [and] is perfectly aligned with the guidance of the Venezuelan State . . . .  PDVSA and its workers are now an integral part of the country."

97.     The following year, in February 2006, Chávez instructed Mr. Ramírez "to allocate towards the financing of [a] Science Mission 941 billion bolivars derived from the dividends of PDVSA's subsidiary in the United States, CITGO, calculated at $500 million." PDVSA's press release noted Chávez's "emphasi[s] that Citgo and all it has is 100% Venezuelan, when faced with some voices that have designated this company as American."

98.     Citgo's dividends continued to flow at an accelerating rate through PDVH to PDVSA and Venezuela. For example, in May 2013, Reuters reported that the "refining subsidiary of state-owned Petróleos de Venezuela (PDVSA) in the United States, Citgo, will pay $461 million in first-quarter dividends to the parent company this month," "a quarterly record." In comparison, in the prior year, 2012, "all of PDVSA's external affiliates, including Citgo, reported a dividend to the parent company of just $77 million."

99.     In July 2014, Citgo prepared to issue a $650 million note in part to finance $300 million in dividends for PDVSA. Press coverage from July 17, 2014 noted Citgo would therefore "be indebted to provide resources to its parent company [PDVSA]."

ii.      2015 Dividend Transaction

100.     In the years prior to 2015, Citgo had been paying dividends roughly equal to net earnings. After 2000, funds from these dividends went up the shareholding chain: Citgo paid dividends to Citgo Holding; Citgo Holding paid dividends to PDVH; PDVH paid dividends to PDVSA; and PDVSA transferred value to Venezuela in a variety of ways, including through the payment of cash and non-cash dividends, and social development contributions.

101.     But in February 2015, Citgo Holding paid a dividend of $2.2 billion—nearly three times its net earnings—to PDVH as net proceeds from $2.8 billion of debt incurred by Citgo Holding. And on the same day, PDVH paid a $2.2 billion dividend to PDVSA. Venezuela and PDVSA directed PDVH and its subsidiaries to engage in the dividend transaction. All of Citgo

Holding's assets were pledged as collateral for the debt incurred to fund the 2015 dividend.

102.    Prior to the 2015 dividend, a number of arbitration awards were rendered against Venezuela following the Chávez regime's wave of expropriations, and other arbitrations—including Tenaris's and Talta's arbitrations—had been pending for years.  In July 2014, Venezuelan "energy ministry officials" said that PDVSA was considering selling Citgo to "reduce the government's exposure to foreign litigation" because of "concerns in Caracas" that arbitration awards totaling approximately $10 billion "could be followed by US court litigation resulting in attachments and liens on Citgo assets in the US."  On information and belief, the 2015 dividend was motivated, in part, by a desire to reduce the equity value of Venezuela's assets in the United States as part of a strategy to reduce its exposure to enforcement of those awards.

103.    The 2015 transaction to fund the dividend took place in two parts.  First, on or about February 9, 2015, Citgo Holding issued $1.5 billion in high-yield bonds secured by 100% of Citgo's stock, five terminals, and substantially all other assets of Citgo Holding and the guarantors, which guarantors included the holding companies that owned Citgo's refineries. Second, on or about February 12, 2015, Citgo Holding entered into a $1.3 billion loan facility, secured by 100% of Citgo's stock and 100% of the limited liability company interests in Citgo Holding's direct subsidiaries, as well as minority pipeline interests and terminals owned by those subsidiaries, and further guaranteed by Citgo Holding's "direct subsidiaries other than CITGO."

104.    In a February 18, 2015, presentation, Citgo characterized the debt as having the "primary purpose" of paying dividends to PDVSA.  Citgo has also referred to the 2015 dividend transaction as the "largest dividend refinancing ever."

105.    The offering memorandum for the $1.5 billion bond issuance disclosed the risk that creditors of PDVSA or Venezuela would seek to attach assets of PDVH, and noted the liability

protections generally afforded under U.S. law, absent a veil piercing determination:

> In addition, in connection with the arbitrations and lawsuits against PDVSA and the Bolivarian Republic of Venezuela, the claimants may seek to freeze or attach our assets and/or assets of PDVSA, PDV Holding and/or CITGO. A freeze or attachment of assets of the issuer and/or CITGO could adversely affect our financial condition and results of operation, including precluding dividends from CITGO to the issuer, which could affect our ability to make payments under the notes offered hereby. In addition, an attachment of shares of PDV Holding, the issuer and/or CITGO, depending on the percentage of shares affected, could result in a change of control of the issuer and/or CITGO. Before a claimant in a proceeding against PDVSA or the Bolivarian Republic of Venezuela is able to attach assets of PDV Holding, CITGO or the issuer, it would first have to succeed in proceedings seeking to pierce the corporate veils of PDV Holding and, in the case of assets of the issuer or CITGO, the issuer and, in the case of CITGO's assets, CITGO. A claimant in a proceeding against the Bolivarian Republic of Venezuela would also have to succeed in piercing the corporate veil of PDVSA. Although no assurances can be made as to the ultimate outcome of any such proceeding, we note that under U.S. law, corporate entities are presumed to be separate and distinct entities until proven otherwise and that, in order to defeat the separate corporate form and pierce the corporate veil, a claimant generally would have to show either that the corporate form had been used to defraud creditors or that the companies involved had so ignored corporate formalities as to act as if they were not separate. Piercing the veil is difficult under US law and is a very fact specific analysis. Generally, without a strong showing that the corporate form has been abused or used for improper purposes, piercing the veil is not allowed. Any claimant seeking to attach assets of CITGO or the issuer would be an unsecured creditor and any claims it may have against such assets would be subject to the prior liens of CITGO's and the issuer's respective secured creditors, including in the case of the issuer, the holders of the notes offered hereby and the lenders under the Issuer Term Loan Facility. However, any such attachment of the assets of CITGO would be structurally senior to any claim against those assets by the issuer or the holders of the notes.

106.    In 2015 Citgo Holding generated net income of under $925 million, meaning its dividend ratio was nearly three times net earnings. By one measure, this dividend ratio is approximately 10 times higher than the ratios of U.S. refining peers such as Phillips 66, Valero, and Marathon; by another, it is over 3 times higher than the ratios of peers.

107.    Between 2014 and 2015, equity as a share of Citgo Holding's assets fell from 25.1% to only 4.4%, and equity as a share of PDVH's assets fell from 25.6% to only 4.7%, while equity as a share of assets rose for Phillips 66 (from 45.3% to 49.3%), Valero (46.6% to 48.2%), and Marathon (37.4% to 45.6%) during that same time period.

108.    After Citgo Holding generated $2.8 billion in debt, it transferred $2.2 billion in funds to PDVH as a dividend—which Horacio Medina, President of the PDVSA Ad Hoc Board, has referred to as a "fictitious" and "non-existent" dividend. Mr. Medina also described the

dividend as follows in a 2022 Facebook Live interview with Guaidó, who was the Interim President at the time:

> [A]t the upper level, we have CITGO Holding, which is where . . . they took on debt in the – when they realized they couldn't sell the company, they put $2.8 billion in debt on it, created CITGO Holding for that purpose, and, and they sent $2.2 billion to Venezuela as a dividend. In other words, they borrowed money, indebted the company, and sent it as a dividend. No one, by the way, has asked or asks where that money went, even though everyone knows.

109.    PDVH then declared a dividend and transferred the funds to PDVSA, moving a significant portion of Citgo's value outside the United States—and the reach of creditors based in the United States, including the entities that had already been awarded billions of dollars in arbitration awards.

110.    Venezuela disclosed in an SEC filing that it had "received U.S.$2.8 billion in dividends from CITGO in February 2015."

111.    The 2015 dividend represented at least 5% of total Venezuelan revenue for the year.

112.    In 2019, Carlos Jordá, the President of Citgo, and Luisa Palacios, President of Citgo's Board of Directors and a member of PDVH's Board of Directors, acknowledged in an interview that Citgo's 2019 dividends were being used to pay down the $2.8 billion debt incurred by Citgo Holding when it "repatriate[d] dividends" to Venezuela as part of the 2015 Dividend transaction.

113.    Venezuela disclosed in an SEC filing that it had "received U.S.$2.8 billion in dividends from CITGO in February 2015." After Citgo Holding transferred $2.091 billion to PDVSA on February 12, 2015, the reported reserves of the Venezuelan Central Bank increased by $2.063 billion between February 13, 2015, and February 18, 2015. During the first quarter of 2015, the Venezuelan Central Bank reported receiving $4.4 billion from PDVSA.

114.     PDVSA paid Venezuela $9.2 billion in social development contributions in 2015.

### G.     The 2016 Pledges of PDVH's Entire Stake in Citgo Holding

115.     In April 2007, PDVSA issued $3,000,000,000 in aggregate principal amount of notes due in April 2017 (the "**April 2017 Notes**"), and in October 2010 and January 2011, PDVSA issued $6,150,000,000 in aggregate principal amount of notes due in November 2017 (the "**November 2017 Notes**").  The principal on the November 2017 Notes was due in three equal installments of $2,050,000,000 on November 2, 2015; November 2, 2016; and November 2, 2017.

116.     The April 2017 Notes and the November 2017 Notes (collectively the "**2017 Notes**") were denominated in U.S. dollars and governed by New York law and New York forum-selection clauses, and the November 2017 Notes were deposited in New York, New York.

117.     By the middle of 2016, PDVSA was facing the prospect of many more arbitration awards, including the January 2016 award of $87 million to Tenaris and Talta for the expropriation of Matesi, as well as principal payments of $2 billion due in November 2016, $3 billion due in April 2017, and $2 billion due in November 2017.  Having made billions of dollars in dividend payments the previous year, PDVSA lacked the cash to manage its business in the ordinary course, and funded infrastructure projects through promissory notes.  In fact, PDVSA described the implementation of over $1 billion in "different transactions that allow [it] to partially convert the outstanding commercial debt maintained with certain commercial suppliers into financial debt" in 2016.

118.     PDVSA tried several times to exchange the 2017 Notes, including in February and July 2016, but earlier efforts were unsuccessful.

119.     In early September 2016, PDVSA and Credit Suisse modeled three options for a bond exchange: (i) exchanging the 2017 Notes for new 2020 bonds secured by 50.1% of PDVH's equity ownership in Citgo Holding at a 1:1 exchange ratio, (ii) exchanging the 2017 Notes for new

unsecured 2020 bonds with an upfront cash payment, or (iii) exchanging the 2017 Notes for new unsecured 2020 bonds with no upfront cash payment, at a much higher exchange ratio.

120.     On September 15, 2016, the PDVH board signed a unanimous written consent resolving to pledge 50.1% of its shares of Citgo Holding capital stock as collateral.  PDVH's board first learned about the pledge the same day, or thereabouts, it signed the unanimous written consent, and no PDVH witness has been able to articulate any benefit to PDVH from the transaction.

121.     On September 16, 2016, an Exchange Offer was announced for the 2017 Notes, which had a collective outstanding principal balance of $7.1 billion.  PDVSA offered to exchange the 2017 Notes for "U.S. dollar denominated 8.50% Senior Secured Notes due 2020" secured by PDVH's pledge of 50.1% of its shares of capital stock of Citgo Holding.

122.     On October 28, 2016, the Exchange Offer closed, and the 2017 Notes were exchanged for 2020 bonds secured by a pledge of 50.1% of PDVH's equity in Citgo Holding.  Through this exchange, PDVSA exchanged $2.8 billion in maturing, *unsecured* bonds for $3.4 billion of new bonds (an exchange ratio of 1:1.2) secured by the collateral of 50.1% of the shares of Citgo Holding owned by PDVH.  In other words, the PDVSA investors who participated in the exchange received bonds backed by PDVH's assets, not by assets owned directly by PDVSA, to replace their unsecured debt.  By pledging shares of Citgo Holding to secure PDVSA's 2020 bonds, PDVSA avoided making upfront cash payments that would have been required (or incurred less debt than it would have) without the pledge.

123.     The validity of the exchange and pledge is the subject of ongoing litigation that PDVH and PDVSA initiated in the United States District Court for the Southern District of New York in 2019.

124.     A physical stock certificate for the collateral—50.1% of PDVH's equity in Citgo Holding—is held in a vault in New York.

125.     On November 30, 2016, the remaining 49.9% of PDVH's equity in Citgo Holding was pledged as collateral for a loan to PDVSA made by the Russian state-owned oil company Rosneft ("***Rosneft***").  PDVSA's 2016 financial statements report five separate payments from Rosneft to PDVSA and the guarantees provided for each payment, and note that only a single $485 million payment was guaranteed by the 49.9% pledge. Furthermore, over a month after PDVH had handed over the stock certificate for its Citgo Holding shares, PDVH still did not have a fully executed Pledge and Security Agreement contract despite repeated attempts to obtain it.

126.     Over the span of a month, all of PDVH's assets were pledged for the benefit of PDVSA and Venezuela.

127.     Yet PDVH did not receive value from either transaction.  The Venezuelan Special Attorney General, José Ignacio Hernández, confirmed in 2019 that "PDV Holding, Inc. had no plausible financial reasons to establish the pledge in order to guarantee an obligation of its shareholder, unrelated to its line of business," and noted that, "despite the fact that PDV Holding, Inc. signed the guarantee contract [the Pledge], in truth, it was PDVSA who undertook the obligation to establish that guarantee, for the benefit of its own public credit operation—which in no way benefitted PDV Holding, Inc."

128.     Nor, upon information and belief, was the PDVH board involved in any of the analysis surrounding either of the 2016 pledges, including instructing any Citgo personnel to conduct any diligence.

> **H.     *Limitations Imposed on PDVH Dividends to PDVSA***

129.     In August 2017, the United States issued an executive order explicitly prohibiting "dividend payments or other distributions of profits to the Government of Venezuela from any

entity owned or controlled, directly or indirectly, by the Government of Venezuela," an order which would prevent another dividend transaction like the one undertaken in 2015.

130.    This executive order followed a July 2017 press release by OFAC announcing sanctions against certain Venezuelan officials and noting allegations that between 2004 and 2014, approximately $11 billion went missing from PDVSA.

131.    In 2019, industry press for the oil and gas industry noted that Citgo's dividends had contributed significantly to PDVSA and Venezuela, and Citgo's President and the President of Citgo's Board of Directors stated in an interview that Citgo's dividends were used to pay Venezuela's debts.

132.    The U.S.-recognized Venezuelan government—the National Assembly—issued a Statute Governing the Transition to Democracy (the "**Transition Statute**") on February 5, 2019, which—because Maduro continues to hold the presidency in Venezuela—continues to this date to prohibit PDVH from making dividend payments to PDVSA.  Article 36 states that any assets recovered by state-owned companies—which includes any stake in subsidiaries such as Citgo Holding and Citgo—cannot be disposed of while Maduro remains in office illegitimately.

## I.    *Venezuela's Extensive Control Over PDVSA and PDVH*

133.    As discussed above, for decades Venezuela has considered Citgo, PDVH, and PDVSA to be "an instrument of [the Venezuelan] people," after "dismantling" the "perverse structure" of the "iron 'Corporate Veil' that stood between international business and the control of the Venezuelan State" to create the "reality . . . that PDVSA now belongs to the People, [and] is perfectly aligned with the guidance of the Venezuelan State."  Venezuela "emphasized that Citgo and all it has is 100% Venezuelan, when faced with some voices that have designated this company as American."

134.    Venezuela exerts de jure control over PDVSA. PDVSA's articles of incorporation provide that PDVSA is a "state-owned company . . . under the form of a corporation, which will carry out and execute the policy issued in matters of hydrocarbons by the National Executive Branch." PDVSA Articles of Incorporation, Article 1. PDVSA's "company purpose [is] to plan, coordinate and supervise the actions of the companies it owns . . . in order to achieve an appropriate relationship between the hydrocarbon resources and the national economy, . . . and in general, to perform all those operations, contracts and commercial acts that are necessary or convenient for complying with the aforementioned object." *Id*., Title I, Article Two.

135.    Furthermore, a Venezuelan court recognized that, "although [PDVSA] is a company incorporated and organized in the form of a corporation, it is beyond doubt, and this is reaffirmed by the Constitution of the Bolivarian Republic of Venezuela, that it is framed within the general structure of the National Public Administration, . . . because of the unbreakable principle that the Venezuelan State reserves the exclusivity of oil activity. . . . [B]y reason of national economic, political and strategic sovereignty, the Venezuelan State will retain all [PDVSA's] actions." *See* Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 464 (Mar. 18, 2002). Similarly, in 2007, the same court reversed and remanded a case to the lower court with instructions to extend the "privileges" of the Venezuelan state to PDVSA. *See* Constitutional Chamber of the Supreme Tribunal of Justice, Decision No. 281 (Feb. 26, 2007).

136.    PDVSA has explicitly stated that it views its subsidiaries as playing a role in advancing the political objectives of the Venezuelan government. On the "Subsidiaries" page of its website, PDVSA explicitly refers to the objectives of the *Plan de la Patria* (the six-year plan for Venezuela, approved by the national legislature) of ensuring the quality of life and availability of human talent committed to Venezuela, and affirms that the workforce of "the businesses and oil

and non-oil subsidiaries plays a leading role in achieving the goals set by PDVSA."

137.    PDVSA has represented to the United States Securities and Exchange Commission that it is regulated and supervised by the National Executive of Venezuela.

138.    Furthermore, under the laws enacted by the Maduro regime, every contract—national or international—to which PDVSA or any of its subsidiaries (including PDVH, Citgo Holding, and Citgo) or joint companies is a party is subject to prior review, approval, and/or validation by the President of PDVSA. *See* Venezuelan Official Gazette 41.294, Resolution No. 164 (Dec. 6, 2017) (any lack of such prior review, approval, and/or validation affects the existence and/or validity of the contract).  Upon information and belief, the President of PDVSA is a Venezuelan government official.  It is not a typical corporate formality for a parent's president to approve all contracts of a subsidiary—rather, it is yet another way in which PDVSA exerted its domination and control over PDVH.

139.    In April 2018, Maduro issued Decree No. 44, which empowered the Venezuelan Minister of Petroleum to take a variety of actions to control PDVSA and its subsidiaries—including PDVH, Citgo Holding, and Citgo—such as creating, eliminating, or making changes to PDVSA and its affiliates; creating, eliminating, modifying, or centralizing the management and administration of PDVSA and its affiliates; and ordering the amendment of the by-laws of state-owned oil companies. *See* Venezuelan Official Gazette 440.859, Decree No. 44 (Apr. 12, 2018).

140.    The close political control over PDVH continued under the National Assembly regime.  Article 34 of the 2019 Transition Statute stipulated that the PDVH Directors would be subject to the "control and accountability mechanisms exercised by the National Assembly."  The enactments of the National Assembly have extraterritorial effect and specifically govern actions taken on behalf of PDVH and its subsidiaries.  Explicit statements by Guaidó and the National

Assembly confirm this conclusion by affirming the applicability of the Transition Statute, the Constitution, and other Venezuelan laws to Venezuela's offshore assets, including PDVH and its subsidiaries.  PDVH's directors in fact conducted themselves in accordance with the National Assembly's directives that prohibited contact with the Maduro regime, banned payment of dividends or sales of assets, and mandated a scorched-earth litigation strategy to frustrate and delay creditors in the name of "asset protection."

### J.    *Venezuela and PDVSA Exercise Control Over the Boards of Directors of PDVH and Citgo*

#### i.    Maduro's Direct Appointment of Citgo's Board and Arrest of Its Members

141.    Venezuelan presidents have directly appointed the president of Citgo—ignoring the boards of PDVSA, PDVH, and Citgo Holding—on multiple occasions.

142.    On April 26, 2017, Maduro signed a decree appointing José Ángel Pereira, then Citgo's Vice President of Finance, as Citgo's interim president and delegating to the Minister of Oil the responsibility of swearing in Mr. Pereira.  Mr. Pereira held the job for only a few months before he was arrested and imprisoned by the Maduro regime (five top executives of Citgo were arrested with Mr. Pereira on November 21, 2017; the men are referred to as the "**Citgo Six**").  Maduro's April 26, 2017, appointment decree did not mention PDVH or Citgo Holding.

143.    On November 22, 2017, the day after Mr. Pereira was arrested, Maduro signed a decree appointing Mr. Asdrúbal Chávez—a cousin of Hugo Chávez—as interim president of Citgo and delegating to the Minister of Oil the responsibility of swearing him in.  Maduro's November 22, 2017, decree did not mention PDVH or Citgo Holding.

144.    When Maduro announced his appointment of Chávez as Citgo's president during a November 22, 2017 broadcast on state television, Maduro disregarded corporate formalities and said:  "I have decided to appoint as president of CITGO, Venezuelan firm in the United States,

comrade Asdrubal Chávez . . . .  Asdrubal Chávez, from Barinas, is going directly [to serve] as president of CITGO now, to restructure CITGO, to recover CITGO, to strengthen CITGO in the United States, which is a firm that is ours, Venezuelan capital, Venezuelan firm." The Citgo board of directors did not announce Asdrubal Chávez's appointment until a week later, on November 29, 2017.

145.    Both of these decrees state that Maduro, as President of Venezuela, was using the authority conferred by Article 236(16) of the Venezuelan Constitution to "appoint and remove those public officials whose designation is attributed to him by this Constitution and the Law." Each decree also cites Article 20 of the Statute of Public Function, which classifies as high-level public officials "general directors, directors and other public officials of similar level at the service of the Presidency of the Republic, Executive Vice-presidency and Ministries."

ii.    The Citgo Six

146.    On November 21, 2017, the Venezuelan government arrested the Citgo Six— Citgo President and Chairman José Ángel Pereira and five top executives:  Gustavo Cárdenas (Vice President, Shareholder Relations and Government and Public Affairs), Jorge Toledo (Vice President, Supply and Marketing), José Luis Zambrano (Vice President, Shared Services), Alirio Zambrano (Vice President and General Manager, Corpus Christi Refinery), and Tomeu Vadell (Vice President, Refining).

147.    The Citgo Six were prosecuted for engaging in a Citgo business "transaction without the approval of the Venezuelan authorities."  The specific stated reason for the arrests and prosecutions was that the Citgo Six had signed a contract to refinance loans under "leonine [*i.e.*, excessive] and unfavorable conditions."

148.    Specifically, the Citgo Six were accused of having signed a loan agreement in June 2017 to refinance Citgo's debt for $4 billion with Frontier Group Management and Apollo Global

41

Management that offered Citgo as collateral and thereby "compromised the national patrimony and the future of this important subsidiary."

149.    Resolution 164 (from December 2017) and Decree 44 (from April 2018), discussed *supra* Paragraphs 138–139, requiring Venezuelan government review of contracts, were enacted shortly after the arrest of the Citgo Six, and during the first of several years the men remained imprisoned in Venezuela.

150.    Venezuelan Prosecutor General Tarek William Saab stated that the agreement "did not count [] with the approval of the Republic's National Executive" and "exposed the subsidiary to a potential criminal situation for non-compliance with the subscribed contracts," concluding that "one must have a truly anti-Venezuelan vision to put at risk our main subsidiary, which is Citgo."

151.    Prosecutors in the Maduro regime charged the Citgo officials with violating certain provisions of the Law Against Corruption (the "**Venezuela Anti-Corruption Act**") and the Law Against Organized Crime and the Financing of Terrorism.

152.    Upon information and belief, the Venezuela Anti-Corruption Act only applies to public officials.

153.    Article 3 of the Venezuela Anti-Corruption Act, under which the Citgo Six were prosecuted, "explicitly states" that "directors of companies ultimately owned by the Republic are considered public officials."

154.    The Venezuelan Special Attorney General concurred in the Venezuela Anti-Corruption Act's potential application to control the business activity of Citgo executives by treating them as public officials, opining in 2019 that the Act "governs officials of public sector agencies and entities that carry out their activities abroad" and thus "could potentially apply to the

directors of Citgo Holding, Inc."

155.    Furthermore, upon information and belief the Citgo Six were prosecuted under Article 33 of the Law Against Organized Crime and the Financing of Terrorism, which prescribes an additional punishment if the offender is a public official.

156.    On November 26, 2020, a Venezuelan court sentenced Mr. Pereira to 13 years and 7 months in prison for fraudulent embezzlement and association between a public official and a government contractor with criminal purposes, and the other five executives to 8 years and 10 months in prison for association between a public official and a government contractor with criminal purposes.

157.    In January 2021, the Trump administration stated that the Venezuelan prosecutor working on the Citgo Six matter and the judge overseeing the trial were involved in what the United States believed to be "false corruption charges" in that case.

iii.     <u>The 2015 National Assembly's Direct Appointment of Board Members of PDVSA's Subsidiaries</u>

158.    The practice of direct appointment of executives and directors of PDVSA's subsidiaries, which reflects a blatant and deliberate disregard of corporate formalities and appropriate corporate governance norms, continued under the National Assembly.

159.    For example, in a February 13, 2019 decree, the National Assembly instructed the board of PDVH to "carry out all the necessary actions with the purpose of designating the new board of the subsidiaries of PDV Holding, Inc., of CITGO Holding, Inc. and of the Firm CITGO Petroleum corporation, . . . ." The National Assembly further proceeded in the February 13 decree to list numerous specific individuals who would be appointed, all but one of whom would eventually assume positions on the boards.

160.    Interim President Guaidó announced the decision through a Twitter post where he stated: "From the @AsambleaVE [National Assembly] we designated the new board of CITGO, formed by Luisa Palacios, Ángel Olmeta, Édgar Rincón, Luis Urdaneta, Andrés Padilla and Rick Esser."  In a press release on the official website of the National Assembly, Guaidó additionally stated: "We [have] started the reconstruction of Venezuela with the appointment of Citgo's board of directors. People of Venezuela, this is a historic agreement that not only protects Venezuela's assets but also safeguards each developing asset of the country."

161.    On February 15, 2019, two days after the National Assembly issued its decree specifically appointing the boards of PDVH, Citgo Holding, and Citgo, and ignoring corporate formalities and the distinct identities of each subsidiary, each parent company ratified the mandates of the National Assembly by installing on the boards through written consent all but one of the individuals that the National Assembly had identified.

162.    Following the National Assembly's directives, Guaidó's April 10, 2019 Decree No. 3 made clear that the Interim Government would control the actions of the PDVSA Ad Hoc Board, including the appointment of the boards of the U.S.-based subsidiaries, and that the Ad Hoc Board would be "reorganize[d]" and "assign[ed] . . . new powers and duties."  Article 17 of Decree No. 3 appointed the following persons to the PDVSA Ad Hoc Board: Simón Antunes, Gustavo Velásquez, Carlos José Balza, Ricardo Alfredo Prada, Luis Pacheco, Claudio Martínez, León Miura, María Lizardo and Alejandro Grisanti.  This almost doubled the size of the five-person board originally appointed on February 13, 2019.

163.    In August 2019, Guaidó announced that, "together with members of the National Assembly's board and the Parliament's Energy and Petroleum Commission, we have appointed" Carlos Jordá as CEO of Citgo "to protect and safeguard this asset, ensuring it serves Venezuela."

44

Guaidó stressed that the appointment of Mr. Jordá, together with other appointments that he "will continue to make and announce," were aimed at "protec[ting] Venezuela, protect[ing] its assets so that [the Maduro regime] do[es] not continue to plunder the nation."

164.    On November 20, 2019, Luisa Palacios, acting for PDVH, Citgo Holding, and Citgo, sent a letter to a representative of the PDVSA Ad Hoc Board asking that Mr. Jordá be appointed to the boards of PDVH subsidiaries.  It was not until seven months later, on July 6, 2020, that the PDVSA Ad Hoc Board held a meeting at which it authorized Mr. Jorda's appointment to the boards of Citgo Holding and Citgo.  He was installed later that month.

165.    In July 2020, Citgo issued a shareholder report which stated that the boards of directors of Citgo Holding and Citgo were appointed by the PDVSA Ad Hoc Board.

166.    Upon information and belief, on October 26, 2020, the PDVSA Ad Hoc Board on an interim basis appointed Fernando Vera as president of PDVH and Mr. Jordá as chairman of the board of Citgo.  The PDVSA Ad Hoc Board subsequently mentioned these appointments in a memorandum dated October 5, 2021.  PDVH and Citgo did not approve the appointments.

167.    In December 2020, representatives of the PDVSA Ad Hoc Board chose Andrés Yrigoyen Luna to be director of, *inter alia*, Citgo Holding, and Guaidó subsequently approved his selection.  In particular, the Ad Hoc Board "authoriz[ed] the appointment" of Yrigoyen, and Guaidó confirmed that he had received the Board's "notification . . . [of Yrigoyen's] appointment". Although Yrigoyen later withdrew from consideration following threats from the Maduro regime, the language of the Ad Hoc Board's and Guaidó's communications demonstrate that they—and not the PDVH board—drove the appointment process.

168.     On December 17, 2020, a representative of the PDVSA Ad Hoc Board wrote to Guaidó and asked that Guaidó authorize the appointment of Mr. José Ramón Pocaterra to the board

of Citgo. Thereafter, at a December 29, 2020 PDVH board meeting, a PDVH director stated that the PDVSA Ad Hoc Board had authorized the appointment of a new director to the Citgo Petroleum board. Accordingly, the PDVH board ordered the PDVH secretary to instruct Citgo Holding to take steps to have Mr. Pocaterra appointed to the Citgo board.

169.    In March 2021, during criminal proceedings against Jose Luis de Jongh Atencio, a former Citgo employee, the Executive Branch of the U.S. government told the U.S. District Court for the Southern District of Texas, "PDVSA's U.S. subsidiaries, including Citgo, are controlled by the ad hoc Administrative Board of PDVSA, appointed by President Guaidó." *OIEG*, 663 F. Supp. 3d 406 at 419 (citing U.S. Gov. Trial Brief at 8, *United States v. Atencio*, No. 20-cr-00305, (D. Del. Mar. 23, 2023) (S.D. Tex. Mar. 16, 2021), ECF No. 80).

170.    On January 5, 2022, a representative of the PDVSA Ad Hoc Board instructed the president of the PDVH board that all "removals and restructuring proposals" of entities in the corporate chain were to be deferred pending a discussion with PDVSA.

iv.    Overlapping Directors

171.    For decades, there has been substantial overlap between the Boards of Directors of PDVSA and PDVH. PDVSA's board members are appointed by decree of the President of Venezuela, and PDVH directors have listed their address as PDVSA's headquarters in Venezuela. This overlap can serve, has served, and continues to serve as a mechanism for abusing the corporate form.

172.    Upon information and belief, over a period of decades, a majority of members of the board of PDVH also served on the board of PDVSA, often concurrently.

173.    Upon information and belief, in the 1990s, Luis Urdaneta was Executive Vice President of PDVSA and a Director of PDVH; Alonso Velasco was a Director of PDVH and a Director of PDVSA; and Theodore Helms was a Director of PDVH and the self-described New

York-based financial representative for PDVSA.

174.     Upon information and belief, in the years between 2000 and 2004, Aires Barreto served as a Director of PDVH and a Director of PDVSA; Carlos Jordá, presently the CEO of Citgo, served as a Director of PDVH and held various positions at PDVSA; and Oswaldo Contreras, the CEO of Citgo from 2000 to 2003, also served as a Director of PDVH and held various positions at PDVSA.

175.     In early 2003 Déster Rodríguez served concurrently as a Director of PDVSA, a Director of Citgo, and a member of the board of PDVH; upon information and belief his tenure on the board of PDVSA lasted until late 2008.

176.     Similarly, in early 2005 Eudomario Carruyo served concurrently as a Director of PDVSA, a Director of Citgo, and a member of the board of PDVH; his tenure on the board of PDVSA lasted until late 2008.  According to Delaware tax records, Carruyo served as a Director of PDVH during the tax years 2006 to 2010.

177.     In early 2005, Alejandro Granado served concurrently as Vice President of PDVSA; President of Citgo; and President of PDVH, PDV USA, PDV Chalmette, PDV America, and PDV Caribe.  Upon information and belief, his tenure on the board of PDVSA lasted until late 2008.

178.     According to Delaware tax records, Ivan Hernandez served as a Director of PDVH for the 2004 tax year.  Upon information and belief, he served concurrently as the Vice President of Refining at PDVSA.

179.     Upon information and belief, Nelson Martínez served concurrently as a Director of PDVH and President of PDVSA in 2005, and President and CEO and Chairman of the Board of Directors of Citgo, President of PDVSA, and Venezuela's oil minister in 2017; Luis Marín

served as a Director of PDVSA, the head of Citgo, and a Director of PDVH from 2003 to 2005; Feliz Rodriguez served as a Vice President of PDVSA and a Director of PDVH from 2006 to 2007; and Asdrubal Chávez served as a Director of PDVH from at least 2009 to 2014 and 2017 to 2018, and held a variety of positions at PDVSA from 2003 to 2014.

180.     Upon information and belief, during the period from 2011 to 2015 Víctor Aular served as a Director of PDVH, a Director of Citgo Holding, a Director of Citgo, a Director and Vice President of PDV USA, and from 2011 to 2014 an Internal Director of PDVSA.

181.     Orlando Enrique Chacín served as a Director of PDVH, Citgo Holding, and PDV USA from 2015 to 2017, and a Director of Citgo during various times from 2014 to 2017.  He was also a Vice-President of PDVH, Citgo Holding, and PDV USA from 2015 to 2017.  From 2011 to 2017 he served as an Internal Director of PDVSA, and from 2015 to 2017 he was PDVSA's Vice President of Exploration and Production.  In November 2015 and October 2016, Mr. Chacín was one of only three members of the board of PDVH.  Mr. Chacín is also a registered foreign agent of PDVSA in connection with his work with PDVH.

182.     Jesús Enrique Luongo served at various times, including in 2015 and 2016, as a Director and President of PDVH, Citgo Holding, Citgo, PDV USA, and PDV Chalmette.  From 2011 to 2016, he served as an Internal Director of PDVSA, and from 2015 to 2017 he was PDVSA's Vice President of Refining, Trade, and Supply.  In connection with the sale of the Chalmette refinery, Mr. Luongo signed the Sale and Purchase Agreement and Debt Assumption Agreement in June 2015 and October 2015, respectively, as President of PDV Chalmette, while simultaneously serving as a Director and Vice President of Refining, Trade and Supply for PDVSA.  On October 28, 2016, Mr. Luongo signed the pledge agreement for 50.1% of PDVH's equity in Citgo Holding, as part of the Exchange Offer, on behalf of PDVH.  On that date, Mr.

Luongo was simultaneously the President of PDVH (and one of only three board members) and the PDVSA Vice President of Refining, Trade and Supply.  On November 30, 2016, Mr. Luongo signed an export contract with Rosneft as a Director of Petróleo, and signed the Rosneft Pledge and Security Agreement three times (for PDVH as pledgor, as Director of PDVSA as guarantor, and as Director for Petróleo as seller).  Mr. Luongo is also a registered foreign agent of PDVSA in connection with his work with PDVH.

183.     Antón Rafael Castillo served as a Director of PDVH, Citgo Holding, Citgo, and PDV USA, and, from 2014 to 2017, an Internal Director of PDVSA.  In November 2015 and October 2016, Mr. Castillo was one of only three members of the board of PDVH, while serving simultaneously as a Director of PDVSA.

184.     From 2008 to 2015, Eulogio Del Pino Díaz served as President, Chief Executive Officer, and a Director of PDVH, President and Chairman of the Board of Directors of Citgo Holding, and President and a Director of PDV USA.  He was President of PDVSA from 2014 to 2017, and, upon information and belief, in 2016 he served concurrently as the President of PDVSA, the President of Citgo Holding, and the Minister of Petroleum of Venezuela.  While serving simultaneously as President of PDVSA and President of PDVH in 2015, Mr. Del Pino signed the Chalmette Refining LLC Owners' Agreement on behalf of PDVH in connection with the sale of the Chalmette Refinery.

185.     Also from 2011 to 2019, upon information and belief, Asdrubal Chávez held a variety of positions at PDVSA.  He was appointed the President of Citgo directly by Maduro in 2017.  Maduro did not first propose Chávez to the boards of PDVH or Citgo Holding or otherwise follow corporate formalities.  Chávez served as a Director of PDVH during at least 2008 to 2013 and 2017 to 2018.

186.    Upon information and belief, when the PDVSA Ad Hoc Board appointed a new board of directors of PDVH, the overlap continued.  For example, Exeario Boscan served as a Director on the PDVSA Ad Hoc Board in 2021, and a Director of PDVH from 2022 to 2024; and Carlos Jordá, the present CEO of Citgo who served as a Director of PDVH and held various positions at PDVSA in the early 2000s, served as a Director of PDVH from 2023 to 2024. Furthermore, Fernando Vera served concurrently as a Director of PDVH, President of LDC, and President of PDV Chalmette.

187.    PDVH reported in its September 2022 filing to the U.S. Department of Justice ("**DOJ**") pursuant to the Foreign Agents Registration Act of 1938 ("*FARA*") that, under the DOJ's interpretation of FARA, Carlos Jordá, acting on behalf of PDVH, had rendered services directly in furtherance of the interests of the PDVSA Ad Hoc Board.

188.    PDVSA leveraged its influence over PDVH and its subsidiaries' boards of directors by causing them to enter into commercial arrangements with, or for the ultimate benefit of, PDVSA.  For example, PDVSA instructed the PDVH board—which, in 2016, consisted of Mr. Luongo, Mr. Chacín, and Mr. Castillo, each of whom was also a vice president (Mr. Luongo and Mr. Chacín) or director (Mr. Castillo) of PDVSA—to form and capitalize a new PDVH subsidiary, Citgo Aruba, using debts between PDVH's subsidiaries in furtherance of PDVSA's ultimately unsuccessful investment in a refinery in Aruba that was capable of processing Venezuelan heavy-crude oil.  Notably, Mr. Luongo, Mr. Chacín, and Mr. Castillo, on behalf of PDVH, authorized the Aruba project—including a $150 million guarantee by PDVH—*after* they approved its execution on behalf of PDVSA.  Similarly, Fernando Vera, after being appointed by the National Assembly as a Director of PDVH, also served as President of LDC and President of PDV Chalmette and, in that capacity, authorized LDC's interest payment on the 2020 PDVSA bond and the use of PDV

Chalmette's funds to pay for legal expenses on behalf of the PDVSA Ad Hoc Board.  Furthermore, Jesús Luongo signed the November 30, 2016, Pledge and Security Agreement (pledging 49.9% of PDVH's shares in Citgo Holding) on behalf of PDVSA, PDVH, and Petróleo.

## IV.    PDVSA Is an Alter Ego of Venezuela

189.    No matter when the analysis is conducted, PDVSA is the alter ego of Venezuela. Venezuela's domination of PDVSA has persisted since at least 2002 when Chávez peremptorily fired approximately 20,000 PDVSA employees and began directing operations of the company to benefit the Venezuelan state.  This conduct continued under Nicolás Maduro and now the National Assembly.  The Third Circuit has made this determination multiple times—that is, PDVSA under the control of the Chávez and Maduro-appointed board is an alter ego of Venezuela, and PDVSA under the control of the PDVSA Ad Hoc Board is an alter ego of Venezuela—and the Delaware District Court relied on those determinations, and the stipulation between Venezuela, PDVSA, and Gramercy that the Third Circuit's decision controlled, when granting Gramercy's motions for writs of attachment against the PDVH Shares.  *Crystallex*, 932 F.3d at 152 ("[I]f the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can."); *OIEG II*, 73 F.4th at 176 ("For the second time in five years, we conclude that PDVSA is the alter ego of Venezuela."); *Tidewater Inv.*, 2023 WL 7182179.  The Supreme Court has repeatedly declined to review the Third Circuit's determination.

190.    Accordingly, PDVSA is, and continues to be, an alter ego of Venezuela under both Maduro and the U.S.-recognized National Assembly—regardless of whether the U.S.-recognized National Assembly in turn recognizes Juan Guaidó as Interim President—a conclusion that has a preclusive effect on the alter ego issues and/or claims in this matter under the doctrines of collateral estoppel and/or res judicata.

191.     Alternatively, if the Court does not find that the prior decision preclusively establishes that PDVSA was, is, and continues to be an alter ego of Venezuela, the facts alleged herein independently establish that PDVSA was, is, and continues to be an alter ego of Venezuela. This is because PDVSA satisfies the two-part disjunctive alter ego test, according to which the corporate veil may be pierced:  (1) where "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created;" or (2) where recognizing the instrumentality's separate judicial status "would work fraud or injustice."  *Bancec*, 462 U.S. at 629.

192.     Venezuela caused the incorporation of PDVSA.  Indeed, Venezuela's control over PDVSA stems from the Venezuelan Constitution itself, which endows the State with significant control over PDVSA and the oil industry.   Article 12 and Article 302 of the Venezuelan Constitution provide for state ownership over hydrocarbon deposits and petroleum activity respectively, and Article 303 specifically provides as to PDVSA: "the State shall retain all shares in Petroleos de Venezuela, S.A."

193.     Under Chávez, Maduro, and the U.S.-recognized National Assembly, Venezuela maintained and maintains extensive economic control over PDVSA, treating PDVSA's assets as its own.  For example, upon information and belief, the Chávez regime directed Citgo to sell its stake in a Texas refinery and send the proceeds to Venezuela, and members of the government remarked at the time that the sale was an example of PDVSA "acting like it should, as an instrument of the State of Venezuela."

194.     The regime continued to sell off Citgo's assets and caused PDVH to issue the extraordinary 2015 dividend, with proceeds flowing through PDVSA to Venezuela to fund government public spending.

195.     Between 2003 and 2016 PDVSA allocated approximately 11% of its gross revenue, $137 billion, to Venezuela for "Social Development Contributions."

196.     The Maduro government continued this pattern and caused PDVSA to sell oil products at below-market prices for political ends.  Similarly, as Horacio Medina, Chairman of the PDVSA Ad Hoc Board acknowledged in an interview, the U.S.-recognized National Assembly used funds from the PDVSA Ad Hoc Board to compensate lawyers representing Venezuela. Venezuela's economic control of PDVSA remains engrafted in Venezuela's Constitution, resulting in substantial control over PDVSA and the Venezuelan oil industry.

197.     As explained above, under Chávez, Maduro, and the U.S.-recognized National Assembly, PDVSA operated with grossly inadequate capital.  Furthermore, PDVSA's revenues plummeted from $122 billion in 2014 to $48 billion in 2016, a year in which it converted over $1 billion in commercial debt into financial debt by issuing promissory notes and relied on PDVH's pledges of 100% of its equity in Citgo Holding to secure bonds and payment from Rosneft.  And as the billions of dollars in claims against PDVSA in U.S. courts demonstrate, PDVSA under the National Assembly continues to leave its creditors unsatisfied.

198.     Under Chávez, Maduro, and the U.S.-recognized National Assembly, Venezuelan statutes and public governmental statements demonstrate that Venezuela views PDVSA as an arm of the state.  For example, among other things:  (i) in 2017 the Venezuelan government arrested the Citgo Six—top Citgo executives—and imprisoned them for allegedly attempting to refinance Citgo's debt without obtaining government approval; (ii) the government then issued Resolution 164 and Decree 44 as means to further control PDVSA and its subsidiaries' actions; (iii) the Maduro-appointed president of Citgo, Asdrúbal Chávez (Hugo Chávez's cousin) described Citgo as "ours, Venezuelan capital, Venezuelan company"; (iv) the National Assembly enacted the

Transition Statute which stipulated, among other things, that "[t]he National Assembly may adopt any decisions necessary to defend the rights of the Venezuelan State before the international community, to safeguard assets, property and interests of the State abroad"; and (v) the PDVSA Ad Hoc Board systematically publishes statements in favor of the Venezuelan political opposition on its official social media accounts, including as recently as April 11, 2025, four days before the filing of this Second Amended Complaint on April 15, 2025.

199.    Under Chávez, Maduro, and the U.S.-recognized National Assembly, PDVSA is wholly owned by the Venezuelan government and is managed by officers and directors who are closely linked to the Venezuelan government.

200.    Under Chávez and Maduro, Venezuela profited from PDVSA's operations.  As discussed above, PDVSA has distributed disproportionate amounts of money to fund Venezuela's governmental functions, some of which was borrowed by PDVSA using Citgo as collateral. Although under the U.S.-recognized National Assembly PDVSA no longer receives cash dividends from PDVH, cutting off one source of funds for Venezuela, the PDVSA Ad Hoc Board has directed payments from PDVH subsidiaries to pay for Venezuela's legal representation, travel expenses of National Assembly legislators and CAPA members, and other expenses the PDVSA Ad Hoc Board has incurred in connection with lobbying the U.S. Government to further the National Assembly's interests.

201.    Under Chávez, Maduro, and the U.S.-recognized National Assembly, Venezuela has used, and continues to use, PDVSA's property as its own and is the real beneficiary of PDVSA's conduct, as evidenced by, among other things, Venezuela's use of PDVSA property (including airplanes) for government activities; Venezuela's use of PDVSA petroleum to support Venezuelan foreign policy (including with respect to below-market price sales to Cuba and China);

and the National Assembly's use of PDVSA subsidiaries' blocked assets (specifically, debts incurred by PDVH's subsidiaries under Chávez and Maduro) to fund the PDVSA Ad Hoc Board's own operations and advocacy efforts undertaken on behalf of the Interim Government.

202.    PDVSA is concerned with Venezuela's problems and interests, as evidenced by PDVSA's website's declaration that one of its strategic objectives is to "[s]upport the geopolitical positioning of Venezuela internationally," and the PDVSA Ad Hoc Board's website's declaration that its functions include "[t]he promotion of policies that foster the sustainable development of [Venezuela's] oil sector."

203.    Venezuela is regularly involved in the business operations of PDVSA. Under Chávez, Maduro, and the U.S.-recognized National Assembly, Venezuelan government officials manage PDVSA, having a hand in its daily affairs. For example, Chávez regularly fired and appointed PDVSA board members and executives, and both the Chávez and Maduro governments appointed members of PDVSA's board (including government officials, such as the Minister of Petroleum) and the president of Citgo. Similarly, the U.S.-recognized National Assembly has exercised its powers under the Transition Statute to appoint the PDVSA Ad Hoc Board and to appoint directly, or instruct PDVH and its subsidiaries to appoint, members to PDVH's subsidiaries' boards.

204.    Furthermore, on June 28, 2023, CAPA wrote a letter to the U.S. Secretary of State, entitled "Resolución Administrativa CAPA-R-007-1-2023," which set forth a proposal for how "PDV Holding, Inc. . . . and its indirect subsidiary CITGO Petroleum Corporation . . . could resolve via settlement, the bulk of the creditor claims currently pending against [PDVSA and Venezuela]." Specifically, CAPA proposed "to leverage CITGO's improved financing capacities to settle claims by Crystallex, the PDVSA 2020 bondholders, and the PDVSA creditors who currently hold

conditional attachments (ConocoPhillips, Dresser Rand, and Red Tree)," deferring the resolution of other creditors' claims "until after the 2024 Venezuelan elections, after which would come a major debt restructuring process."  There is no reference in the letter to any input by the Citgo board of directors on CAPA's proposal that settlements would continue "as CITGO pays down the debt[s]" of certain PDVSA creditors.  The CAPA letter also noted that "PDVSA and PDVH began settlement discussions with Crystallex in December of [2022].  Since then, the parties have had more than a dozen settlement-related calls and meetings, and the PDVSA Ad Hoc Board has advanced two concrete settlement proposals to Crystallex."  In other words, after Citgo, PDVH, and PDVSA's attempts to use Citgo's assets to pay Venezuela's and PDVSA's debts were unsuccessful, the Venezuelan government made a formal request to "the U.S. Government to give PDVSA and PDVH the time and space necessary to pay the claims of Crystallex, the PDVSA 2020 bondholders," and certain other PDVSA creditors, and to use the OFAC sanctions process to prevent any other creditors from being satisfied "until after a Venezuelan election in 2024"—thus demonstrating Venezuela's control over PDVSA, PDVH, Citgo Holding, and Citgo.

205.    The June 2023 CAPA letter followed a May 16, 2023 letter from Dinorah Figuera, as President and on behalf of the National Assembly, to the U.S. Secretary of State asking for the reversal of the U.S. Government's decision to "grant attachment licenses to any creditor of the Republic chosen by the Delaware court," and specifically requesting the revocation of an OFAC license permitting the *Crystallex* sale to move forward.  According to the letter, the policy reflected in the decision and license "upended all progress that had been made towards the private settlements" the PDVSA Ad Hoc Board "and its U.S. subsidiaries" had been trying to reach with "a number of creditors of the Maduro and Chávez regimes," which was necessary given that "an orderly debt restructuring process" was not possible until after "a free and fair election takes place

in Venezuela."

206.    PDVSA is merely a façade for Venezuela's dominance, resulting in an abuse of the corporate form that perpetuates a wrong or injustice.

207.    This injustice has been perpetrated repeatedly throughout the Chávez, Maduro, and National Assembly-led regimes.

208.    As set out herein, Venezuela abuses the corporate form of PDVSA and its subsidiaries.  Venezuela, through PDVSA, does not treat PDVH as an independent commercial enterprise, but instead operates the corporate structure down to PDVH, Citgo Holding, and Citgo as an arm of the Venezuelan government and manipulates the operations of its subsidiaries to both shield itself from its creditors and preserve PDVH's assets for future use by the Venezuelan government.

209.    Despite U.S. sanctions limiting PDVH's ability to pay dividends to PDVSA in 2017, at PDVSA's request, PDVH routinely secured OFAC licenses authorizing transactions to use PDVH funds held by its subsidiaries to pay Venezuela and PDVSA's legal expenses; monthly stipends for the PDVSA Ad Hoc Board; and other expenses including more than $70 million of interest payments on bonds secured by the 2016 pledge of PDVH's assets.

210.    Adherence to separate identities between Venezuela and PDVSA would entitle Venezuela to disregard PDVSA's separate corporate existence when it suits Venezuela's political purposes to do so, while simultaneously invoking the limited-liability shield afforded by PDVSA's purportedly separate corporate existence as a means of avoiding its legitimate financial obligations – such as the billions of dollars in debt outstanding to creditors it has been avoiding for years. PDVSA and Venezuela have to date been permitted to reap the benefits of U.S. law in United States courts while manipulating the same law to avoid financial obligations.  This abuse of the

corporate form is an injustice.

**V.    PDVH Is an Alter Ego of PDVSA**

> **A.    _Under the_ Bancec _Standard, PDVH Is an Alter Ego of PDVSA_**

211.    In a separate proceeding against PDVSA and PDVH in the Southern District of New York, the court ruled that _Bancec_ also governs the determination of whether PDVH is an alter ego of PDVSA.  Venezuela and PDVSA's control of PDVH satisfies both of the disjunctive _Bancec_ prongs, namely that PDVH "is so extensively controlled by its owner that a relationship of principal and agent is created," <u>and</u> that recognizing PDVH's separate judicial status "would work fraud or injustice."

> i.    <u>Venezuela and PDVSA Exert Significant and Extensive Control over PDVH</u>

212.    The relationship between Venezuela, PDVSA and PDVH satisfies _Bancec_'s "control" prong because (i) Venezuela and PDVSA have exerted an extreme level of economic control over PDVH; (ii) Venezuelan government officials manage PDVH and its subsidiaries and otherwise have a substantial hand in their daily affairs; (iii) all of PDVH's profits have either been directed to Venezuela to serve the political ends of Venezuela or kept in PDVH as part of a scheme to shield them from PDVSA's and Venezuela's creditors; and (iv) Venezuela is the real beneficiary of PDVH's conduct.

> 1.    Venezuela and PDVSA have exerted extreme economic control over PDVH

213.    From the time of the expropriations giving rise to Plaintiff's Judgments through the present day, PDVSA and its alter ego Venezuela have exerted significant and extensive economic control over PDVH beyond the control attendant to equity ownership in the entity.  As discussed above, PDVSA and Venezuela have persistently and repeatedly contrived schemes to extract cash and services from PDVH and its U.S. subsidiaries to fund the Venezuelan

government's political objectives while evading their creditors.  PDVSA and Venezuela have controlled PDVH by appointing, removing, coercing, and otherwise controlling the leadership of PDVH and its subsidiaries; used PDVH's property as their own, including by siphoning off PDVH's funds by extraordinary dividends that flowed through PDVSA and were spent on Venezuelan social development programs, even while Venezuela was incurring unpaid obligations to creditors; required PDVH to assume enormous debts against its commercial interests and to pledge substantially all of its assets to raise funds for PDVSA and Venezuela with no benefit to PDVH; prohibited PDVH from providing PDVSA with normal dividends that it could use to pay creditors; used PDVH and its subsidiaries to selectively pay the expenses of PDVSA and its leadership and for sovereign functions; and used PDVH to lobby the United States government to keep select sanctions in place until its frustrated creditors submit to settlement on PDVSA's and Venezuela's terms, even while representing to the United States government that PDVH's assets could be made available to finance a settlement with certain creditors.

214.    The massive debt-financed distributions in 2015, which saddled PDVH subsidiaries Citgo and Citgo Holding with billions of dollars of debt to fund extraordinary dividends ultimately directed to Venezuela, is only the starkest example of Venezuela and PDVSA using PDVH assets as their own.  Instead of using the funds generated for commercial purposes or to pay creditors, PDVSA transferred the value from the dividends to Venezuela, to the financial detriment of both PDVH and PDVSA.  In describing the transaction in a filing with the SEC, Venezuela completely disregarded the existence of PDVH and PDVSA, and instead reported that it had "received approximately U.S. $2.8 billion in dividends from CITGO . . . ."

215.    Citgo Holding's payment of dividends greater than net earnings to its parent for several consecutive years was highly unusual for a subsidiary corporation, and vastly exceeded the

dividends paid by comparable large oil companies.

216.    In addition to the dividend payments, in late 2016, PDVSA and Venezuela continued to exert economic control over PDVH by causing PDVH to collateralize the multibillion-dollar refinancing of PDVSA's debt with a pledge of 50.1% of its equity in Citgo Holding, further diluting PDVH's value.  And, a month later, PDVH pledged the remaining 49.9% of its stake in Citgo Holding to secure a loan to PDVSA by Rosneft.  PDVH's board was not substantively involved in the discussions leading to either transaction.

217.    Prior to 2019, PDVSA also relied on PDVH subsidiaries Citgo and PDV USA to access funds that were no longer obtainable through cash dividends, utilizing mechanisms including non-cash dividends and so-called "crude offsets."  PDVSA used the funds extracted from PDV USA for "logistical support services" that ranged from paying for rent, utilities, and furniture expenses for multiple apartments in New York City for several Venezuelan citizens, including Hugo Chávez's daughter when she was a member of the Venezuelan delegation to the United Nations, to funding the Venezuelan soccer team, Venezuelan outreach to the United Nations, and a Venezuela Minister of Tourism photo exhibit contribution.

218.    This economic control of PDVH continues under the National Assembly.  The PDVSA Ad Hoc Board uses PDVH and its subsidiaries to channel funds for PDVSA's benefit in ways that have shielded them from PDVSA's creditors, such as by causing PDVH and its subsidiaries to pay directly—instead of by an attachable dividend—PDVSA's travel expenses, lobbying fees, consulting fees, an interest payment on the 2020 PDVSA bonds, and legal fees, as well as stipends to members of the PDVSA Ad Hoc Board.  In addition, PDVSA caused PDVH's subsidiaries, PDV Chalmette and LDC, to enter into a series of transactions that resulted in them incurring payment obligations to PDVSA subsidiary Petróleo.  Yet, instead of allowing Petróleo

to receive and use these funds to repay its creditors, PDVSA caused PDV Chalmette, LDC, and Citgo to pay directly for PDVSA's and Venezuela's various expenses described above.

219.    As part of a separate scheme to extract value from PDVH's subsidiary Citgo while avoiding moving funds from PDVH into PDVSA's bank account, where they might be attached, PDVSA instructed Citgo to direct payments to certain of PDVSA's own third-party service providers in lieu of paying PDVSA for amounts that Citgo owed for crude oil deliveries. PDVSA employed such strategies after the National Assembly mandated a halt to PDVH's dividend payments in 2019, artificially restricting the flow of distributions that would normally support PDVSA's operating expenses and debt service. Such selective workarounds were inconsistent with standard practices between parents and subsidiaries and enabled PDVSA to enjoy direct access to PDVH's assets, while at the same time relying on PDVH's supposedly separate corporate form to shield its assets from creditors.

220.    PDVSA and Venezuela have insisted that OFAC sanctions prevented ordinary dividends, but they never sought an OFAC license authorizing such payments. In fact, PDVSA and Venezuela did the opposite, asking the U.S. government to keep the sanctions in place to prevent creditors from enforcing judgments against PDVH until a regime change in Venezuela. PDVSA further sought approval from OFAC to access funds to pay what the PDVSA Ad Hoc Board described to the U.S. State Department as "bona fide commercial and legal obligations" while keeping in place sanctions to "protectively block the assets of PDVSA and certain PDVSA subsidiaries," thereby shielding them from attachment to satisfy other legitimate financial obligations, including those owed to Plaintiff.

221.    PDVH, Citgo Holding, and Citgo (in a 2019 shareholder report) acknowledged Venezuela's and PDVSA's pervasive control of PDVH's and its subsidiaries' finances, explaining

61

that the decline in their net income was the result of the Maduro regime's "irresponsible actions."

> 2. **Venezuelan government officials manage PDVH and its subsidiaries and otherwise have substantial hand in their daily affairs**

222.     As a holding company, PDVH has no employees and no independent operations. Its core functions consist of appointing board members and otherwise holding the ownership interests in its subsidiaries and determining the timing and amount of dividends.  PDVSA and Venezuela have exerted extensive control over all of these functions—directly appointing officers and directors of PDVH and its subsidiary entities and controlling PDVH's dividend decisions, which PDVSA and Venezuela have manipulated for Venezuela's political ends rather than for any legitimate commercial purpose of PDVH.

223.     Under the Chávez and Maduro regimes, PDVSA's alter ego, Venezuela, directly appointed the President of Citgo on multiple occasions.  Venezuela, through its alter ego PDVSA, also designated members of PDVSA's board to sit on the PDVH Board.  Several PDVSA board members held positions in the Venezuelan government, bolstering its control over PDVH and its subsidiaries.

224.     Between December 2017 and April 2018, the Maduro government enacted laws granting the Venezuelan Minister of Petroleum broad control over PDVSA and its subsidiaries (including PDVH).  With respect to PDVSA's subsidiaries (including PDVH), these laws, among other things, (1) authorized oversight of their administration and by-laws, (2) mandated government review of their contracts, (3) required strict adherence to PDVSA's directives "to ensure compliance with legal, financial, budgetary, and technical requirements," and (4) specifically required PDVH and its subsidiaries to obtain PDVSA's president's sign–off before validly entering into any contracts subject to PDVSA's control.

225.    The Maduro regime's arrest of the Citgo Six in 2017 for negotiating to refinance Citgo's debt without government approval demonstrates the extent of Venezuela's political interference with PDVH and its subsidiaries.  That incident lays bare Venezuela's complete authority over PDVH and its subsidiaries; confirms Venezuela's view that executives of PDVH and its subsidiaries are Venezuelan public officials, treated as such by Venezuelan prosecutors and courts and who required government approval before acting on behalf of the company; and clearly communicates that Venezuela is willing and able to wield the force of its judicial and police apparatus to usurp PDVH's control of its subsidiaries.

226.    The extensive control and political interference with PDVH have continued under the National Assembly and the PDVSA Ad Hoc Board that it appointed.  The National Assembly's Transition Statute imposed additional constraints on the PDVH board, requiring it to operate under "commercial efficiency criteria" or face "the control and accountability mechanisms exercised by the National Assembly, and other applicable control mechanisms."  This includes a prohibition on any director of PDVH or any of its subsidiaries having any association with the Maduro regime, as well as a prohibition on paying dividends to any entity above PDVH in the corporate chain, and the exclusive control by PDVSA of any potential settlement.  In 2019, the National Assembly selected the individuals to serve on the board of Citgo Holdings and Citgo, and announced their appointment days before PDVH took any formal action.  Guaidó also selected Mr. Jordá to serve as CEO of Citgo.

227.    As demonstrated above, Venezuela and PDVSA have wielded their political control over PDVH to cause the company to distribute extraordinary dividends that impaired the financial viability of PDVH and its subsidiaries and otherwise caused PDVH and its subsidiaries to engage in transactions with no associated commercial benefit to the entities undertaking them.

228.     Following heightened scrutiny over Venezuela's and PDVSA's treatment of their U.S. subsidiaries, but still under the direction of PDVSA, PDVH has routinely rubber stamped its shareholders' decisions, without meaningful consideration as evidenced by the multiple transactions entered into without any benefit to PDVH.

3.     All of PDVH's profits have been directed to Venezuela or otherwise serve the political ends of Venezuela

229.     Venezuela and PDVSA have consistently exerted their economic and political control over PDVH to ensure that all profits from PDVH and its subsidiaries' commercial activities flow to Venezuela or otherwise serve its political ends.

230.     Through the 2015 dividend transaction, the Maduro regime extracted more than two billion dollars of value that should have been available to satisfy commercial obligations of PDVH and PDVSA but was instead diverted to serve Venezuela's political objectives.

231.     The 2015 dividend was issued at a time when PDVSA was hundreds of millions of dollars in arrears to commercial creditors, yet the dividend was not used to satisfy those legitimate commercial debts.

232.     PDVH's resources were used to advance Venezuela's interests in other, more direct ways as well.  Under the Chávez regime, Venezuela caused Citgo to supply discounted heating fuel to American communities as part of a public relations charm offensive.  Under Maduro, PDVH also paid for Venezuela's U.S. Embassy and U.N. Mission, planes for government officials, and real estate rentals in New York for diplomats and other officials.  These purchases were accounted for as non-cash dividends, but were never distributed up to PDVSA, enabling PDVSA to avoid taking possession of cash in the United States needed to pay the expenses.

233.     The extraction of resources from PDVH has continued under the National Assembly.  For example, since 2019, PDVH and its U.S. subsidiaries have spent millions of dollars

on travel expenses, stipends, and legal expenses of PDVSA.  Moreover, at the direction of PDVSA's Ad Hoc Board, PDVH caused its subsidiary LDC to make a $71,559,991.25 coupon payment on PDVSA's 2020 Bonds.  This payment was made entirely for the benefit of PDVSA and without any commercial purpose or benefit to PDVH or LDC.

4.    Venezuela is the real beneficiary of PDVH's conduct.

234.    The facts described herein establish that the true beneficiaries of the activities of PDVH and its subsidiaries have at all relevant times been the various political factions in Venezuela that control PDVSA and treat PDVH as nothing more than a source of funds and leverage to advance their political objectives to the detriment of PDVSA's and Venezuela's creditors.

235.    As described above, the Maduro regime extracted billions of dollars of value from PDVH through the extraordinary 2015 dividend and pledge transactions, which afforded PDVH no commercial benefit.  There can be no question that Venezuela was the only true beneficiary of these transactions.  The Maduro regime likewise tapped the resources of PDVH and its subsidiaries to pay expenses of PDVSA and Venezuela that served no commercial purposes of PDVH or its subsidiaries.

236.    The National Assembly has likewise used PDVH and its subsidiaries as a tool to serve the National Assembly's political objectives of undermining and ultimately succeeding the Maduro regime.  For example, the National Assembly—which has publicly acknowledged that it lacks the resources to further these objectives on its own—tasked the PDVSA Ad Hoc Board with the responsibility of protecting Venezuela's ultimate ownership and control of Citgo, and authorized the PDVSA Ad Hoc Board to use PDVH and its subsidiaries' resources to fund its operations and, alongside the National Assembly-appointed managers of PDVSA's U.S. subsidiaries, advocate on its behalf with the U.S. government.  Between September 29, 2021, and

August 21, 2023, PDVH's public FARA filings describe 57 meetings, calls, emails, and/or texts in which it advanced Venezuela's interests with the U.S. government.

237.     The National Assembly has also required PDVH to pursue an "asset protection" strategy.  That strategy prohibits PDVH from selling assets or paying dividends to PDVSA (where they could be attached).  The purposes of the strategy are to frustrate creditors of PDVSA and Venezuela, prevent the Maduro regime from accessing any of the wealth generated by PDVH, and perpetuate PDVSA's ownership of PDVH so that it can help finance the National Assembly's priorities following the end of the Maduro regime.

238.     As a result of the National Assembly's prohibition on PDVH declaring dividends or using its cash to settle valid judgments against PDVSA or Venezuela, billions of dollars of Citgo profits accumulated in PDVH, purportedly beyond the reach of PDVSA, but actually within its ability to direct as needed, including to pay for PDVSA's own expenses and expenses of the National Assembly.  During the period from year-end 2016 to 2023, PDVH generated over $4.8 billion in retained earnings (primarily in the period from 2022-2023, since during the period from year-end 2016 to 2021 PDVH generated approximately $156 million in retained earnings), none of which was paid as a dividend to PDVSA.  At the same time, PDVSA and Venezuela have accrued over $20 billion of unpaid judgments, including to Plaintiff.

239.     The National Assembly has negotiated with the U.S. government to use PDVH's and its subsidiaries' assets and debt capacity to restructure debts of Venezuela and PDVSA, premised on the hope for a future regime change.  The proposal discussed would have settled other creditors' claims, but not Plaintiff's.  The premise of those negotiations—that Venezuela and PDVSA will be able to cause PDVH to resume distributions of funds as and when needed—establishes beyond doubt the practical and pervasive control that the Venezuelan government

exercises over PDVH for political purposes.

240.    In sum, the facts set forth herein establish beyond peradventure that Venezuela and PDVSA have exerted tremendous control over PDVH and its subsidiaries, stripping these entities of their autonomy and justifying piercing of the corporate veil between them.

ii.    <u>Piercing the Veil Is Necessary to Avoid Injustice</u>

241.    In addition to being warranted by the pervasive control Venezuela and PDVSA exert over PDVH and its subsidiaries, piercing the corporate veil between PDVH, PDVSA and Venezuela is independently justified as a means of avoiding fraud or injustice.

242.    As demonstrated above, Venezuela exerts pervasive control over PDVSA, PDVH, Citgo Holding, and Citgo, rendering PDVH a sham entity and facilitating fraud or injustice.

243.    While refusing to pay their debts, Venezuela and PDVSA repeatedly disregard PDVH's corporate independence to accommodate Venezuela's political aspirations, extract value for Venezuela's benefit, and avoid obligations to creditors, all while benefiting from the U.S. legal system.

244.    Under Chávez and Maduro, Venezuela, by and through PDVSA, used PDVH and its subsidiaries to funnel billions of dollars to the sovereign without paying creditors of PDVSA or Venezuela.

245.    The abuse of PDVH's corporate form has continued under the National Assembly. Rather than order the issuance of dividend payments that would normally be expected from the profits of PDVH's subsidiaries—and which PDVSA's creditors could garnish in the United States—the National Assembly has now ordered PDVH to *withhold* dividend payments to PDVSA, relying on PDVH's separate corporate identity to prevent creditors from enforcing judgments directly against PDVH.  Although funds currently available to PDVH and its subsidiaries could be used to satisfy PDVSA's creditors, PDVSA nevertheless seeks to sequester

that value in PDVH, supposedly beyond the reach of its creditors (including Plaintiff), until PDVSA deems the circumstances more politically and financially propitious.

246.    Despite purporting to treat PDVH as a separate entity, PDVSA continues to tap PDVH and its subsidiaries to pay PDVSA's and Venezuela's expenses, thus allowing PDVSA to access PDVH's funds while shielding them from PDVSA's creditors.  In particular, as discussed above, PDVSA directed PDV USA and PDV Chalmette, to directly pay expenses on PDVSA's behalf.

247.    Venezuela and PDVSA have abused the U.S. legal system to avoid paying their creditors.  PDVSA has benefitted from the U.S. legal system by, *inter alia*, (1) entering into debt instruments governed by New York law to fund Venezuelan priorities; (2) establishing PDVH and its subsidiaries as its U.S.-facing assets; (3) having PDVH issue pledges collateralizing PDVSA debt obligations that are governed by New York law with a New York choice of forum clause; (4) having Citgo Holding raise capital in the U.S. debt markets in order to generate funds to be distributed to Venezuela;  and (5) obtaining OFAC approval to fund its expenses while also lobbying OFAC to maintain sanctions to impede creditors' access to its assets.

248.    As the Third Circuit observed, "PDVSA . . . derives significant benefits from the U.S. judicial system," as the "2020 bonds are backed by the common stock and underlying assets of U.S.-based corporations, and hence disputes stemming from default will be subject to U.S. laws and presumably be resolved through the U.S. legal system."  *Crystallex*, 932 F.3d at 149.  PDVSA went so far as to sue the holders of certain bonds in the Southern District of New York in 2019, seeking a declaration that the pledge securing the now-defaulted notes is invalid under Venezuelan law and unenforceable in U.S. court.  *Petróleos de Venezuela S.A. et al. v. MUFG Union Bank and GLAS Americas LLC*, Case No. 1:19-cv-10023-KPF (S.D.N.Y.), Dkt. 1.  Similarly, PDVH has

turned to U.S. courts to challenge its obligations related to the October 2016 pledge collateralizing the PDVSA bonds issued in the Exchange Offer.

249.     In addition, PDVSA and PDVH have asserted in U.S. federal court that Venezuela's filings before U.S. regulatory agencies are "wrong" and cannot be relied on. Specifically, PDVSA and PDVH have asserted that although Venezuela reported in a Form 18-K filed with the U.S. Securities and Exchange Commission that it "received U.S.$2.8 billion in dividends from CITGO in February 2015," Venezuela did not in fact receive any dividends in 2015.

250.     In each of these ways, PDVSA and Venezuela have used PDVH in an effort to hinder, defeat and defraud Plaintiff and their other creditors. Under the circumstances, adherence to separate identities between PDVSA and PDVH would allow PDVSA, as an instrumentality of a foreign state, and Venezuela, as a foreign state, to enjoy the benefits of conducting business in the United States and invoking the protections of its courts while simultaneously abusing the corporate form to cheat creditors and shirk valid debts.

251.     Plaintiff and its predecessors have vigorously sought to hold Venezuela financially responsible for the unlawful expropriations of business interests that Venezuela perpetrated over two decades ago. Plaintiff and its predecessors Tenaris and Talta have pursued the collection of their debts for well over a decade. Each of Tenaris' and Talta's arbitration proceedings, which began in 2011, lasted over six years from commencement to the completion of annulment proceedings. Tenaris and Talta then litigated the enforcement of the awards in the D.D.C. for over two years. Since it acquired the rights and interests in the awards and judgments, Gramercy diligently sought to participate in the *Crystallex* sale process, but was unable to secure an in-the-money priority position due to the first in time, first in line priority process followed by

the District of Delaware. Plaintiff and its predecessors have been stymied at every turn by Venezuela's improper efforts to place the assets of its business enterprises beyond the reach of the country's creditors. The Court should not countenance a continuation of Venezuela's unjust scheme by honoring the corporate separateness of PDVSA's subsidiary entities, which Venezuela has consistently manipulated and exploited in order to avoid its financial obligations.

### B.    Under Delaware Law, PDVH Is an Alter Ego of PDVSA

252.    In the alternative, in the event that this Court determines that the *Bancec* test does not apply, Delaware law would apply. PDVH—a Delaware corporation—is, and has been at all relevant times, an alter ego of PDVSA under Delaware law.

253.    Delaware courts expressly permit creditors to impose liability on subsidiaries for the liabilities of the parent under certain circumstances.

254.    At all relevant times, PDVSA and PDVH operated as one entity.

255.    Under Chávez and Maduro, PDVSA controlled the funds of PDVH as though they were its own, and left PDVH and its subsidiaries undercapitalized by damaging PDVH's financial health and diminishing its ability to meet consolidated financial obligations, thus also creating an unjust result towards Plaintiffs.

256.    This appropriation and control over PDVH's property persisted under the Interim Government and continues under the National Assembly, thus furthering injustice toward Plaintiffs. The PDVSA Ad Hoc Board uses PDVH and its subsidiaries to channel funds for PDVSA's benefit in ways intended to shield those funds from PDVSA's creditors, such as by causing PDVH and its subsidiaries to pay directly, instead of by an attachable dividend, PDVSA's travel expenses, lobbying fees, consulting fees, interest payments on the 2020 PDVSA bonds, and legal fees, as well as stipends to members of the PDVSA Ad Hoc Board. In addition, PDVSA caused PDVH's subsidiaries, PDV Chalmette and LDC, to enter into a series of transactions that

resulted in them unnecessarily incurring payment obligations to PDVSA Petróleo—another PDVSA subsidiary—which PDVSA caused PDV Chalmette, LDC, and Citgo to repay by directly paying PDVSA's and Venezuela's legal fees, the monthly stipends of the members of the PDVSA Ad Hoc Board, and other expenses.

257.    As part of a separate scheme to extract value from PDVH's subsidiary Citgo, while avoiding moving funds from PDVH to PDVSA, where they might be attached by creditors, PDVSA instructed Citgo to direct payments to certain of PDVSA's own third-party service providers in lieu of paying PDVSA for amounts that Citgo owed for crude oil deliveries.  PDVSA continued such strategies after the National Assembly mandated a halt to PDVH's dividend payments in 2019, artificially restricting the flow of distributions that would normally support PDVSA's operating expenses and debt service.

258.    PDVH knew, should have known, and/or recklessly and/or deliberately disregarded that PDVSA was scheming to avoid commercial obligations to creditors by dominating and controlling the whole corporate enterprise, including PDVH, to send funds to Venezuela without satisfying commercial debts, and/or to block funds from flowing up to PDVSA and/or Venezuela to prevent satisfaction of any commercial debts.

259.    PDVSA and Venezuela failed to observe PDVH's corporate formalities.  This has been evidenced in the direct appointments of PDVH's subsidiaries' officers.  The abuse continued under the National Assembly, which has directly appointed full slates of PDVH's and its subsidiaries' boards and exercised veto powers over appointments in the corporate chain.  In addition, the PDVSA Ad Hoc Board has interfered with the appointment of officers of PDVH's subsidiaries, requiring that they reverse or nullify appointments.  The formalistic (and often post-dated) ratification by the PDVH board of decisions made by the PDVSA Ad Hoc Board elevates

form over substance.  It does not change the reality that it is Venezuela and PDVSA who ultimately decide on the composition of the corporate chain's boards.

260.     PDVSA extensively abused the corporate form to perpetrate a wrong or injustice. PDVH's separate corporate existence from PDVSA is a fiction:  PDVSA uses PDVH as a conduit for its profits to be siphoned to PDVSA without respect for its corporate separateness, or the rights of any creditors.  At the same time, the National Assembly and PDVSA invoke the supposedly separate corporate nature of PDVH in order to shield its assets from judgment creditors like Plaintiff and preserve the wealth generated by PDVH for their own political purposes.  The PDVSA Ad Hoc Board is explicit about the political objectives behind its asset protection strategy, stating in a press release that its efforts had "position[ed] CITGO favorably for a potential democratic transition in Venezuela, in which it could be safeguarded within the framework of a comprehensive restructuring of PDVSA's debt," noting that the "only obstacle to this scenario remains the Maduro regime[]."  Similarly, the Ad Hoc Board argued that certain U.S. sanctions should be kept in place because "loss of PDVSA's ownership of CITGO before the 2024 [Venezuelan] elections would embolden the Maduro regime."

261.     Piercing the veil from PDVSA to PDVH would not impair the legitimate expectations of any adversely affected shareholders who are not responsible for the conduct that gave rise to the claim.  PDVSA owns 100% of the shares of PDVH, so there are no shareholders who are not responsible for the improper conduct that supports veil-piercing.  Allowing the veil to be pierced from PDVSA to PDVH would not establish a precedent troubling to shareholders generally.

262.     Innocent third parties will not be harmed if the Court pierces PDVH's veil.  In a reverse veil-piercing case like this one, only the interests of the putative alter ego are relevant to

the analysis. *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 715 (Del. Ch. 2021) (considering "the extent to which the reverse pierce will harm innocent third party creditors *of the entity the plaintiff seeks to reach*" (emphasis added)). Here, the third parties with claims against PDVH of whom Plaintiff is aware are ably represented in other courts.

263.    PDVSA has exercised significant and extensive dominion and control over PDVH, as described above.

264.    As a creditor of PDVSA, Plaintiff was harmed by PDVSA's exercise of dominion and control over PDVH. PDVSA first stripped all of its subsidiaries of value without paying creditors in total disregard to duties it owed to all of the residual beneficiaries when it could not pay its debts in the ordinary course of business. Then, since 2019, the PDVSA Ad Hoc Board has blocked its subsidiaries from distributing any dividends. Equity will not countenance such an unjust result, where assets were first stripped and then blocked from distribution in the ordinary course, thereby frustrating creditors. It is an abuse of the corporate form and U.S. law that, absent veil-piercing, benefits the wrongdoers, who improperly benefit from limited liability while simultaneously avoiding legitimate debts.

265.    The public convenience would be served by allowing the veil to be pierced from PDVSA to PDVH because doing so would prevent abuse of the corporate form of Texas-headquartered entities by foreign owners in order to leave creditors unsatisfied. And the public convenience would also be served by allowing the veil to be pierced from PDVSA to PDVH because doing so would prevent Delaware companies from abusing their corporate form in order to leave creditors unsatisfied.

266.    The wrongful conduct engaged in by PDVSA is extensive and severe.

267.    Plaintiff comes before the Court with clean hands and has engaged in no wrongful

conduct sufficient to bar it from obtaining relief. Plaintiff properly acquired Tenaris's and Talta's rights in the Judgments through the APA and complied with all requirements of the U.S. Department of the Treasury of Foreign Asset Controls to obtain the license to complete the purchase. Plaintiff now seeks to pierce the veil between PDVSA and PDVH in order to exercise the remedies available to it as a judgment creditor, which Plaintiff and its predecessors have been pursuing for years, to no avail.

268.    No other remedies are practically available to Plaintiff at law or in equity to recover the debt owed to it by Venezuela and PDVSA. Multiple judges have recognized the extent of PDVSA's and Venezuela's recalcitrance as judgment debtors, and vast resources have been expended by courts and creditors in pursuit of the debts owed by PDVSA and Venezuela. Upon information and belief, no creditors have recovered anything from PDVSA or Venezuela in years.

## CLAIMS FOR RELIEF

### COUNT I
### Declaratory Relief
### (against PDVSA)

269.    Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

270.    Plaintiff is a creditor of Venezuela.

271.    Venezuela owns 100% of PDVSA.

272.    Pursuant to the doctrines of collateral estoppel and/or res judicata, PDVSA is an alter ego of Venezuela as it pertains to Plaintiff, and as an alter ego of Venezuela, PDVSA is liable for the sums Venezuela owes Plaintiff.

273.    In the alternative, pursuant to *Bancec*, PDVSA is an alter ego of Venezuela, and as an alter ego of Venezuela, PDVSA is liable for the sums Venezuela owes Plaintiff.

a)   Venezuela caused the incorporation of PDVSA.

b) At all relevant times, Venezuela and PDVSA operated as one entity.

c) At all relevant times, Venezuela exercised significant and extensive economic control over PDVSA. PDVSA has expressed publicly that it considers itself to function for the benefit of the Republic.

d) Venezuela has exercised extensive control over PDVSA for decades and has expressed publicly that it considers PDVSA to be an instrument of the Republic. Venezuela has used the corporate façade of PDVSA to siphon billions of dollars to Venezuela, which left PDVSA operating with grossly inadequate capital. These funds have been used for the benefit of the sovereign functions of the Venezuelan government while leaving PDVSA undercapitalized, which in turn allows PDVSA to avoid obligations to its commercial creditors. Under both the Maduro government and the U.S.-recognized National Assembly, PDVSA conducts itself as an extension of the Venezuelan government and acts in the interest of the Venezuelan government, as evidenced by the government's involvement in the daily affairs of managing PDVSA, appointing members to PDVSA's board of directors (some of whom served as Venezuelan government officials) who then acted in the interest of Venezuela, and using PDVSA property (including airplanes) for government activities. PDVSA's corporate existence, which has been dominated and controlled by the Venezuelan government, has become a façade created by the Venezuelan government to avoid its obligations to creditors.

e) At all relevant times, Venezuela used PDVSA's property as its own, and PDVSA's profits went to Venezuela.

75

f) At all relevant times, Venezuela ignored PDVSA's separate status and ordinary corporate formalities.

g) At all relevant times, Venezuela deprived PDVSA of independence from close political control.

h) Based on the domination of PDVSA by Venezuela, it is reasonable to infer that PDVSA had to obtain approval from Venezuela for ordinary business decisions, including its contracts, from Venezuelan political actors. And under the National Assembly, the PDVSA Ad Hoc Board implements instructions from the National Assembly regarding the appointment of directors to its subsidiary PDVH.

i) At all relevant times, Venezuela issued policies or directives that caused PDVSA to act directly on the Republic's behalf.

j) At all relevant times, Venezuelan officials managed and/or had substantial involvement in the ordinary affairs of PDVSA.

k) At all relevant times, Venezuela was the true beneficiary of PDVSA's activities.

l) Adherence to separate identities between Venezuela and PDVSA would perpetuate a fraud or injustice.

274. An actual case or controversy exists because Plaintiff seeks a declaration that PDVSA is an alter ego of Venezuela and is thus liable to Plaintiff for the Judgments, which are final and binding and have been registered in this District.

275. An actual case or controversy exists, in that PDVSA disputes that it is an alter ego of Venezuela and that it is liable for Plaintiff's judgments against Venezuela, whereas Plaintiff contends it is so liable.

276.     An inequitable and unjust result would follow if the corporate separateness of PDVSA were respected with respect to Plaintiff and the debt owed to Plaintiff; no adequate alternative remedy exists; and a declaration of the liability of PDVSA, as the alter ego of Venezuela, is necessary to allow Plaintiff to recover the money it is owed.

277.     Plaintiff seeks a declaration of its right to recover, from PDVSA as an alter ego of Venezuela, Venezuela's debt to Plaintiff and any judgment entered against Venezuela.

278.     Such a judicial declaration is necessary and appropriate at this time and under the circumstances and to resolve the dispute between Plaintiff and Venezuela.

279.     Accordingly, Plaintiff seeks a declaratory judgment pursuant to the Court's authority under 28 U.S.C. § 2201 finding PDVSA, as an alter ego of Venezuela, liable to Plaintiff for the unpaid amount of the debt owed to Plaintiff by Venezuela, along with interest, attorneys' fees, and costs.

**COUNT II**
**Declaratory Relief**
**(against PDVH)**

280.     Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

281.     PDVSA, Venezuela's alter ego, owns 100% of PDVH.

282.     Plaintiff is a creditor of PDVSA because PDVSA is an alter ego of Venezuela and Plaintiff is a creditor of Venezuela.

283.     Pursuant to the *Bancec*, PDVH is an alter ego of PDVSA, and as an alter ego of PDVSA, PDVH is liable for the sums PDVSA owes Plaintiff.

    a)  At all relevant times, PDVSA exercised significant and extensive economic
        control over PDVH.

b) At all relevant times, PDVSA used PDVH's property as its own, and PDVH's profits went to PDVSA.

c) At all relevant times, PDVSA ignored PDVH's separate status and ordinary corporate formalities.

d) At all relevant times, PDVSA and PDVH have had common officers or directors.

e) At all relevant times, PDVSA deprived PDVH of independence from close political control.

f) Based on the domination of PDVH by PDVSA, it is reasonable to infer that PDVH had to obtain approval from PDVSA for ordinary business decisions from the President of PDVSA, a Venezuelan political actor under the Maduro Regime.   And under the National Assembly, PDVH has implemented instructions from the National Assembly and Interim President Guaidó regarding the appointment of officers to its subsidiaries, and abides by and implements instructions issued by the National Assembly prohibiting asset sales, dividend declarations and other activities.

g) At all relevant times, PDVSA issued policies or directives that caused PDVH to act directly on PDVSA and the Republic's behalf.

h) At all relevant times, PDVSA officials managed and/or had substantial involvement in the operations of PDVH.

i) At all relevant times, PDVSA was the true beneficiary of PDVH's activities.

j) Adherence to separate identities between PDVSA and PDVH would perpetuate a fraud or injustice.

284.     Alternatively, pursuant to Delaware law, PDVH is an alter ego of PDVSA, and as such, PDVH is liable for the sums PDVSA owes Plaintiff.

a)  At all relevant times, PDVSA and PDVH operated as one entity.

b)  PDVSA caused PDVH to transfer billions of dollars of Citgo dividends to PDVSA, which in turn siphoned funds to Venezuela without any corporate entity in the chain paying creditors.

c)  This conduct resulted in PDVSA controlling the funds of PDVH as though they were its own and damaged PDVH's financial health by diminishing its ability to meet consolidated financial obligations.

d)  PDVSA and PDVH failed to observe corporate formalities at various times throughout the relevant period, including when PDVH's directors overlapped with PDVSA's board of directors and allowed PDVSA to directly control Citgo, when PDVH's directors took direction from or ceded control to Venezuela to take actions not in the best interest of all residual beneficiaries of their fiduciary obligations, including creditors, without any genuinely independent assessment beforehand.

e)  PDVH's corporate existence is a façade for PDVSA's dominance and control.

f)  PDVH knew, should have known, and/or recklessly and/or deliberately disregarded that PDVSA was scheming to avoid commercial obligations to creditors by dominating and controlling the whole corporate enterprise, including PDVH, to send funds to Venezuela without satisfying any commercial debts, and/or to block funds from flowing up to PDVSA and/or Venezuela to prevent satisfaction of any commercial debts.  FARA filings show

that funds were siphoned to PDVSA, PDVSA's directors, and Venezuela at various times.

g) At all relevant times, PDVSA abused the corporate form to perpetrate a wrong or injustice.

h) PDVH is a sham entity used by PDVSA for the purpose of defrauding creditors by advancing PDVSA's (and in turn, Venezuela's) interests while avoiding its obligations.

i) Piercing the veil from PDVSA to PDVH would not impair the legitimate expectations of any adversely affected shareholders who are not responsible for the conduct that gave rise to the claim.

j) Allowing the veil to be pierced from PDVSA to PDVH would not establish a precedent troubling to shareholders generally.

k) At all relevant times, PDVSA exercised extensive dominion and control over PDVH, which in turn harmed Plaintiff as a creditor of Venezuela and its alter ego PDVSA.

l) The public convenience would be well served by allowing the veil to be pierced from PDVSA to PDVH.

m) At all relevant times, the wrongful conduct engaged in by PDVSA was extensive and severe.

n) Plaintiff comes before the Court with clean hands and has engaged in no wrongful conduct sufficient to bar Plaintiff from obtaining equitable relief.

o) Innocent third-party creditors of PDVH and/or PDVSA will not be harmed if the Court pierces the veil between PDVSA and PDVH.

p) No other remedies are practically available to Plaintiff at law or in equity to recover the debt owed to it by PDVSA.

285. An actual case or controversy exists because Plaintiff seeks a declaration that PDVH is an alter ego of PDVSA and is thus liable to Plaintiff for the Judgments, which are final and binding and have been registered in this District.

286. An actual case or controversy exists, in that PDVH disputes that it is an alter ego of PDVSA and that it is liable for PDVSA's debt, whereas Plaintiff contends it is so liable.

287. An inequitable and unjust result would follow if the corporate separateness of PDVH were respected with respect to Plaintiff and the debt owed to Plaintiff; no adequate alternative remedy exists; and a declaration of the liability of PDVH, as the alter ego of PDVSA, is necessary to allow Plaintiff to recover the money it is owed.

288. Plaintiff seeks a declaration of its right to recover from PDVH the debt it is owed by PDVSA and PDVSA's alter ego Venezuela on the ground that PDVH is an alter ego of PDVSA with respect to its debt to Plaintiff and any judgment entered against PDVSA.

289. Such a judicial declaration is necessary and appropriate at this time and under the circumstances and to resolve the dispute between Plaintiff and PDVH.

290. Accordingly, Plaintiff seeks a declaratory judgment pursuant to the Court's authority under 28 U.S.C. § 2201 finding PDVH, as an alter ego of PDVSA, which is an alter ego of Venezuela, liable to Plaintiff for the unpaid amount awarded to Plaintiff against Venezuela, along with interest, attorneys' fees, and costs.

**COUNT III**
**Enforcement of Judgments**
**(against PDVSA and PDVH)**

291. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

81

292.    Based on the alter ego declarations sought herein, PDVSA and PDVH are each jointly and severally liable for the full amounts of the Judgments against Venezuela, which are final, unappealable, and enforceable.

293.    Plaintiff is accordingly entitled to recover as damages from PDVSA and PDVH, jointly and severally, an amount equal to the full amount owed on each of the Judgments, which currently remain entirely unsatisfied.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment in favor of Plaintiff and against Defendants, as follows:

i.      entering a judgment that PDVSA is an alter ego of Venezuela;

ii.     entering a judgment that PDVH is an alter ego of PDVSA;

iii.    awarding Plaintiff damages against Defendant PDVH and Intervenor-Defendant PDVSA jointly and severally in the amount of the Judgments against Venezuela acquired by Plaintiff though the APA, together with all accumulated interest thereon;

iv.     expediting relief in light of other creditors seeking to enforce their rights; and

v.      granting such other and further relief as this Court shall deem just and proper.

Dated: April 15, 2025

Respectfully submitted,

/s/ *Justin Waggoner*

Justin Waggoner
State Bar No. 24003122
SDTX No. 23098
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, TX 77002
Tel: (713) 221-2346
Fax: (713) 221-2320
E-mail: jwaggoner@steptoe.com

Michael J. Baratz (*admitted pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
E-mail: mbaratz@steptoe.com

*Counsel for Plaintiff*
*Gramercy Distressed Opportunity Fund, LLC*

## CERTIFICATE OF SERVICE

I certify that, pursuant to Federal Rule of Civil Procedure 5(b) and Local Rule 5.3, a true copy of the **Second Amended Complaint** was filed on April 15, 2025 via the court's CM/ECF system, which will automatically serve a Notice of Electronic Filing to all registered users.

/s/ *Justin Waggoner*

Justin Waggoner